1  Timothy Lewis Whiting
   44489 Towncenter Way
2  Suite D #179
   Palm Desert, CA 92260
3  Tele: (760) 406-2495
   Email: tw92240@hotmail.com
4

5  In Pro Se

6

7  

8                           **UNITED STATES DISTRICT COURT**

9                           **CENTRAL DISTRICT OF CALIFORNIA**

10                          **EDCV 11-552**        **(CW)**

11 Timothy Lewis Whiting,              ) CASE NO.
   on behalf of himself and all others similarly )
12 situated,                          ) Three-Judge Court

13              Plaintiff,             ) **VERIFIED COMPLAINT FOR DAMAGES**
                                       ) **FOR:**
14     vs.                             )

15 STAN HENRY, former Chief of Police, in ) 1)  18 U.S.C. § 1962: RACKETEER
16 his individual capacity as a peace officer )     INFLUENCED AND CORRUPT
   with the Cathedral City Police Department; )     ORGANIZATIONS (RICO);
17 STANLEY SNIFF, individually as Sheriff )
   of Riverside County; DAVID G.      ) 2)  42 U.S.C. § 1983 – FIRST
18 DOMINGUEZ, former chief of police, in )     AMENDMENT FREEDOM OF
19 his individual capacity as a peace officer )     SPEECH – RETALIATION;
   with the Palm Springs Police Department; )
20 BRAD RAMOS, in his individual capacity ) 3)  18 U.S.C. § 113(a)(1) and (2) –
   as chief of police of the Indio Police )     ASSAULT WITH INTENT TO
21 Department; BUD ENGLAND, in his    )     COMMIT MURDER;
22 individual capacity as chairman of the )
   board with the Sunline Transit Agency and ) 4)  Cal. Pen. Code § 182 –
23 mayor pro tem for the City of Cathedral )     CONSPIRACY TO COMMIT
24 City; JOE McMILLIN, in his individual )     MURDER;
   capacity as attorney that represents )
25 Sunline Transit Agency and the City of ) 5)  42 U.S.C. § 1983 – EXCESSIVE
   Cathedral City;                    )     FORCE;
26                                     )
   CITY OF CATHEDRAL CITY,            ) 6)  42 U.S.C. § 1983 – UNLAWFUL
27 CALIFORNIA, a municipality; KEVIN  )     ARREST;
28 CONNOR, LAURA HANLON, ANITA        )
   SINGLETERRY, CORWIN DEVEAS,        ) 7)  42 U.S.C. § 1983 –
   JOSE NUNEZ, JEFFREY BIRD, A.       )     UNREASONABLE SEIZURE;
   LEMUS, T. BROTHERS, JESSICA        )
                                      ) 8)  42 U.S.C. § 1983 –
                                      )     UNREASONABLE SEARCH;

| | |
|---|---|
| CARBAJAL, LARRY GAINES,  John Does No. 1-5 ,and JANE Doe No. 1, all in their individual capacities as peace officers with the Cathedral City Police Department, inclusive; | 9)   42 U.S.C. § 1983 – SUPERVISORY LIABILITY; |
| KAMALA D. HARRIS, in her individual capacity as attorney general for the State of California; | 10)   42 U.S.C. § 1983 – NEGLIGENT HIRING, RETENTION, AND TRAINING; |
| COUNTY OF RIVERSIDE, a municipality; DAN WILHAM, CHRISTOPHER GELINAS,  CHANEY, COVINGTON, ROBERTSON, ELDERS, CLEARY, RAYMOND GREGORY, HORKEL, ADAMS, and DOES 6-20, all in their individual capacities as peace officers with the Riverside County Sheriff's Department; | 11)   42 U.S.C. § 1983 – DUE PROCESS OF LAW; EQUAL PROTECTION; |
| | 12)   42 U.S.C. § 1985 (3) & 1986– CONSPIRACY; |
| | 13)   18 U.S.C. § 241 – CONSPIRACY TO INTERFERE WITH CONSTITUTIONAL RIGHTS; |
| COUNTY OF RIVERSIDE BOARD OF SUPERVISORS; BOB BUSTER, JOHN F. TAVAGLIONE, JEFF STONE, JOHN J. BENOIT, AND MARION ASHLEY all in their individual capacities as board members; | 14)   18 U.S.C. § 242 – DEPRIVATIOIN OF CONSTITUTIONAL RIGHTS UNDER THE COLOR OF LAW; |
| | 15)   18 U.S.C. § 245 – INTERFERENCE WITH FEDERALLY PROTECTED ACTIVITIES; |
| RIVERSIDE COUNTY DISTRICT ATTORNEY'S OFFICE; RICHARD PICKOWITZ AND MULLEN, in their individual capacities as senior investigator prosecutors; | 16)   18 U.S.C. § 1341and 1346 – MAIL FRAUD—SCHEME TO DEFRAUD; |
| | 17)   18 U.S.C. § 1951 – HOBBS ACT— EXTORTION OR ATTEMPTED EXTORTION BY FORCE |
| CITY OF PALM SPRINGS, CALIFORNIA, a municipality; MICHAEL. STUDER, VEGAS, DONALD CRAGER, and DOES 21-30, all in their individual capacities as a peace officers with the Palm Springs Police Department; | 18)   CAL. CIV. CODE § 815.2 and CAL. CIV. CODE § 52.1; |
| | 19)   CAL. CIV. CODE § 51.7; |
| | 20)   CAL. CIV. CODE § 52.3; |
| SUNLINE TRANSIT AGENCY, a public entity; MIKEL OGLESBY, DALIAH H., CRAIG T.,  SALVADOR SANDOVAL, CAROLYN, and JOE McMILLIN, all in their individual capacities as employees of Sunline Transit Agency; | 21)   FALSE ARREST; |
| | 22)   FALSE IMPRISONMENT; |
| | 23)   ASSAULT and BATTERY; |
| CITY OF INDIO, CALIFORNIA, a municipality;; Unknown defendants, DOES 31-40, in their individual capacities as a peace officers with the Indio Police | 24)   NEGLIGENT HIRING, RETENTION, AND TRAINING; |
| | 25)   COMMON LAW CONSPIRACY; |

1  Department;

2  William Bower Associates, Inc. (d/b/a
   Bower Security), a California corporation;

3  WILLIAM RICHARD BOWER, in his
   individual capacity as president of Bower

4  Security operated out of Palm Desert,
   Riverside County; and JOHN DOE #41;

5
   Bower Events (d/b/a Bower

6  Investigations), a California corporation;
   WILLIAM RICHARD BOWER, RON

7  AYALA, both in their official and individual

8  capacity for Bower Investigations of Palm
   Desert, California, Riverside County;

9
   International Counterintelligence Services,

10 Inc., a corporation headquartered in
   Scottsdale, Arizona; DAVID RABERN,

11 MICHAEL RABERN, RON AYALA, in their

12 individual capacity for International
   Counterintelligence Services in Palm

13 Desert, California, Riverside County;

14
   LAWRENCE P. BEST, judge/

15 commissioner, in his individual capacity as
   a superior court judge of the Larson

16 Justice Center Riverside County Superior

17 Courthouse in Indio, California; ROBERT
   PICKOWITZ, PONCE, in their individual

18 capacities as deputy sheriff bailiffs with the
   Larson Justice Center Riverside County

19 Superior Courthouse in Indio, California;

20 WARREN NORRIED, in his individual
   capacity as a government informant;

21
   AGUA CALIENTE BAND of CAHUILLA

22 INDIANS, a federally-recognized Indian
   Tribe; AGUA CALIENTE TRIBAL

23 CORPORATION, a federally-chartered

24 Tribal governmental corporation; and
   AGUA CALIENTE CASINO RESORT SPA

25 in Rancho Mirage, California; CHRIS

26 MAY, in his individual capacity as a
   security officer of Agua Caliente Casino

27 Resort Spa in Rancho Mirage, California;
   and John Does Nos. 42 - 43, in their

28 individual capacities as security officers of
   Agua Caliente Casino Resort Spa in
   Rancho Mirage, California;

26) NEGLIGENT INFLICTION OF
    EMOTIONAL DISTRESS;

27) INTENTIONAL INFLICTION OF
    EMOTIONAL DISTRESS;

28) NEGLIGENCE

29) SUPERVISORY LIABILITY;

30) MUNICIPAL LIABILITY;

31) DEMAND FOR JURY TRIAL;

1   TENET HEALTHSYSTEM DESERT INC.
2   (d/b/a Desert Regional Medical Center), a
    California corporation; DEBBIE
3   INOCENCIO, RONALD B.  HIMELMAN,
    BILL BUCKLEY, and JOHN DOE#44,  in
4   their individual capacities as employees of
5   Desert Regional Medical Center;

6   DAVID JUSTICE LYNCH ASSOCIATES,
    a Professional Law Corporation; DAVID
7   JUSTIN LYNCH, CHRISTOPHER N.
    MANDARANO, and  GARY
8   GEMBERLING, in their individual capacity
9   as attorneys of David Justin Lynch &
    Associates, a Professional Law
10  Corporation;

11  EUREKA AEROSPACE, a "C" corporation
    headquartered in Pasadena, California;
12  JAMES TATOIAN, in his individual and
13  official capacity as  president and CEO of
    Eureka Aerospace;
14
    PARAGON SYSTEMS, INC. (d/b/a
15  Parasys, Inc.) located in Chantilly,
    Virginia; JAN JONES, in her individual
16  capacity as a private contractor security
17  officer of Parasys Incorporated employed
    by the Social Security Administration;
18
    ERIC HOLDER, in his official capacity as
19  Attorney General of the United States,
    injunctive relief only;
20
21  ROBERT MUELLER, in his individual
    capacity as Director of the Federal Bureau
22  of Investigation;  STEVEN M. MARTINEZ,
    in his individual capacity as Assistant
23  Director in Charge with the Los Angeles
    Field Office of the FBI; Special Agent
24  REGINA CANALE-MILES, in her
25  individual capacity as the INFRAGARD
    FBI Coordinator of the InfraGard Los
26  Angeles Members Alliance; and DOES;

27  INFRAGARD LOS ANGELES MEMBERS
28  ALLIANCE, a California corporation;
    WILLIAM MICHAEL, in his individual  and
    official capacity; and Unknown Informant
    DOES 101-1000 in their individual

1  capacities with the InfraGard Los Angeles  )
   Members Alliance;                          )

2  JAMES R. CLAPPER, in his official          )
3  capacity as Director of National           )
   Intelligence, injunctive relief only;      )
4  DENNIS BLAIR, in his individual capacity    )
   as former director of National Intelligence; )
5
6  TIMOTHY J. HEALY, in his official            )
   capacity as Director of the Terrorist        )
7  Screening Center; injunctive relief only;    )

8  JANET ANN NAPOLITANO, in her official        )
9  capacity as Secretary of the Department      )
   of Homeland Security; injunctive relief      )
10 only;                                        )

11 ERIC KEN SHINSEKI,  in his official          )
   capacity as Secretary of the Department      )
12 of Veteran Affairs; injunctive relief only;  )

13 SHAUN L. S. DONOVAN,  in his official        )
14 capacity as Secretary of Housing and         )
   Urban Development, injunctive relief only;   )
15 TOM NEILSON, in his individual capacity      )
   as Secretary of Housing and Urban           )
16 Development Section 8 Supervisor of          )
17 Riverside County;                            )

18 KATHLEEN SEBELIUS, in her official           )
   capacity as  Secretary of the United States  )
19 Department of Health and Human               )
   Services, injunctive relief only;            )
20

21 LEON PANETTA, in his official capacity as    )
   Director of the Central Intelligence Agency  )
22 ,injunctive relief only;                     )

23 KEITH B. ALEXANDER, in his official          )
24 capacity as Director of the National         )
   Security Agency, injunctive relief only;     )
25

26 and

27 ROBERT M. GATES, in his official
   capacity as Secretary of the Department
28 of Defense, injunctive relief only;

_____
                    Defendants,

Plaintiff, Timothy Lewis Whiting, hereby complains and alleges upon personal knowledge and belief as his own acts, and information and belief as to all other matters, as to which allegations plaintiff believes substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, alleges as follows.

## I.    INTRODUCTORY STATEMENT

1.    The defendants were directly involved in the wrongful acts constituting federal causes of actions from 2008 to 2011 and as part of a conspiracy were implicated throughout the 2008 to 2011 time period covered by this lawsuit. They violated and conspired to violate plaintiff's civil rights and knowingly inflicted great and irreparable harm upon plaintiff. They became part of a RICO "Enterprise" and RICO conspiracy which may include a foreign private military counterintelligence contractor corporation from British of Columbia operating within the U.S.A. Plaintiff's civil rights violations do not serve as the basis for his RICO action.

2.    This is an action seeking declaratory, injunctive, and/ or monetary relief against all of the defendants whom plaintiff accuses of having formed a secretive prejudicially-motivated consortium as part of an ongoing criminal enterprise organization.

3.    If only plaintiff had received advanced notification from the Civil Rights Division, in Washington D.C., which U.S. Attorney General Eric Holder has called the "conscience of the Justice Department," that just by filing a civil rights complaint would lead to  being classified as a high-value "terrorist" and  then maliciously used as a human "guinea pig" faced with  "legalized experimental physical and psychological human torture" by defendants Central Intelligence Agency (CIA), National Security Agency (NSA),  Department of Defense (DOD), Department of Homeland Security (DHS), Los Angeles FBI Joint Terrorism Task Force (LA-JTTF) and other federal agencies (collectively as "BIG BROTHER") who purposely exploited the "authoritative powers" of the USA PATRIOT Act, the INTELLIGENCE REFORM AND TERRORISM PREVENTION Act, and the PROJECT BIOSHIELD ACT, then surely,  plaintiff—who was homeless and who is an African-American military veteran with up to 12,000 hours of training and experience as an  electronics/ air traffic control radar technician with training in electromagnetic microwave radiation LASER theory and analysis which is mentioned here because of the complex technological issues in this case—would have remained quiet and said absolutely nothing about the constitutional abuses plaintiff has suffered and continue to suffer

from his law enforcement tormentors whose modernized 21st century methods of retaliative torture are truly unimaginable.

4.    BIG BROTHER's attempts to cover-up the <u>constitutional mess</u> and numerous civil rights violations made by defendant local police officers of Cathedral City, Palm Springs, Indio, Palm Desert, and Riverside County Sheriff Department deputies (jointly as "Coachella Valley law enforcement" or "little brother") resulted in an elaborate conspiratorial scheme to retaliate with an objective to chase plaintiff out of California. BIG BROTHER and little brother <u>equated</u> plaintiff's filing of legitimate, justifiable citizen civil rights police & sheriff misconduct complaints with acts of <u>domestic terrorism</u>.

5.    After numerous attempts to "get rid of" plaintiff,  federal and civilian agents mobilized maximum support for "little brother" by  hiring of local and/ or foreign private security/ military contractors and others to chase plaintiff out of the State of California using advanced 21st century electromagnetic microwave "cancer-causing" guns or Direct Energy Weapons (DEWs),  or similar DEWs weapons,  **see attachment "Exhibit A"**.

6.    BIG BROTHER' and little brother terrorist sting tactics in trying to identify plaintiff as a <u>dangerous "terrorist" operative</u> over a period of many months has had some degree of success in causing disruptions with immediate family members, alienating plaintiff from friends, causing a denial of Social Security benefits, and completely destroying his social life, with the exception of, plaintiff, without an automobile, refuses to stop walking to church despite being shot with the damaging painful electromagnetic ray guns.

7.    This well-organized prejudicially-biased secretive group became part of a RICO "Enterprise" and RICO conspiracy. The federal agents (BIG BROTHER) involvement came as a personal favor for a recently retired 33-year law enforcement Cathedral City Police Department (CCPD) veteran, defendant former CCPD Police Chief STAN HENRY (Henry) who is the longest-reigning police chief in Riverside County with plaintiff accusing defendant Henry and his subordinate administrators and police officers of repeated retaliatory civil rights violations.

8.    Plaintiff also believes our government covertly employs U.S. and foreign private military counterintelligence contractors to perform "surveillance and intelligence"  work and authorizes these private civilian counterintelligence contractors to cause injury to U.S. citizens labeled as "high-valued" *suspected domestic terrorists*, possibly contracted by defendants CIA, NSA, ODNI, DOD, DOJ, FBI, or DHS who want to remain legally criminally exempt by way of "plausible deniability" and anonymous which explains why plaintiff was being stalked by male

1  non-African-American persons driving vehicles with Arizona license plates and foreign persons
2  driving vehicles with British of Columbia license plates.

3  **Racial Profiling and Discrimination of Plaintiff by Defendants**

4  9.    One of the motivating factors, of the over 20 Coachella Valley law enforcement
5  officers, who plaintiff accuses of constitutional violations which none of whom are of African-
6  American descent, and others was based on plaintiff's unfortunate social status as a homeless
7  African-American. In addition, as a U.S. Army Military Veteran, FBI counterintelligence officials
8  and other agencies, in support of their ongoing bogus criminal terrorism investigation,
9  discriminated against plaintiff by using risk assessment data, as a tool of exploit, collected from
10  defendant Department of Homeland Security Secretary Janet Napolitano's report, on April 9,
11  2009, that cites "disgruntled military veterans as being possible security threats…" and likely to
   become potential home-grown "lone-wolf" terrorists.

12  10.    Defendants Riverside County Sheriff's Department and the Cathedral City Police
13  Department and its employees engage in and condone in a continuing pattern and practice of
14  race-based stops, assaults, detentions and searches of homeless African-American military
15  veterans walking on the public streets of the State of California. Plaintiff in this case, represents
16  a class and subclass of African Americans who have been or will be subjected to the humiliation
17  of being targeted, interrogated, detained and searched by defendants Riverside County Sheriff's
18  Department and the Cathedral City Police Department due to the defendants' policy and
19  practice of what is commonly known as "racial profiling." The moment plaintiff was stopped by
20  the defendants he became a victim of what the United States Court of Appeals for the Ninth
21  Circuit called "an all too familiar set of circumstances – an intrusive law enforcement stop and
22  seizure of innocent persons on the basis of suspicions rooted principally in the race of the
   'suspects.'" ***Washington v. Lambert*, 98 F.3d1181, 1182(1996)**.

23  11.    To any person of color, regardless of ethnic background, level of education, or
24  economic status in life, the insidious problem of racial profiling by law enforcement officers is all
25  too familiar. It is a continuing reminder that, despite popular notions of progress in race
26  relations, racial discrimination remains a day-to-day reality in our society. By the Complaint in
27  this case, plaintiff seeks judicial redress for violations of his civil rights due to racial profiling. But
28  plaintiff may also seek to confirm what everyone has a right to expect in the United States: that
   people of color may use the public streets just like anybody else, without having to suffer the
   indignities of racial discrimination at the hands of government officials.

**Plaintiff's Specific Charges**

12.     Plaintiff's filing of legitimate citizen police & sheriff misconduct complaints, which is a First Amendment Freedom of Speech right, created a "personal crisis" for local police and sheriff department officials. Due to the overall number of peace officers involved, the local police and sheriff officials, as a "regular way of doing business" , contemplated resolution to their problem to "get rid of" plaintiff by contacting close friends working for federal BIG BROTHER agencies to  help with the job. This type of prejudicial, unlawful federal and local law enforcement collaborative organization allowed the building of bogus criminal terrorism investigations against plaintiff which "opened the door" for millions of dollars of Federal terrorism funding. The federal monies was used as a "revolving door" of income to secure employment for friendly local/foreign private military security/ counterintelligence contractors, businesses, and individuals who were directed by corrupted BIG BROTHER agents to write fictitious suspicious activity terrorist intelligence reports after casually encountering plaintiff out in public areas.

13.     These illegal unconstitutional criminal acts committed by the defendants are being used to deter plaintiff from testifying freely, fully, and truthfully in a court of law by attempting (to) chase plaintiff out of Riverside County and the State of California,  (to) slowly murder plaintiff under the veneer of an accidental death using torturous cancer-causing microwave guns, (to) cause massive delays until the period of statute of limitations expires,  (to) protect the corporate assets of local public entities and private businesses who plaintiff had ongoing legitimate civil litigation, and (to) protect the law enforcement careers and their department reputations that lauds allegiance to the "good ol boy" network of local police officers and sheriff deputies who consider themselves "above the law" in absolute defiance of constitutional law.

Specifically the plaintiff charges:

+     that the actions and many non-actions of various defendants, and policies of supervisory and municipal defendants, deprived plaintiff of his First Amendment rights of Freedom Speech & Religion, Fourth and Fifth Amendment rights protection against Unreasonable Search and Seizure, and Fourteenth Amendment rights Due Process, Discrimination, and Equal Protection of the Laws under both the United States and the California Constitutions; Title VI of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. §§ 1981, 1982, 1983 and 1986; and other constitutional violations.

+ that certain of defendants' actions also has severely injured plaintiff under state tort law, and;

+ that some or all of these wrongs flowed from a conspiracy or conspiracies among the defendants and others in the picture, who shared a wrongful 'meeting of the minds' in the illicit official desire to injure, disfigure and/or murder the plaintiff to prevent plaintiff from filing a federal civil rights lawsuit in a court of law; thereby, it is the defendant's desire to suppress and chill plaintiff's First Amendment rights to petition the government for redress of grievances.

## II.   JURISDICTION

14.    Jurisdiction is conferred upon this Court by *28 U.S.C. § 1331* (federal question), *28 U.S.C. § 1343(a)* (civil rights), *28 U.S.C. § 1367(a)* (supplemental jurisdiction), and *28 U.S.C. §§ 2201 and 2202* (the Declaratory Judgment Act); *42 U.S.C. § 1981, 42 U.S.C. § 1983* (civil action for deprivation of rights), *42 U.S.C. § 1985* (conspiracy to interfere with civil rights), *42 U.S.C. § 1986* (action for neglect to prevent), and *42 U.S.C. § 1988* (proceedings in vindication of civil rights); *18 U.S.C. § 241* (conspiracy against rights), and *18 U.S.C. § 242* (deprivation of rights under color of law); *5 U.S.C. §§ 551, 559* (Administrative Procedure Act); Plaintiff is alleging his rights under **Title IX of the Organized Crime Control Act of 1970**, as amended, *Civil R.I.C.O.* violation of *18 U.S.C. §§ 1961-1965* (Right to sue and treble damages); *18 U.S.C. § 4* (federal crime reporting statute requires any person who knows of a federal crime to promptly "report it to a federal judge" or other officer); Title VI of the *Civil Rights Act of 1964* and its implementing regulations. **Article 1, §§ 7(a) and 13** of the California Constitution; California Government **Code §§ 11135 and 11139**; and the California Common Law; conspiracy; intentional infliction of great emotional stress; Additionally, the federal defendants are sued under the parallel federal constitutional jurisdiction established by the U.S. Supreme Court in **Bivens vs. Six Unknown Named Agents,** 403 U.S. 388 (1971).

## III.   VENUE

15.    Venue is proper in the United States District Court for the Central District of California pursuant to *28 U.S.C. § 1391* and under *18 U.S.C. §1965(a)* in that plaintiff's claims herein arise out of incidents within the Central District of California judicial district.

## IV.   Statute Of Limitations & Exhaustion of Remedies

16.     The violations of federally protected rights, for the purpose of this lawsuit, continued without interruption from 2008 to the present date, consisting of continuing violations. Certain federal causes of actions constituting major violations of federally protected rights, a part of a convoluted pattern of unlawful conduct, occurred when plaintiff became homeless and began being seized, harassed, assaulted, and falsely arrested by local law enforcement officials. Plaintiff has been unable to satisfy the time requirements of some civil rights violations as a direct result of the continued retaliation for filing civil rights police & sheriff misconduct complaints. The latest incident occurred on March 21, 2011. Plaintiff exhausted remedies in filing claims with all municipalities and having sent complaint letters to local district attorneys, and California attorney general. Plaintiff also sought relief from the Civil Rights Special Litigation Section in Washington, D.C. with a returned respond date of April 29, 2009.

## V.     PARTIES

### Plaintiff:

17.     Plaintiff TIMOTHY LEWIS WHITING is an adult male citizen of the United States, who is more than 40 years of age and at all relevant times of this action, was a resident of the Central District of California, in Riverside County. Plaintiff is an African-American U.S. Military Veteran, who swore an oath to defend and protect our country, and who has lived in Riverside County as a temporary/permanent resident for about 10 years.

18.     Prior to July 2008, for the past 13 years, plaintiff was in excellent physical health without any serious illnesses. Plaintiff is a non-smoker and non-drug user. Plaintiff exercised daily.   Plaintiff had annual x-rays, CT scans, and MRI check-ups with no signs of related illness.

19.     In 2007, due to company closure and severe finance problems, plaintiff became homeless.  Before becoming homeless, plaintiff took classes and maintained a 3.5 GPA at College of the Desert in Palm Desert, CA. For the past five years or more, plaintiff has been a frequent visitor to Palm Desert and Rancho Mirage Public Libraries, and the Barnes & Nobles Bookstore located in the Westfield Shopping Mall in Palm Desert, CA.

20.     Admittedly, plaintiff who is not to be considered a "perfect citizen" did recklessly commit a serious offense, about 20 years ago.  A jury of plaintiff's peers administered judgment and plaintiff paid his debt to society.  Ever since, plaintiff has abided by the law with the exception that he was convicted of a *vehicle infraction* for driving his car with a bad muffler in June 2004. Plaintiff attends church at Kyriakos Christian Center in Indio, California.

21.      In 1982 , at Redstone Arsenal, a very high-tech research U.S. Army military base, one of few military bases at that time to have a LASER weapons firing range, plaintiff obtained a Secret U.S. government clearance. Some facts in this case involve issues related to highly advanced 21st century local law enforcement and private military contractor weaponry technology (Direct Energy Weapons DEWs) or specifically "electromagnetic microwave guns" which necessitates inquiry into plaintiff's technical military education, training, and experience to unequivocally quash the Defendants theory that plaintiff is "crazy" and sees "little green men" when describing radiation exposure associated with factual accounts of electromagnetic microwave ray gun attacks on plaintiff's person by individuals hidden behind deep dark tinted windowed vehicles.

22.      Plaintiff's military and civilian educational background includes a combined total of over 12,000 hours of technical training and work experience in the field of electronics technology specializing in test equipment repair and air traffic control/ RADAR maintenance. Plaintiff's training included, but not limited to, electromagnetic microwave radiation LASER theory and analysis. During plaintiff's training and work experiences, between 1982 thru 1990, he was inadvertently and very briefly, at times, exposed to electromagnetic radiation dosages in varying degrees; so, plaintiff is a living testament and very familiar with the immediate onset of medical symptoms and post effects of electromagnetic radiation exposure.

23.      As a civilian, plaintiff worked as a Honeywell Corporation electronics technician having performed preventive and corrective maintenance on electronic pinger transmitters, operated LORAN Radar equipment, and repaired underwater acoustic electromagnetic frequency wave transducers. Also, plaintiff worked along side government civilian electronic and computer engineers giving recommendations for equipment modifications. Thus, plaintiff has worked in the field of Electronics Technology expanding over 15 years. Plaintiff has been seriously harmed and injured by the defendants' destructive activities and misconduct in the use of these highly advanced electromagnetic microwave guns or similar portable weaponry.

**Defendant: City of Cathedral City and Employees**

24.      Defendant CITY OF CATHEDRAL CITY ["Cathedral City"] is a Municipal Corporation, organized under the laws of the State of California. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and

employees, and injury occasioned thereby. It is also the public employer of the peace officers named as defendants of the Cathedral City Police Department (CCPD).

25.     Defendants STAN HENRY (Henry), KEVIN CONNOR (Connor), LAURA HANLON (Hanlon),  ANITA SINGLETERRY (Singleterry), CORWIN DEVEAS (DeVeas), JOSE NUNEZ (Nunez),  JEFFREY BIRD (Bird), A. LEMUS (Lemus), T. BROTHERS (Brothers), JESSICA CARBAJAL (Carbajal), LARRY GAINES (Gaines), JANE Doe No. 1, and John Does No. 1-5, who are natural persons, were at all times relevant to this complaint acting under the color of law, in their individual capacities as sworn peace officers of the Cathedral City Police Department.

26.     JOHN DOE No. 5 operates a specialized deeply dark tinted windowed heavily equipped communications vehicle (a Ford Crown Victoria) funded by the FBI, similar to this photo, **see attachment "Exhibit B"**. Plaintiff accuses deputized agents and others of firing electromagnetic microwave rays guns while hidden in the back seats of this type and other unmarked vehicles including SUVs.

**Defendant: California Attorney General**

27.     Defendant KAMALA D. HARRIS is the Attorney General of the State of California. Defendant HARRIS who knew or should have known that the acts complained of, occurred, is sued in her individual capacity.

**Defendants: County of Riverside and Employees**

28.     Defendant, COUNTY OF RIVERSIDE, is a legal and political entity established under the laws of the State of California, with all the powers specified and necessarily implied by the Constitution and laws of the State of California and exercised by a duly elected Board of Supervisors, an appointed county manager and Sheriff, and their agents and officers. It is a local government entity and is not an arm of the State of California for Eleventh Amendment purposes.  Defendant, Riverside County Sheriff's Department (hereinafter referred to as "RCSD"), is a public agency subject to suit.

29.     Defendants STANLEY SNIFF (Sniff), DAN WILHAM (Wilham), RAYMOND GREGORY (Gregory), Deputy HORKEL (Horkel), Deputy ELDERS (Elders), CHRISTOPHER GELINAS (Gelinas), Deputy CLEARY (Cleary), Deputy CHANEY (Chaney), Deputy COVINGTON (Covington), Deputy ROBERTSON (Robertson), RAYMOND GREGORY

(Gregory), and Deputy ADAMS (Adams) who are all natural persons, were at all times relevant to this complaint acting under the color of law, in their individual capacities as sworn peace officers of the Riverside County Sheriff's Department and were residents of Riverside County, California, and DOES 11-20, in their individual capacities as peace officers with the Riverside County Sheriff's Department. The county employees joined an ongoing retaliatory conspiracy to block plaintiff's filing of his legitimate, justifiable civil rights lawsuit implicating numerous Riverside County peace officers for constitutional violations and abuses. JOHN DOE#20 operates a specialized deeply dark tinted windowed heavily equipped communications vehicle funded by the FBI. Plaintiff accuses deputized agents and others of firing electromagnetic microwave guns while hidden in the vehicle back seats.

30.    Defendants BOB BUSTER, JOHN F. TAVAGLIONE, JEFF STONE, JOHN J. BENOIT, AND MARION ASHLEY, who are natural persons, have the responsibility of accepting or rejecting damage claims against the County of Riverside. All members became part of an ongoing conspiracy by rejecting plaintiff's claim for damages against sheriff deputies whose training permits the drawing of deadly weapons, without provocation, to threaten citizens who file legitimate civil rights complaints. All members are being sued in their individual capacities.

31.    Defendants Richard Pickowitz and Mullen, who are natural persons, as senior prosecutor investigators, acting under the color of law, are professional members of the criminal justice system. The district attorneys became part of the conspiracy by turning a "blind eye" to the constitutional violations committed against plaintiff by local police officers and sheriff deputies and telling plaintiff to "move to another county if someone is trying to kill you". Both defendants are sued in their individual capacities.

32.    Defendant, Tom Neilson, is being sued in his individual capacity as Section 8 Supervisor of Riverside County. As a clear case of fraudulent practices and purposeful delay, defendant Neilson responsibility lies with the fact that plaintiff has been on the Section 8 waiting list for over four years with a priority military veteran preference code. This delay was designed as part of a conspiracy scheme to keep plaintiff homeless and in the streets for ease of access for Riverside County federal and local law enforcement intelligence agents seeking to harm plaintiff with DEWs to chase him out of California in order to block plaintiff's federal lawsuit.

**Defendants: City of Palm Springs and Employees**

33.     Defendant CITY OF PALM SPRINGS ["Palm Springs"] is a Municipal Corporation, organized under the laws of the State of California.

34.     Defendants DAVID G. DOMINGUEZ (Dominguez), M. STUDER (Studer), Police Officer VEGAS (Vegas), and DONALD CRAGER (Crager), who are natural persons, were at all times relevant to this complaint acting under the color of law in their individual capacities as sworn peace officers of the Palm Springs Police Department (PSPD), and DOES 21-30, in their individual capacities as a peace officers with the Palm Springs Police Department. JOHN DOE#30 operates a deeply dark tinted windowed specialized communications equipped vehicle funded by the FBI. Plaintiff accuses deputized agents and others of firing DEWs while hidden in the vehicle back seats of Ford Crown Victoria vehicles and SUVs. The defendants took part in the conspiracy by intimidation and treating plaintiff unequally.

**Defendants:  City of Indio and Employees**

35.     Defendant CITY OF INDIO ["INDIO"] is a Municipal Corporation, organized under the laws of the State of California. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and injury occasioned thereby. It is also the public employer of the peace officers named as defendants of the Indio Police Department (IPD).

36.     Defendant BRAD RAMOS, who is a natural person, was at all times relevant to this complaint acting under the color of law, in his individual capacity as a sworn peace officer of the Indio Police Department, and DOES 31-40, in their individual capacities as a peace officers with the Indio Police Department. JOHN DOE#40 operates a deeply dark tinted windowed specialized communications equipped IPD police vehicle funded by the FBI. Plaintiff accuses deputized agents and others of stalking, intimidation, and firing DEWs at plaintiff.

**Defendants: Sunline Transit Agency**

37.     Defendant SUNLINE TRANSIT AGENCY is a public entity transit operator in Riverside County. Injunctive relief only.

38.     Defendants BUD ENGLAND, JOE McMILLIN, MIKEL OGLESBY, SALVADOR SANDOVAL, CRAIG T., DALIAH H., and CAROLYN who are natural persons and were at all times relevant to this complaint acting under the color of law, in their individual capacities as employees with Sunline Transit Agency. Plaintiff accuses the defendants as co-conspirators

with federal and local law enforcement officials by stalking, bribery of a public official, denial of rights to speak at a public hearing, and in attempting acts of confrontational provocation.

**Defendants: Bower Security and Bower Investigations**

39.    Defendant WILLIAM BOWER ASSOCIATES, INC., (d/b/a Bower Security), is a private patrol operator licensed by the California Bureau of Security & Investigative Services (BSIS) under license number PPO-16205, a California corporation, which is headquartered in the County of Riverside, State of California.

40.    Defendant EVENT SUPPORT SERVICES, Inc., (d/b/a Bower Investigations), is a private patrol operator  licensed by the California Bureau of Security & Investigative Services (BSIS) under license number PPO-16526, a California corporation, which is headquartered in the County of Riverside, State of California.

41.    Defendant WILLIAM RICHARD BOWER ("BOWER"), also known as RICHARD BOWER, is a natural person, and <u>a former Riverside County sheriff's deputy</u>; BOWER founded or helped to found defendants Bower Security and Bower Investigations. BOWER is or has been the Chief Executive Officer, and President. At all times material to this Complaint, acting alone or in concert with others, under the color of law in his individual capacity, BOWER has formulated, directed, controlled, or participated in the acts and practices of Bower Security and Bower Investigations, including the acts and practices set forth in this Complaint. BOWER transacts or has transacted business in the Central District of California and throughout the United States. Defendant BOWER's whereabouts unknown to Plaintiff.

42.    Defendant RON AYALA ("AYALA"), who is a natural person and has an extensive and varied background of more than thirty years in criminal and civil investigations; and <u>fourteen years as a Deputy Sheriff and a member of the</u> <u>Anti-Terrorist and Subversives-Special Investigations Unit</u> for the <u>Los Angeles County Sheriff's Department</u>, was at all times relevant to this complaint acting under the color of law in his individual capacity as former Chief Investigator for Bower Investigations operated out of Palm Desert, California, Riverside County. At all times material to this Complaint, acting alone or in concert with others, AYALA has formulated, directed, controlled, or participated in the acts and practices of Bower Investigations, including the acts and practices set forth in this Complaint. Bower Investigations transacts or has transacted business in the Central District of California and throughout the United States. Defendant AYALA's whereabouts are unknown to Plaintiff.

43.     Defendant JOHN DOE #41, who is a natural person, was at all times relevant to this complaint acting under the color of law in his individual capacity as private security officer as an employee with Bower Security stalked Plaintiff for over a half mile before Plaintiff decided to call 911 to report a case of criminal stalking against the security officer.

**Defendant: International Counterintelligence Services and Employees**

44.     Defendant INTERNATIONAL COUNTERINTELLIGENCE SERVICES, INC. (herein sometimes referred to as ICS) an international private security and investigations consulting company licensed by the Arizona Department of Public Safety under license number 1001124, an Arizona Corporation, which is headquartered in Scottsdale, Arizona. ICS has over 8,000 undercover agents throughout the world, a company helicopter, and a speedboat. Plaintiff believes ICS employees used direct energy weapons (DEWs) against plaintiff after being contracted by federal and local law enforcement officials and others through defendant RON AYALA to chase plaintiff out of California. The defendant also used its employees to cross state lines from Arizona into California to stalk and intimidate plaintiff.

45.     Defendant DAVID RABERN is a natural person and founded International Counterintelligence Services, Inc. and its former President. DAVID RABERN is a former CIA operations officer and freelance mercenary, a Certified Homeland Security Specialist level three, and his counter-espionage and counter-terrorism skills are well known throughout the counter-intelligence industry. At all times material to this Complaint, acting alone or in concert with other law enforcement, under the color of law in his individual capacity, DAVID RABERN has formulated, directed, controlled, or participated in the acts and practices of ICS, including the acts and practices set forth in this Complaint. DAVID RABERN transacts or has transacted business in the Central District of California and throughout the United States and the world. Defendant DAVID RABERN's whereabouts are unknown to Plaintiff.

46.     Defendant MICHAEL D. RABERN is a natural person, is the president of International Counterintelligence Services, Inc. At all times material to this Complaint, acting alone or in concert with other law enforcement, under the color of law in his individual capacity, MICHAEL D.  RABERN has formulated, directed, controlled, or participated in the acts and practices of ICS, including the acts and practices set forth in this Complaint. MICHAEL D. RABERN transacts or has transacted business in the Central District of California and

throughout the United States and the world. Defendant MICHAEL D. RABERN's whereabouts are unknown to Plaintiff.

47.    Defendant RON AYALA ("AYALA") is a natural person, who while working as an employee for Bower Investigations located in Palm Desert, California, in 2007, AYALA joined the International Counterintelligence Services, Inc., (ICS) network of Private Investigators performing investigations in the State of California for ICS. At all times material to this Complaint, acting alone or in concert with other law enforcement, under the color of law in his individual capacity, AYALA has formulated, directed, controlled, or participated in the acts and practices of ICS, including the acts and practices set forth in this Complaint. AYALA transacts or has transacted business in the Central District of California and throughout the United States and the world. Defendant AYALA's whereabouts are unknown to Plaintiff.

## Defendant: Commissioner/ Judge Lawrence P. Best and Sheriff Bailiffs

48.    Defendant LAWRENCE P. BEST is or was a judge/ commissioner working for the Larson Justice Center Riverside County Superior Courthouse in Indio, California, was at all times relevant to this complaint acting under the color of state law, in his individual capacity. Commissioner Best allowed his courtroom to be used as a "kangaroo court" and treated plaintiff with extreme hostility then ruled against plaintiff's motion for a Temporary Restraining Order (TRO) against a Riverside County sheriff deputy who assaulted plaintiff with a deadly weapon.

49.    Defendants ROBERT PICKOWITZ and Deputy PONCE, who are natural persons, were at all times relevant to this complaint acting under the color of law, in their individual capacities as sworn peace officers of the Riverside County Sheriff's Department and were residents of Riverside County, California. Both defendant deputy sheriff bailiffs were assigned duties at the Larson Justice Center Riverside County Superior Courthouse in Indio, California. Both defendants concocted a coordinated an assault on plaintiff's body using a government informant to attack plaintiff in the courthouse library while conducting legal research with an objective to obstruct justice.

50.    Defendant WARREN NORRIED (name may be fictitious), is a natural person, and at all times relevant to this complaint acting under the color of law, in his individual capacities as a government informant. Defendant Norried resides at 7777 Country Club Drive in Palm Desert, CA. Under government law enforcement authority, Norried assaulted plaintiff in the Indio Larson

Justice Center Courthouse for the effect of obstructing justice and intimidation as part of a conspiracy to suppress plaintiff's First Amendment Freedom of Speech rights.

## Defendants:  Private Security Paragon Systems

51.   Defendant PARAGON SYSTEMS, INC. (d/b/a Parasys, Inc.), is a private security contractor and employer of JAN JONES, a Virginia Corporation, located at 14160 Newbrook, Suite 150, Drive Chantilly, Virginia. The defendant is a government contractor and provides security services for the Social Security Administration. Defendant JAN JONES (Jones), who is a natural person, in her individual capacity, acting under the color of law, as a private security officer for Parasys Incorporated. JONES committed an act of assault with a deadly weapon after being "ALERTED" by law enforcement officials that plaintiff was a "trouble-maker" for filing civil rights complaints against police officers.

## Defendants: Agua Caliente Casino Indian Tribal Corporation

52.   AGUA CALIENTE BAND OF CAHUILLA INDIANS operates the Agua Caliente Casino Resort & Spa in Rancho Mirage, California, of Riverside County and is a federally-recognized Indian Tribe. AGUA CALIENTE TRIBAL CORPORATION is a federally-chartered Tribal governmental corporation.

53.   Defendants private security officers CHRIS MAY, JOHN DOE#42, and JOHN DOE#43, who are natural persons, were at all times relevant to this complaint acting under the color of state law, in their individual capacities and acted within the course and scope of his agency and employment as private security guards of the Agua Caliente Casino Resort Spa in Ranch Mirage, California, of Riverside County. The defendants in collaboration with Riverside County sheriff deputies took part in a conspiracy of assault with a deadly weapon to retaliate and tamper with plaintiff who filed police misconduct complaints.

## Defendants: Tenet HealthCare and Desert Regional Medical Center

54.   Tenet HealthSystem Desert Incorporated (d/b/a Desert Regional Medical Center) is a California Corporation with its principal place of business at 1150 North Indian Canyon Drive, Palm Springs, California, which is in the Central District of California.

55.   Defendant DEBBIE INOCENCIO, in her individual capacity as a Mental Service Worker with the Desert Regional Medical Center. RONALD B.  HIMELMAN, independent contractor, in his individual capacity as a cardiologist with the Desert Regional Medical Center.

JOHN DOE#44, independent contractor, in his individual capacity as a cardiologist with the Desert Regional Medical Center (DRMC). BILL BUCKLEY, in his individual capacity as Security Director of Desert Regional Medical Center. All defendants, are natural persons, and were at all times relevant to this complaint acting under color of law in the performance of their duties. The defendants implanted a radioactive RFID GPS chip, similar to this type of device inside of plaintiff's body without consent. DRMC medical personnel seized plaintiff's person and transported him to a local psychiatric hospital in a calculated attempt to label plaintiff as being "crazy" to discredit any truthfulness in plaintiff's statement to others concerning the RFID chip implantation and the electromagnetic microwave radiation gun (DEWs) attacks. Plaintiff was immediately released from the psychiatric hospital, in an hour's time.

**Defendants: DAVID JUSTIN LYNCH & ASSOCIATES**

56.    Defendant David Justin Lynch & Associates, a Professional Law Corporation, is incorporated in the State of California. Defendants David Justin Lynch, Christopher N. Mandarano, and Gary Gemberling were attorneys and residents of the State of California. Plaintiff accuses the defendants of accepting a bribe to sabotage plaintiff's civil negligence claim against Sunline Transit Agency and the City of Cathedral City. The defendants failed to offer a single settlement offer to opposing counsel over an 18 month time span.

**Defendant: EUREKA AEROSPACE**

57.    Eureka Aerospace is a California corporation with its principal place of business at 3452 East Foothill Blvd., Suite 340, Pasadena, California. Guiding Eureka's vision and operations is its CEO, Dr. James Tatoian, a seasoned scientific investigator with more than 25 years of experience in the field of electromagnetic and advanced radar systems. The Department of Defense developed the portable hand-held electromagnetic microwave ray gun which differs from the weapons designed by Eureka Aerospace which permits the weapons to be stored in the front/rear bumper vehicle of a Ford Crown Victoria or similar sized vehicle.

58.    The electromagnetic energy weapons stored hidden away in the front and rear bumpers of vehicles, used against plaintiff, were designed by Eureka Aerospace that received funding from Los Angeles Sheriff Department. As part of a scheme to chase plaintiff out of California, RON AYALA who is a former anti-terrorist trained Los Angeles County sheriff deputy introduced the weapons to Riverside County federal and local law enforcement intelligence officials and others, who, while driving these specially equipped vehicles would intentionally

stalk and follow plaintiff positioning the vehicle directly in plaintiff's walking path to cause plaintiff internal bodily cancer-causing injuries as plaintiff would walk in front of the Ford Crown Victoria vehicles out-fitted with the hidden DEWs weapons.

**Defendant: FEDERAL OFFICIALS**

59.    Defendant ERIC HOLDER is the Attorney General of the United States of America. HOLDER is sued in his official capacity. Injunctive relief only.

60.    Defendant ROBERT MUELLER is the Director of the Federal Bureau of Investigation. Director MUELLER who knew or should have known that the acts complained of, occurred, is sued in his individual capacity.

61.    Defendant STEVEN M. MARTINEZ is the Special Agent Assistant Director who is in Charge of the FBI Los Angeles field office of the State of California. He is being sued in his individual capacity.

62.    Defendant TIMOTHY J. HEALY is the Director of the Terrorist Screening Center. Director HEALY is sued in his official capacity. Injunctive relief only.

63.    Defendant JAMES R. CLAPPER is the Director of National Intelligence. Director CLAPPER who knew or should have known that the acts complained of, occurred, is sued in his official capacity. Injunctive relief only.

64.    Defendant DENNIS BLAIR was the Director of National Intelligence from January 2009 – May 2010. Former director BLAIR who knew or should have known that the acts complained of, occurred, is sued in his individual capacity.

65.    Defendant JANET ANN NAPOLITANO is the Secretary of the Department of Homeland Security. NAPOLITANO is sued in her official capacity. Injunctive relief only.

66.    Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services. She is named as a defendant in her official capacity only. Injunctive relief only

67.    Defendant Eric K. Shinseki is the Secretary of the United States Department of Veterans Affairs VA is an agency within the meaning of 5 U.S.C. § 552 (f). He is named as a defendant in his official capacity only. Under the control of defendant Shinseki, Loma Linda Veterans Hospital denied plaintiff on three separate occasions a Magnetic Resonance Imaging (MRI) exam to determine if an RFID chip had been implanted in plaintiff's chest by undercover federal agents during an un-needed angiogram surgery. Injunctive relief only.

68.     Defendant Shaun Donovan is the Secretary of the United States Department of Housing and Urban Development. He is named as a defendant in his official capacity only. Injunctive relief only.

69.     Defendant GENERAL MICHAEL V. HAYDEN, USAF, is the Director of the CIA, and is named solely in his official capacity. Injunctive relief only.

70.     Defendant DR. ROBERT M. GATES is the Secretary of Defense, and is named solely in his official capacity. Plaintiff is accusing the DOD and others of re-jumpstarting the human experiment projects under the PROJECT BIOSHEILD ACT. Injunctive relief only.

71.     Defendant Lieutenant General Keith B. Alexander, in his official capacity, is the Director of the NSA. NSA intercepted and disrupted plaintiff's cell phone communications and tapped into his laptop computer as part of the conspiracy of to suppress plaintiff's First Amendment rights to petition the government for redress of grievances. Injunctive relief only.

72.     Plaintiff accuses defendant federal officials of (1) employing the use of highly advanced portable hand-held electromagnetic microwave ray weapons, in various shapes and sizes, as a tool of deterrence, for local law enforcement and private sector intelligence agents to assist in suppressing plaintiff's Freedom of Speech rights by chasing plaintiff out of the State of California or by killing plaintiff (2) playing a role in building a fictitious federal criminal terrorist case file on plaintiff based on bogus suspicious activity SARs reports and (3) playing a role in the use and collection of experimental human radiation medical data collected from the illegally implanted RFID chip inside of plaintiff's body.

**Defendant: InfraGard Los Angeles Members Alliance**

73.     InfraGard is a partnership between the FBI and the private sector. InfraGard is an association of businesses, academic institutions, state and local law enforcement agencies, and other participants dedicated to sharing information and intelligence to prevent hostile acts against the United States. InfraGard Chapters are geographically linked with FBI Field Office territories. Each InfraGard Chapter has an FBI Special Agent Coordinator assigned to it, and the FBI Coordinator works closely with Supervisory Special Agent Program Managers in the Cyber Division at FBI Headquarters in Washington, D.C.

74.     Defendant WILLIAM MICHAEL is Program Director of the InfraGard Los Angeles Members Alliance and Consultant to the Joint Regional Information Center. He is named as a defendant in his individual capacity having taken part in a retaliatory conspiratorial scheme with

direct overall responsibility of its member's who took part in retaliating, intimidating, and tampering with a witness by blocking plaintiff's gainful employment opportunities, verbal and physical provocation, purposeful dissemination of fictitious intelligence "protected information" or suspicious activity reports (SARs) to the FBI who used this unverified information as a means of getting federal grant stimulus terrorist monies in building a bogus criminal terrorist case against plaintiff with continual supportive employment for Infragard members in stalking plaintiff.

75.    Defendant Special Agent REGINA CANALE-MILES is the INFRAGARD FBI Coordinator of the InfraGard Los Angeles Members Alliance. She is named as a defendant in her individual capacity having taken part in a retaliatory conspiratorial scheme in using InfraGard members as "pawns" to block plaintiff's gainful employment opportunities and to create false "terrorist information" or suspicious activity reports (SARs)in building bogus criminal terrorist cases against plaintiff for filing civil rights complaints against law enforcement officers. Defendant unknown informants DOES 45-1000 are InfraGard Members of the InfraGard Los Angeles Members Alliance. All members are being sued in their <u>individual capacities</u>.

## Defendants: DOES

76.    Plaintiff sues defendant DOES by such fictitious names because their true identities are presently unknown to plaintiff.  Upon ascertaining the true identity of a defendant Doe, plaintiff will amend this Complaint or seek leave to do so by inserting the true name in lieu of the fictitious name.  Plaintiff is informed and believes, and on the basis of such information and belief alleges, that each defendant Doe herein is in some manner. Does 1 through 1000, who are unknown at this time, and who were part of the underlying conspiracy that has inflicted continuing civil rights and RICO violations upon plaintiff since 2008. The inclusion of each defendant named herein is necessary to afford complete relief, and to avoid a multiplicity of actions and of inconsistent results.

## V. FACTUAL BACKGROUND

## A.   General Allegations on Policy and Practice

77.    Plaintiff is informed and believes, and on the basis of such information and belief alleges, that defendants, who were acting under the color of law, acted with deliberate indifference, gross negligence, and reckless disregard for the safety, security, and constitutional and statutory rights of plaintiff, and all persons similarly situated, maintained, enforced,

1   tolerated, permitted, acquiesced in, and applied policies, practices, or customs and usages of,

2   among other things;

3       a)    Subjecting citizens to unreasonable uses of force against their persons;

4       b)    Selecting, retaining, and assigning peace officers with demonstrable propensities
for excessive force, violence, and other misconduct;

5       c)    Failing to adequately train, supervise, and control peace officers in the arts of law

6   enforcement, including, without limitation, the taking into custody of persons such as plaintiff,

7   who was not engaged in criminal activity;

8       d)    Failing to adequately discipline peace officers involved in misconduct; and,

9       e)    Condoning and encouraging officers in the belief that they can violate the rights of

10  persons such as the plaintiff in this action with impunity, and that such conduct will not adversely

11  affect their opportunities for promotion and other employment benefits.

12      78.    Plaintiff is informed and believes, and on the basis of such information and

13  belief alleges, that defendants CIA, NSA, DOD, DHS, FBI, ODNI, County of Riverside, Riverside
County Sheriff's Department, Cathedral City Police Department, Palms Springs Police

14  Department, Indio Police Department, and other DOES, ordered, authorized, acquiesced in,

15  tolerated, permitted or maintained custom and usages permitting other foreign defendants

16  herein to engage in the unlawful and unconstitutional actions, policies, practices, and customs

17  or usages set forth in the foregoing paragraphs.  Defendants' conduct as alleged herein

18  constitutes a pattern of constitutional violations based either on a deliberate plan by defendants

19  or on defendants' deliberate indifference, gross negligence, or reckless disregard to the safety,

20  security, and rights of plaintiff.

21      79.    At all times relevant hereto, the defendants acted willfully and wantonly and with

22  deliberate indifference to the rights and feelings of the Plaintiff. At all times relevant hereto, the

23  defendants acted in accordance with an established policy, practice, custom, procedure, and/or
conspiracy which violated Plaintiffs known constitutional rights. The defendants knowingly and

24  willfully violated 18 U.S.C. 241 and/or 242 and have Obstructed Justice attempting to cover-up

25  the listed state and federal statutory violations in this complaint and intentional Constitutional

26  infringements of the Plaintiffs rights guaranteed to him by the Constitution of the United States

27  of America; Constitution of the State of California. ALL defendants conspired to retaliate against

28  Plaintiff to suppress and neutralize plaintiff's First Amendment right of Freedom of Speech right

1   to file civil rights peace officer misconduct complaints which are matters of public concern, so

2   therefore defendants are not protected under absolute or qualified immunity.

3   **B.   Factual Allegations Common to All Causes of Actions**

4        80.    Plaintiff believes that a well-organized California Riverside County Inland

5   Empire law enforcement intelligence network ("secret society"), made up of a group of racially-

6   biased federal, state, local, and tribal employees, in some cases single individuals, embedded

7   within the governmental ranks of the CIA, NSA, ODNI, DHS, and the FBI rule the Southern

8   California cities of Coachella Valley (Cathedral City, Palm Springs, Rancho Mirage, Thousand

9   Palms, Indio, Palm Desert, La Quinta, and Desert Hot Springs) with an

10  "iron fist" and answers to no one, possibly not even the President of the United States.

11       81.    This secret society of law enforcement officials create its own laws and becomes

12  judge, jury, and executioner when it comes to protecting the law enforcement careers of local

13  police officers and sheriff deputies accused of constitutional civil rights violations. Acting as

14  executioner, this secret society dispenses punishment similar to sentencing an innocent person

15  to death row but only given 1 to 2 years to live by prolonged government experimental torture

16  using advanced 21st century electromagnetic microwave guns or cancer-causing radiological

    direct-energy weapons.

17       82.    Technically, in basic terms, DEWs can be described as advanced wireless

18  TASERs, without prongs, that electrically shocks a person from a greater distance but with

19  much more power that can cause severe irreversible internal body organ injury and DNA

20  damage. In addition, this secret society purposefully has attempted premeditated murder by

21  illegally implanting a radioactive Radio Frequency Identification GPS (RFID) cancer-causing

22  microchip in plaintiff's body without his consent during an unneeded medical procedure

23  performed by undercover federal agents and other hospital medical personnel which explains

24  how local law enforcement can track plaintiff with pin-point precision 24/7.

25       83.    The unknown defendant federal, local and civilian counterintelligence officials, at

    times of convenience, to avoid detection, fired the DEWs while hidden in deeply dark-tinted

26  blacked-out business oriented color-shaded tinted windowed vehicles, and other similar

27  vehicles, such as custom made vans, vans with windows entirely covered with fake business

28  logos, mini-motor homes, **see attachment "Exhibit C"**. After committing an act of computer

    fraud by interception of plaintiff's legal documents and having discovered that plaintiff was

aware of the firing of the weapons behind deep tinted windowed vehicles, law enforcement officials change their tactics using clear un-tinted windowed vehicles stowing a new DEWs weapon in the front/ rear bumpers or trunk with plaintiff still feeling the same ill effects of the DEWs, **see example of how the weapon is affixed to a  vehicle  "Exhibit D"**.

84.    The aforementioned vehicles were not identified based on paranoid delusional random selection but based on the following set of events as plaintiff walked on sidewalks and in street crosswalks;

(a)    Two or more vehicle drive-bys needed to confirm plaintiff's identity before the attacks, with the vehicles slowing to a speed between 15 mph to 20 mph coming within a 40 yard range of plaintiff as which gives the hidden attacker precise targeting with maximum DEWs energy power transfer into plaintiff's body, and;

(b)    The post firing radiation symptoms felt by plaintiff, between 1 minute to 20 minutes after the attack with  symptoms of "all of a sudden" unexplainable painful headaches, heart palpitations, needle-point piercing back pains, extreme fatigue, insomnia, stomach pain, thyroid hyperactivity, blurred vision, disorientation, ringing ears, and in some cases vomiting.

85.    Plaintiff's experience working with energized microwave RADAR antennae as an electronics technician back in 1982 to 1990 allowed plaintiff to easily figure-out the types of weapon(s) being used against him and has what kept plaintiff alive. The unknown federal or foreign civilian agents responsible for the firing of the DEWs at plaintiff's body was meant to kill by way (to) trigger a heart attack, brain seizure, to activate dormant cancer cells over a period of months, or trigger mental psychosis by shooting at the head area of plaintiff's body.  A civil suit can last up to 3 years or more; plaintiff will probably have died from the damaging radiological effects associated with electromagnetic microwave radiation weapons.

86.    In addition, plaintiff refers to the aforementioned vehicles as "anonymous kill vehicles" because of the unknown agent attacker's secret location in the vehicle's backseat hidden out-of-view by totally blacked-out rear-sided, back-sided windows. Surprisingly, California Law allows this type of totally blacked-out vehicle window tinting. Plaintiff will challenge this window tinting California Statue as a result of this federal complaint.

C.    **Plaintiff's Allegations Against Local Law Enforcement Peace Officers**

**CATHEDRAL CITY POLICE DEPARTMENT (CCPD)**
**August 07, 2008 thru October 05, 2009**

87.     On **August 07, 2008**, at approximately **4:45am**, after leaving his girlfriend's house and walking to work near the corners of McCallum Way and San Eljay in Cathedral City, Cathedral City Police Officer (CCPD) Defendant Jose Nunez, with his police Ford Crown Victoria vehicle flood light shining on plaintiff (an African-American) caused plaintiff to stop walking. Plaintiff asked the officer, "Am I under arrest if not then I should be free to walk away?" Defendant Nunez failed to provide plaintiff the reason for stopping and detaining plaintiff. Plaintiff called 911 on defendant Nunez because he failed to exit his vehicle for close to 10 minutes.

88.     On **August 10, 2008**, at approximately **4:40am**, after leaving his girlfriend's house and walking to work near the corners of McCallum Way and Date Palm in Cathedral City, defendants Corwin DeVeas, Jeffrey Bird, A. Lemus, T. Brothers, John Does No. 1- 4, and JANE Doe No. 1, no less than eight police officers with their police vehicle lights flashing, completely engulfed and surrounded plaintiff.  Plaintiff asked the officers, "Am I under arrest if not then I should be free to walk away?"  Plaintiff was seized, searched, and arrested for suspicion of burglary, being under the influence of an illegal substance, and making annoying 911 calls. Plaintiff was released at 06:45am on August 10, 2008. About 8 months later, plaintiff received a **Detention Certificate** basically stating the officers were without probable cause to arrest plaintiff.

89.     On **November 22, 2008**, at approximately **4:49am**, after leaving his girlfriend's house and walking to work near the corners of McCallum Way and San Eljay in Cathedral City, defendants CCPD police officers Lemus, Jessica Carbajal, and Larry Gaines used a home located within a half block of plaintiff's former girlfriend's house to setup a stake-out with the officers seizing and then blinding plaintiff with their flashlights and questioning plaintiff about a burglar alarm. Plaintiff responded by saying, "I am not a burglar." After being released, plaintiff continued on his way to work only to witness the officers quickly leaving the area.

90.     During an interview, on **November 27, 2008**, at precisely 11:24am, defendant Lieutenant Laura Hanlon (Hanlon), a CCPD Internal Affairs Unit Investigator, assigned to investigate plaintiff's claims of police misconduct, attempted to intimidate and twist the facts surrounding plaintiff's claims of false arrest and other civil rights violations by up to ten CCPD officers. Plaintiff never received a copy of the internal investigative report results.

On **January 26, 2009**, from 9:15am to 11:15am, defendant Captain Kevin Connor

(Connor) requested an impromptu interview with plaintiff who originally had visited the Cathedral City Police Department to pick-up copies of documents related to his claims of illegal search & seizure, excessive force, and false arrest. During this interview, Connor made specific revelations and admissions but denied any wrong doing by <u>any</u> of the thirteen officers who took part in my illegal stops, detainments, and arrest. Yet, in the same breadth, while slightly covering his mouth with his right-hand, Connor verbally apologized on the behalf of the CCPD by saying, "I am sorry if we…" and further admitted that a junior officer "…did not know what he was doing." But soon thereafter, Connor attempted to intimidate plaintiff attempting to twist the factual account in plaintiff's citizen complaint. For unknown reasons, Connor—hypothetically speaking—made reference to a man who goes around the community climbing through bedroom windows sexually assaulting women with a sex toy. Plaintiff has never been convicted of a sex crime and failed to understand Connor's rationale. Plaintiff felt severely harassed and never received a copy of the internal investigative report.

91.    On **February 04, 2009**, CCPD Records Supervisor defendants Anita Singleterry tampered with evidence and obstructed justice by falsifying official government documents. The official document, a CCPD police blotter dated 2/04/09, **Event# 0808C-1402**, the dispatcher information had been intentionally left out or deleted referencing the August 10, 2008 incident.

92.    On **October 05, 2009**, about 9:05am, on the corners of Date Palm and Ramon Road in Cathedral City, plaintiff got off at one bus stop and walked over to the next bus stop fronting Mobil Mart. Plaintiff noticed a parked Cathedral City police vehicle (License# 1264499) parked on the left front side. Plaintiff also observed a heavily tinted windowed, dark gray small car parked haphazardly in one of the driveways on the right side of the Mobil Mart, which looked similar to an undercover police vehicle. While Plaintiff waited at the bus stop with two other Hispanic males, without warning, and all of a sudden, we heard a female (possibly undercover officer or store employee coached by the Cathedral City police officer whose vehicle was parked outside) laughing very loudly, hysterically and wildly. The two other males and Plaintiff turned around to see what was happening, and in doing so, the female was pointing in our direction. The female then stopped, and yelled loudly, "What happened to you out there?" she then continued to laugh chaotically before disappearing back inside the Mobil Mart. Shockingly, the two males and Plaintiff briefly turned and looked at each other. Plaintiff then asked the other two males if they knew the female. Both males said with much assurance "No!" Plaintiff then realized that the young Riverside County sheriff deputy defendants Gelinas and Cleary boasted and

bragged to the Cathedral City Police Department about the un-provoked drawing of a deadly weapon on plaintiff. Plaintiff initiated a 5th complaint against the Cathedral City Police Department.

### PALM SPRINGS POLICE DEPARTMENT
### Retaliation On Behalf of Other Law Enforcement Officers
### Incident #1: March 18, 2009

93.    On March 18, 2009, at about 10:38am, Plaintiff encountered defendant Officer M. Studer (Studer), badge #10989, who responded to my 911 call for HELP for an alleged assault by a security guard working for the Social Security Administration. Upon Studer's arrival, his brief questioning of Plaintiff, and before interviewing any other parties, Studer seemed prejudicially intolerant and conveyed a pre-conceived sense of callousness, distrust, and a degree of suspicion towards plaintiff the potential victim in this case. Plaintiff began to feel as if he was the suspect instead of the victim. Studer never, at any time, ask plaintiff "Are you injured or hurt?" "Do you need medical assistance?" After having gotten plaintiff's side of the story, Defendant Studer went inside the Social Security Office Building to speak with security officer Defendant Jan Jones.

94.    After waiting about five minutes or so, Studer and his partner Defendant Vegas, returns back outside and stated that the Defendant Jones, the security guard and other people who witness the incident agreed that Plaintiff was the instigator. In his police report, Studer listed one 47-year-old white male as his only biased witness. Studer intentionally executed an act of "segregated witness selection" by purposefully segregating and carefully selecting his witness who is of Caucasian ancestry.  Studer never attempted to interview any witnesses of African-American or Hispanic descent despite both groups being in the majority.

95.    Plaintiff then respectfully mentioned to Studer that I needed the guard's name, her supervisor's name, and the witnesses' names who offered their support for the guard as part of his investigative police report. Reprehensibly, after hearing my request, Studer became visibly annoyed with a contorted look on his face with him biting down on the right side of his lower lip as if he was trying to suppress an uncontrollable, hidden anger. Now, Plaintiff really felt like the suspect. A moment later, Studer authoritatively said, "You are on federal property!" (again Studer did not tell me to leave property).

96.    Civilly, with a normal tone of voice, Plaintiff explained to Studer that I am the victim and the one who initiated the 911 call for HELP and was not attempting to get in an argument or

disagreement with PSPD but, by Plaintiff, being the potential victim I only wanted the incident properly documented for possible evidence in a civil suit.

At that moment, Studer became even more visibly agitated and said that Plaintiff should leave property and if I do not the security guard will trespass me, so Plaintiff immediately left the premises when commanded to do so.

97.   Studer and defendant PSPD Officer Vega treated me unfairly and unequally as the potential victim in this incident. So prior to leaving property, Plaintiff politely requested both of their badge numbers to express my disapproval and dissatisfaction in their biased enforcement policing investigative policy. In addition, Plaintiff mentioned to Studer "I know my rights and have studied as a paralegal." However, Studer in his police report wrote that Plaintiff said, "He was a 'paralegal.'"

98.   Studer committed an act of lying by having stated in his police report that Plaintiff is a "paralegal" which is an unlawful act under the California Business & Professions Code § 6452 which states; It is unlawful for a person to identify himself or herself as a paralegal on any advertisement, letterhead, business card or sign, or elsewhere unless he or she has met the qualifications.   Studer's purposeful attempt to put words "in my mouth" with the hope of some sort of future prosecution for breaking the law is highly discriminatory based on Studer's biased attitude towards African-Americans.

99.   This is the **third** instance where Plaintiff received unequal treatment in an assault incident involving Palm Springs Police Department (PSPD).

100.   Plaintiff's **first** reported un-provoked assault case occurred in 2006; Plaintiff called PSPD to report an unprovoked racial verbal assault in which a 74-year old White male referred to plaintiff as a "goddamn black!" This incident occurred while Plaintiff stapled papers together, in a non-quiet area, at the Palm Springs Public Library on Sunrise Blvd.

101.   The elderly male's words— considered as "fighting words" or speech that incites violence—is a crime and not protected under the First Amendment.

102.   For this reason, Plaintiff contacted PSPD who arrived on scene, with one PSPD Caucasian officer quickly asking for plaintiff's ID first, and further asked if Plaintiff felt threatened by the elderly male, which Plaintiff stated, "yes!'

103.   At that point, the officers began treating Plaintiff as if he was the suspect instead of the victim.  In the end, unbelievably, one of two of the Caucasian PSPD police officers said to plaintiff that the male is too old and harmless. Plaintiff disagreed!

104.   In 2007, the following year plaintiff's **second** reported un-provoked assault case happened. Plaintiff called 911 to PSPD to report that three intoxicated young white males carried out an unprovoked attack of assault against Plaintiff while walking home from Downtown Palm Springs near the Cambridge Inn on the corner of South Palm Canyon/ East Morongo Road.  The PSPD officers never asked if plaintiff needed medical assistance and dropped plaintiff off at his place of residence without taking an incident report. In April 2009, Plaintiff requested copies of both incident reports from PSPD administration's clerk who told plaintiff neither report could be found. Plaintiff was in disbelief.

### Private Security Contractor
### Bower Security and Bower Investigations

105.   On **July 11, 2009**, at about 8:15pm, as Plaintiff left the Westfield Shopping Mall in Palm Desert, CA, an unidentified defendant Bower Security officer was caught "red-handed" in a furtive attempt to intimidate and harass me on behalf of more than 14 police officers who I have pending police misconduct complaints. The security officer (who can be described as a Hispanic male having dark hair, about 6'1" tall, heavy build weighing 200 to 220 pounds) driving a Bower Security's company vehicle—a white Ford Mustang with two thick dark blue stripes painted from the bumper traveling across the top to the front bumper with company logos on the sides— without any provocation stalked Plaintiff for over a half of a mile.

106.   At about 8:25pm, Plaintiff retrieved his cell phone and dialed non-emergency 911 to report I was being stalked by a Bower Security Company officer for unknown reasons. Plaintiff informed the Palm Desert Police dispatch that Plaintiff wanted his 911 call documented and logged. Immediately after the July 11, 2009 incident, things had gotten worse and the encounters more frequent. Plaintiff began to notice very strange happenings whenever he would visit the Palm Desert area (1) an increase in Palm Desert police and Bower Security vehicular presence wherever Plaintiff happened to be located (2) an increase in unknown persons wearing super dark sunglasses physically following Plaintiff from the library (3) an increase in Westfield Shopping Center security guards activity as Plaintiff browsed the mall stores with the latest encounter on December 2010, and (4) an increase in persons mostly single male drivers driving closely watching Plaintiff while talking on their cell phones.

### Riverside County Palm Desert Sheriff's Department
### Incident #1: July 22, 2009

107.    On July 22, 2009, at about 8:15am, in the morning, Plaintiff left my friend's house riding my bicycle to work on Ramon Road heading westerly towards Varner Road located in Thousand Palms, CA. Plaintiff work as a general labor for temporary day work agency called Labor Ready. I was clean-shaven, wearing a baseball cap, clean pair of black work jeans, gray shirt, and work boots.  In my hand, I carried my purple Palm Desert Public Library book bag, no books only my lunch.

108.    At this hour, in the morning, the streets were bustling with early morning rush hour traffic. After ¾ of a mile or so, Plaintiff made a right-turn off of Ramon onto Varner Road and did not see any Palm Desert Sheriff's Department vehicles in the nearby vicinity. However, as Plaintiff continued north down Varner Road and now about 20 yards from the corner of Varner and Manufacturing Road, I began to hear  faint sounds similar to an emergency siren and then, shortly thereafter, sounds of a quickly approaching vehicle coming up from behind me. As Plaintiff turned to look over my left shoulder, Plaintiff saw a Palm Desert Sheriff's Department vehicle, with its siren blasting and its lights flashing, pulling up next to the sidewalk curb corner directly behind me.

109.    Plaintiff was not wearing any suspicious clothing, and not riding his bike in a haphazardly way. Plaintiff was not acting nervous or paranoid by constantly looking over his shoulders. Most importantly, plaintiff having rode his bike for about 2 miles did not see any other Palm Desert Sheriff's department vehicles moving up and down Ramon Road/Varner Road looking for a dangerous suspect which meant that Plaintiff's behavior did not suggest recent criminal activity.

110.    After stopping and exiting his vehicle, a Palm Desert sheriff deputy quickly approached plaintiff. He is described as a Caucasian male about 6 feet 2 inches tall, medium build, and in his mid to late 30's. Without any delay, Plaintiff asked the deputy, "Why am I being stopped? The deputy said, "I just want to talk to you!" Plaintiff then politely responded by saying, "I do not want to talk to you." The deputy then asked, "Are you on parole or probation?" Plaintiff said, "No." Plaintiff further stated to the deputy that I know what this stop is all about, it is about the police misconduct complaints filed against numerous Coachella Valley police officers and a complaint against a Palm Desert Bower Security officer. The deputy responded by saying, "I do not know who you are." Plaintiff then asked the deputy, "Am I under arrest, if not then I should be free to walk away." The deputy continued to ask me questions about where Plaintiff was coming from. Plaintiff told him a friend's house.

111.    Plaintiff mentioned to the deputy that this is racial profiling. The deputy continued to say, "I just want to talk to you!" "What is your name?" After analyzing his poor excuse, as to why he decided to stop and detain me, Plaintiff asked the sheriff deputy if I could retrieve my cell phone from my pocket to call the FBI in Los Angeles, CA. The deputy agreed. At about 8:39am, after initiating the call, Plaintiff got a male FBI agent on the phone to listen in on what was happening in real-time. Plaintiff explained to the FBI agent that a sheriff deputy stopped me for no reason and violating my civil rights.

112.    First, the FBI agent asked for Plaintiff's name and then the deputy's name. Plaintiff glanced over at the deputy's name tag and told the FBI agent the deputy's name is Sheriff Deputy Chaney (Chaney), badge #4831 (Chaney had refused to give me his badge number but I got it from his dispatch a few hours later) and his vehicle's license# 1246915. Plaintiff then asked the FBI agent if he could please remain on the phone until the incident is over because I am afraid this deputy might attempt a 'Rodney King' beating. The FBI agent responded by saying, "you are doing the right thing, taking this first step." Plaintiff said "thank you."

113.    Shortly after Plaintiff made contact with the FBI agent over the phone, Plaintiff now watched Chaney, who appeared agitated, call for backup assistance. Since Chaney initially admitted, "I just want to talk to you" and approached me as if we were old friends, with Chaney looking very relaxed and calm. This is for good reason, because Plaintiff did not pose a significant threat or present an immediate threat to Chaney. Notably, Plaintiff was not acting rudely, not talking disrespectfully, not using abusive or cursive language, but only speaking with the FBI agent over my cell phone in real-time.  A few minutes, after calling for back-up assistance, defendant Sheriff Deputy Sergeant Covington (Covington), a Caucasian female deputy, and defendant Sheriff Deputy Robertson (Robertson), a Caucasian male deputy, arrived on scene. Both deputies, Covington and Robertson, exited their vehicle, walked over, and stopped a few feet near where Chaney and Plaintiff were now standing, with Chaney standing about 5 feet to my front left side with the other deputies to my front right at about a 4 feet distance. Plaintiff told his name to the FBI agent in a loud and clear voice purposefully spelling it out so that all three deputies could hear. If the deputies did not already know Plaintiff's name at this point, then they should have known it after expressing it to the FBI agent.

114.    Covington, who is Chaney's supervisor and the highest-ranking deputy on the scene, failed to address Plaintiff but only whispered to Robertson, as if, Robertson was receiving on-the-job training. A brief moment later, Chaney did approach and engage in

conversation with Covington. Chaney told Covington that Plaintiff was speaking with a FBI agent and after doing this Chaney repositioned himself back to my front left side standing now at about 4 feet away facing towards me at about a 45-degree angle. Covington still did not acknowledge Plaintiff's existence and resumed her conversation with Robertson.

115.    While speaking with the FBI agent over the phone, who was listening in real-time to what was happening, and with Covington and Robertson standing about 4 feet to my front right side, Chaney, while placing his right hand on his gun, took three to four steps to my left rear maneuvering himself directly behind me. Chaney having done this, Plaintiff quickly communicated this action real-time to the FBI agent who was listening in on the phone. When Chaney moved directly behind me, Plaintiff feared for his life.

116.    Plaintiff asked the FBI agent if everything was being recorded. The FBI agent said yes. My NET10 cell phone number at the time was (760) 408-2423, which Plaintiff used to contact the FBI agent in Los Angeles. This act by Chaney proves without a doubt undeniable proof that Chaney knew my identity and his ulterior motive was to intimidate, harass, and coerce Plaintiff on behalf of the police officers and Palm Desert Bower Security officer who Plaintiff complained of misconduct.

117.    As Plaintiff walked away from his detention and now pushing his bike across Manufacturing Road to the Labor Ready office in search of employment, plaintiff could hear Deputy Chaney mockingly, in a loud voice, three times, asking me "What's your name?" "What's your name?" "You could at least tell me your name? Plaintiff ignored the harassment by proceeding inside of the Labor Ready office building.

118.    As Plaintiff made his way inside of the Labor Ready Building, Plaintiff approached the main counter area to speak with the on-duty assistant manager Tina who had a clear line-of-sight view of the corner of Varner and Manufacturing Roads. Plaintiff's reasons for wanting to speak with Tina was to clear up any misunderstanding that I am not making trouble with law enforcement officials but being harassed because of pending citizen police misconduct complaints. The manager understood my position because of my many years of dedicated, excellent solid work history—with no history of any job performance problems.

119.    While speaking with the assistance manager, Tina noticed outside that a sheriff's department vehicle had now positioned itself just outside the front area. Plaintiff expressed to Tina not to worry because the sheriff deputies had already accomplished their mission, which was to harass me in front of the Labor ready Office Building in hopes that Labor Ready

1  management, upon seeing me questioned, by law enforcement authorities, would deem me unfit

2  to dispatch out for work; thereby blocking my gainful employment.

3      120.    Tina mentioned that on occasion law enforcement stop by the office to do

4  identification checks of its temporary employees. However, Plaintiff assured Tina that Chaney

5  would not enter the building that the deputy is only trying to cover his tracks for stopping and

6  detaining me. Deputy Chaney never entered the Labor Ready Office Building but drive away

7  after a few minutes or so. Deputy Chaney knew plaintiff's identity and methodically tracked

8  plaintiff down and systematically planned to stop and harass him directly in front of the Labor

9  Ready Office in hopes of personally damaging plaintiff, working as an independent contractor,

10  employment and prospected moneymaking opportunities. Plaintiff has a right to work wherever

11  there is available employment. Plaintiff lost prospective employment and daily wages as a result

12  of Riverside County deputies' illegal seizure of plaintiff.

### Riverside County Palm Desert Sheriff's Department
### Incident #2: October 5, 2009

14

15      121.    On October 05, 2009, at about 2:00am, in the morning, Plaintiff was walking on

16  Ramon Road headed west from Thousand Palms over a bridge into the City of Rancho Mirage.

17  Plaintiff's destination was the Aqua Caliente Casino Resort & Spa (Casino). Plaintiff has visited

18  this Casino on and off for about 9-years. In doing so, Plaintiff had never been confronted by

19  security personnel for any reason. Unworriedly, Plaintiff made entrance onto Casino property

20  using the Ramon Road entry way. While doing so, Plaintiff took notice of a police vehicle (with

21  two police officers inside) with its headlights off pointed towards my direction sitting in the casino

22  parking lot. In addition, Plaintiff noticed a Casino security guard on a bike and another sitting

23  inside of a parked Casino security vehicle. Reflectively, Plaintiff began to realize this is possibly

24  a pre-staged act of intentional harassment and intimidation on behalf of the numerous police

25  officers who I have complained of misconduct.

26      122.    Cautiously, Plaintiff approached the parking lot entrance and headed straight for

27  the doorway of the Casino. Plaintiff took this action to get to the main doorway as quickly as

28  possible just in case the officers had the intent to do a "Rodney King" beating on me by which

the Casino surveillance cameras would record without obstruction the entire episode.

    123.    However, as soon as Plaintiff motioned towards the main Casino doorway the

police vehicle began to move slowly in my direction. As Plaintiff continued heading towards the

main doorway, a moment later, the officer driving jumps out of the driver's side of the police vehicle and yelled out "Can we talk to you!" I briefly paused, turned, and said, "No." I then turned back around and continued to make my way to the Casino doorway.

124.    After reaching the main doorway, which Plaintiff considered a "safe zone"(close up video surveillance), and now having taken notice that both police officers had exited their vehicle and was now following me, Plaintiff decided to stop just in front of the Casino doorway entrance. As the officers approached, one of the officers asked again, "Can we talk to you." Again, Plaintiff said, "No." The same officer asked me, "Do you have any ID?" Plaintiff said, "No" for the reason that I lost my wallet weeks before. Plaintiff then asked the questioning officer, "Why am I being detained?" the officer responded by saying, "There are many Drug dealers in this area. I have conducted checks on other people as well."  Plaintiff told the officer that "I am not a drug dealer." The officer then said [paraphrasing] "How, do we know that since we do not know who you are." The officer again asked for Plaintiff's ID. Again, Plaintiff told him I do not have any ID.

125.    Plaintiff then asked the officer, "Am I under arrest, if not I should be free to walk away." The questioning officer said [paraphrasing] "No, but we can stop and ask you for ID." Next, Plaintiff informed the officer that the reason that I am being detained is because of the fact that I have police misconduct complaints filed against over 14 police officers and one of your co-workers a sheriff deputy. Plaintiff further stated to the officer, "You know who I am and this is BS." The questioning officer responded by saying, "We do not know who you are." The officer further stated, "Have you seen my face before?" Plaintiff said "No." The officer then asked Plaintiff the name of the sheriff deputy who Plaintiff filed a complaint. Plaintiff told the officer, "His name is Sheriff Deputy Chaney, badge #4381. " The questioning officer, defendant Rancho Mirage Police Officer Christopher Gelinas (Gelinas), completely disassociated the Rancho Mirage Police Department from the Palm Desert Sheriff's Department by stating, "We are not sheriff deputies we are Rancho Mirage police officers." The young inexperienced Gelinas pretended he did not recognize Chaney's name but gave visual clues that he was lying.

126.    In continuation, Gelinas asked Plaintiff for his ID for about the third time. Plaintiff said for a third time, "I do not have my ID." Gelinas then stated, "How do we know that there might be a warrant for your arrest." Plaintiff said "With technology, if you wanted to know all persons who have warrants then all you have to do is check your vehicle laptop computer." Gelinas then told me that there is a warrant for plaintiff's arrest and activated a micro-electronic

device in his right shirt pocket which displayed a flashing white circular light that pointed in plaintiff's direction. As the light flashed, Gelinas stated that the flashing light told him that there was a warrant for Plaintiff's arrest. Plaintiff, without hesitation, informed Gelinas that the electronic device is wrong.  Technically speaking, as a former U.S. military Electronics Test Equipment Technician, former Air Traffic Control Communications Electronics Repairer, and a former Honeywell Corporation Electronics Technician, plaintiff was more than qualified to make the following statement.

127.    Plaintiff took an educated guess, after a brief viewing of the device and noticing the white flashing light timing intervals along with its initial manual activation and de-activation, Plaintiff determined that Gelinas' electronic device was nothing more than a lapel video camera used by Gelinas to capture Plaintiff's photo for upload into the Rancho Mirage Police Department database.

128.    After plaintiff's initial contact, with the Rancho Mirage police officers, near the doorway to the Casino, Plaintiff was fully compliant with the officers' verbal and lawful commands. At no time, did Plaintiff present a serious threat to the officers' safety; otherwise, Gelinas would not have stood directly in front of plaintiff at about a two feet distance. Casino video surveillance will support this fact, if need be.

129.    Referencing plaintiff's earlier saying about technology, Gelinas said [paraphrasing], "how about this for technology" and drew one of his deadly weapons, a black telescopic metallic baton. Being surrounded, by two Rancho Mirage police officers and two Casino security guards, Plaintiff failed to understand why Gelinas would commit an act of assault with a deadly weapon without justification and with Gelinas stating numerous times that he did not know plaintiff's identity. Briefly, Gelinas held the baton in its collapsed form of about 7 inches, while staring directly into Plaintiff's eyes from a distance of about 2 feet. However, as Gelinas continued to focus directly into my eyes, within a few seconds later, with a flick of his wrist, the metallic baton expanded to its full length of about 21 inches, with Gelinas threatening me with its use. Gelinas grasped the deadly weapon very tightly in his right hand at about a 30-degree angle making small up and down micro-movements, while looking at Plaintiff straight in the eye, as if he wanted to strike me with the weapon. At this point, Plaintiff became fearful for my life and anxiously began thinking about the ongoing criminal conspiracy that Gelinas might attempt to kill me on behalf of his police brethren who Plaintiff filed citizen misconduct complaints.

130.    After expanding his deadly weapon, Plaintiff said to Gelinas, "that is a threat." Gelinas responded by saying, "That water bottle you are holding is a threat." Unbelievably, Plaintiff could not comprehend what Gelinas had just mentioned. This is because the entire time from the initial moment of contact near the main doorway to the Casino Plaintiff had been standing perfectly still and nervously spinning his water bottle with both hands exposed close to his abdomen area within a few feet of the Rancho Mirage police officers, who lied and who are really Riverside County Palm Desert Sheriff Deputies. The officers never verbally communicated to Plaintiff that his water bottle was a deadly weapon and that plaintiff should drop it to the ground. But now, all of a sudden, about 5 minutes later, after Gelinas expands his metallic baton threatening plaintiff with its use, Gelinas decides that plaintiff is holding a deadly weapon—a 20 ounce empty water bottle. Kindly, Plaintiff reminded Gelinas that what he was holding is a weapon.

131.    After the Rancho Mirage police officers indicated that Plaintiff was free to walk away, Plaintiff requested entrance inside of the Casino with one of the security guards posted directly in front of the doorway. The Casino security guard told me that Plaintiff could not enter the Casino without proper identification. Plaintiff said, "Okay!' For the first time, over a 9-year period, Agua Caliente casino security guards asked to see my identification. Suspiciously, the security guards unwelcoming behavior came about only after Plaintiff initiated citizen police misconduct complaints involving more than 14 Coachella Valley law enforcement officers who the Casino may employ as part-time security guards. No question, the Rancho Mirage police officers knew Plaintiff's identity and then tipped off the Casino security guards.

132.    Before leaving the premises, Plaintiff took a moment to write down the police officers vehicle license plate number #1270320, Gelinas threaten to arrest plaintiff for trespassing. Plaintiff had to go to the Palm Desert Sheriff's Department Station to find out the names of the officers. However, office deputy personnel gave me only one of the officer's names. The other defendant name is Sheriff Deputy **Cleary**.

### Riverside County Indio Sheriff's Department
### Incident #3: August 28, 2010

133.    On August 28, 2010, at about 4:25pm, Plaintiff made his daily walk from a local city bus stop to CVRM for emergency overnight shelter. As usual, upon arrival at CVRM, Plaintiff

checked-in at the front desk and wait in the lobby until I can get a bed number. There are no chairs in the lobby, so Plaintiff has to stand up.

134.    At about 4:40pm, as Plaintiff stood waiting in the CVRM lobby, Plaintiff happened to glance out a CVRM chapel window and could see a marked sheriff department cruiser driving-by the CVRM building. Suspiciously, it was minutes after this sheriff department cruiser drive-by that a distraught woman entered the CVRM lobby area requesting for emergency medical aid. On an informative note, a payphone is located outside directly in front of the CVRM main front entry walkway just feet from the main doorway. This female could have easily dialed 911 prior to entering CVRM but she chose not for reasons that draw suspicion whether she was acting out as a paid undercover informant or genuinely in distress. Plaintiff say this because even though this woman appeared emotionally distraught and crying, she was cognizant of her surroundings, her speech was clear, and she was not passing out or regurgitating.

135.    At about 4:50pm, as Plaintiff stood waiting in the CVRM lobby, an emotionally distraught Caucasian woman, weighing approximately 110 pounds and in her late 30s, entered the CVRM main entry door.  The woman walked in a normal gait into the lobby and stood to Plaintiff's right side. The woman looked at Plaintiff and I noticed that she was crying. With a shaky but clear voice, the woman said to me, "Help me, help me! Can somebody help me! Nobody will help me!"  Plaintiff said to the woman, "CVRM staff will help you but be patient because no staff members are available at the moment."

136.    Plaintiff then asked the woman, "What is the problem?"  Woefully, the woman informed Plaintiff that she needed help that her boyfriend assaulted her about a week ago and that about 30 minutes ago she had taken "20 Antivan pills, 16 Nyquil tablets, and that she had been drinking (a half gallon of liquor) all day." Plaintiff noticed that the woman's upper left arm had a deep colored bruise. Since having stayed at the CVRM homeless shelter for about 5 months, Plaintiff immediately alerted CVRM male staff members Kurt and William—who at that time were the only two working at the front desk—about this woman's emergency potentially overdose condition.

137.    After Plaintiff alerted a CVRM staff member concerning the woman's situation, Kurt requested assistance from co-worker CVRM female staff member Gail. While awaiting CVRM Gail's arrival and as Plaintiff comforted (verbal emotional support with no physical touching) this emotionally distressed woman, for over a 5 minute period, I recognized her face

as someone who I had briefly met approximately 4 months earlier at a major city Sunline Transit Agency bus stop located at Highway 111 and Flower Street.

138.    Four months prior, Plaintiff did engage in general everyday conversation with this woman while riding a Sunline Transit Agency public bus. However, for some reason, Plaintiff could not remember this woman's name. In no shape or form, Plaintiff has ever been a friend of this woman and no further interaction has taken place.

139.    CVRM staff member Gail arrived in the lobby area and quickly took charge of the situation. Plaintiff informed Gail of the amount of drugs and alcohol consumed by this woman. Plaintiff further mentioned that I recognized the woman as someone who I briefly met 4 months ago at a city bus stop. Staff member Gail immediately began to question the woman by asking her name. The woman told Gail that her name is "Katrina Tanner".

140.    After hearing this, Plaintiff quietly walked away from the situation but could over hear Gail saying to Katrina Tanner "You do not have to go back to him!" with Gail making reference to Katrina Tanner's boyfriend. Without any further delay, CVRM staff member Gail called 911 paramedics who arrived on scene at about 5:05pm.

141.    After Katrina Tanner was taken by ambulance to a nearby local hospital, defendant Riverside County Sheriff Deputy Adams (Adams), badge #4053, arrived on scene to what appeared to be a pre-orchestrated plan of retaliation against Plaintiff. Now that the lobby area was clear, Plaintiff moved from the Chapel area and made his way back into the lobby to wait for a bed number.

142.    A few minutes after speaking with CVRM staff member Gail, Deputy Adams left the CVRM open courtyard area and made his way to the CVRM front doorway. As Adams, a Caucasian male who weighs approximately 210 pounds, and stood about 6'1" tall, opened the CVRM front door and held it open with his body. Adams was carrying a notepad and wearing black finger-tip-less gloves. While Adams stood in the doorway, he looked at me as I stood about 8 feet away with both of my hands in my pockets.

143.    Next, Adams without saying a single word motioned to me, by waving his hand, for me to step outside the CVRM building. Plaintiff responded to Adams non-verbal request for me to come outside by clearly saying, "I do not know anything, and I do not want to talk to you." As plaintiff continued to stand in the lobby with hands in his pockets, without warning, Adams said to plaintiff "Take your hands out of your pockets, and I am only going to tell you once!" Adams order for Plaintiff to take my hands out of my pockets along with saying, "I am only going to tell

you once!" made Plaintiff realize that not only Plaintiff was not free to leave but Plaintiff felt fearful and threatened in thinking that if Plaintiff did not remove my hands out of my pockets quick enough there was a chance that Adams might draw his gun and shoot me. Plaintiff, without saying a single word or taking another breadth, quickly but cautiously removed both hands out of his front pockets.

144.    Following Deputy Adams order for Plaintiff to take my hands out of my pockets, Adams closed the front door and stepped inside the lobby area and approached the front desk. Adams placed his noted pad on the front desk counter and proceeded to ask Plaintiff for identification. Plaintiff told the deputy, "I do not have any identification."

145.    Adams then asked for Plaintiff's name. Not wanting to be interrogated by this deputy, Plaintiff responded by saying, "Am I under arrest, and if not then I should be free to walk away?" Adams at some point lowered his head and said "No!" so Plaintiff left the lobby area and walked away into the adjacent room the CVRM chapel area.

146.    Later, after about a day or so, Plaintiff visits the Riverside County Indio Sheriff's Department to get a copy of Deputy Adams' report related to this incident. Unsuccessfully, the sheriff clerk informed Plaintiff that the report, Case No. C102400029, is of such confidentiality that not only Plaintiff (the Good Samaritan/ Suspect) will not be able to get a copy of the report but the victim will not have access to the report as well.

147.    On September 4, 2010, at about 10am, Plaintiff paid a visit to a local pharmacy to pick-up some prescription medication. While waiting for my medication, Plaintiff requested to speak with the Pharmacist. After having explained to the Pharmacist about the emergency aid that Plaintiff had provided to a distraught woman (Katrina Tanner) who told me that she had consumed "20 Antivan pills, 16 Nyquil tablets" and that she had "...been drinking all day", which was later found to be about a half gallon of liquor. The pharmacist was in total disbelief. The pharmacist said that the woman was possibly not being honest and playing a practical joke because if a person were to consume that amount of drugs within that short period of time then that person "should be dead, tranquilized, or comatose." Plaintiff left and thanked the pharmacist for sharing his professional medical knowledge.

148.    Plaintiff believes that this incident was a well-orchestrated plan of retaliation to have Plaintiff's name attached to a bogus criminal investigation involving a female citizen who has been victimized by a supposedly suspected domestic terrorist (Plaintiff). On December 18, 2010, plaintiff witnessed this same person Katrina Tanner get on board the same city bus

1   plaintiff was riding possibly with law enforcement taking still photos of plaintiff as Miss Tanner

2   walked near plaintiff to give the appearance that Miss Tanner and plaintiff are close friends but

3   in domestic turmoil which is wholly untrue.

### Federal Officials and the Private Sector Join the Conspiracy
### to Suppress Plaintiff's First Amendment Freedom of Speech Rights

5

6          149.   In or about, December 2008, plaintiff went to the local Palm Springs FBI office to

7   file a civil rights complaint and after having *partially* read plaintiff's complaint against the

8   Cathedral City Police Department (CCPD), a Caucasian male FBI agent, height about 6 feet 2

9   inches tall, slightly gray haired, medium build and weighing approximately 210lbs, told plaintiff

10  straightforwardly, "Be careful who you call a 'dirty cop' next time" making reference to plaintiff's

11  use of words describing the police officers who plaintiff accused of constitutional violations. This

12  negative response left plaintiff speechless; plaintiff walked out of the office to never return.

13  Thereafter, after each civil rights violation, plaintiff contacted the Los Angeles FBI to have

14  incidents recorded and documented telephonically. Later, plaintiff cell phone was mysteriously

15  destroyed by an electronic jamming device.

### Infiltration:

16          150.   Beginning in 2008, until present, plaintiff encounters numerous civilian undercover

17  informants (some who are active or inactive duty DOD military intelligence personnel of the

18  Army, Air Force, or Marines) who attempt to establish friendly relations with plaintiff but denied

19  the chance to do so. The informants' attempted infiltration is causing massive disruptions in

20  plaintiff's ability to perform legal research relating to this case. On November 19, 2009, at about

21  12:55pm, plaintiff was conducting legal research on his case using a computer at the Larson

22  Justice Center Courthouse when a Caucasian male, undercover informant defendant Warren

23  Norried, attempted to become acquainted with plaintiff but committed an act of intentional

24  disturbance and provocation by throwing some unknown object and striking plaintiff on his left

25  arm. Plaintiff summoned defendants Deputy Robert Pickowitz and Deputy Ponce, badge #4883,

26  to file a criminal report of assault. The deputies report listed plaintiff as a non-victim.

### Mail Tampering:

27

28          151.   In February 2010, plaintiff requested thru a local Riverside County (Indio, CA)

military veteran liaison representative, Clinton Hollins, for a copy of plaintiff's U.S. Army military

medical records and to have the documents sent to plaintiff's mailing address at the Cathedral City Post Office.  Plaintiff served in the military from March 1982 to March 1989. However, upon receiving from the Department of Veterans Affairs Records Management Center in Saint Louis, MO, and picking-up the government manila envelope at the Cathedral City Main Post Office, on February 25, 2010, plaintiff first noticed that the mail had been tampered with (opened and resealed with thick mailing tape), **see EXHIBIT E**. After carefully removing the contents of the envelope, <u>all documents should have been military files dated between 1982 thru 1989</u>; however, plaintiff shockingly noticed that the first two pages of plaintiff's U.S. military medical documents had been intentionally replaced with civilian hospital medical documents of a surgery plaintiff had in 1997.  Apparently, unknown federal agent(s) illegally obtained plaintiff's personal private civilian medical documents then opened plaintiff's government mail and inserted these two civilian medical document pages to send a strong message to plaintiff that he is up against a very powerful adversary BIG BROTHER watching over Coachella Valley local law enforcement police officers and sheriff deputies "little brother".

152.   Defendant FBI and other federal agencies have also played a role in interfering with plaintiff's mail in plaintiff's potential award in receiving Social Security benefits which plaintiff applied for in November 2007. At a hearing, on September 17, 2010, an administrative law judge denied plaintiff's disability benefits when clearly plaintiff should have been granted disability payments. Plaintiff contacted the Inspector General. On November 16, 2010, Plaintiff personally mailed a timely notice of appeal which by "Next Day Delivery", however, the Social Security Appeal Division in Virginia never received plaintiff's appeal in the mail.

**Psychological Warfare:**

153.   The FBI and others collaborated with a hospital mental service worker to trick plaintiff to engage in conversation to appear as though he is "crazy" and attempted to have plaintiff involuntary admitted into a psychiatric hospital. On December 18, 2009, Defendant Debbie Inocencio (Inocencio), a peace officer and Riverside County Mental Service Worker (MSW), while working at Defendant Desert Regional Medical Center, attempted to have plaintiff involuntarily admitted into an emergency psychiatric institution by signing official documents stating plaintiff was <u>suicidal</u>, <u>delusional</u>, and <u>crazy</u>. Prior to Inocencio's decision to involuntarily send plaintiff off to Riverside County Emergency Psychiatric Hospital, plaintiff fully explained to the MSW about plaintiff's in depth knowledge, education, and experience in the field of electronics technology concerning direct energy weapons (DEWs) being used against plaintiff

by local law enforcement peace officers that resulted in plaintiff seeking emergency room medical care for burning chest pains and an irregular heart beat. It is the intent of the federal agents and local law enforcement is to have plaintiff re-think his sanity and to discredit plaintiff's credibility in having others to believe that plaintiff is <u>crazy</u> when discussing the existence of electromagnetic microwave guns or direct energy weapons (DEWs).

**Extralegal Force and Obstruction of Justice:**

154.   On November 30, 2009, plaintiff filed a civil rights complaint and a Temporary Restraining Order (TRO) against Defendant Riverside County Sheriff Deputy Christopher Gelinas who prejudicially profiled, falsely arrested, and used excessive force by drawing a deadly weapon (metallic baton) without justification in the midst of defendant Sheriff Deputy Cleary and Agua Caliente Resort & Spa Casino security officer defendant Chris May and others. The TRO hearing, Case Number INC 091041, was heard before defendant Superior Court Commissioner, Lawrence P. Best (Best), who, was influenced by federal agents into allowing his courtroom to be used as a "kangaroo court". Commissioner Best treated *pro se* plaintiff harshly and dismissed the TRO despite plaintiff proving each and every element needed to satisfy the granting of the TRO under California Code of Civil Procedure 527.6 (b) (1). In an act of obstruction of justice, plaintiff's initial Notice of Appeal was never mailed or sent to the appellate court clerk.

155.   On February 16, 2010, federal agents interfered in plaintiff's negligence civil suit against law enforcement friendly public entity Sunline Transit Agency, WHITING vs SUNLINE TRANSIT, CASE NO. INC 081590, that happened on July 26, 2008. David Justin Lynch, and Christopher N. Mandarano, who plaintiff hired to handle his case, took a bribe in an attempt to sabotage plaintiff's case by failing to keep plaintiff informed and failing to demand a single settlement offer with opposing counsel over an eighteen month period.

156.   Plaintiff was homeless and without any money during this period. Quite suspiciously, Sunline Transit Agency attorneys, after receiving the "okay" from federal agents, decided to settle plaintiff's case on October 18, 2010, two months after plaintiff's false arrest, assault and battery, and false imprisonment statue of limitations period had **expired** against the City of Cathedral City Police Department.

**Coercive Force and Torturous Violence Using Electromagnetic Guns or DEWs:**

157.   These sophisticated DEWs do not kill a person instantly but slowly and silently damages sensitive bodily internal organs over a period of months. A person can succumb to the horrible effects of microwave or other radiation effects (such as heart failure, cancerous tumors, brain hemorrhages, metabolic acidosis, irradiated blood poisoning, colon and/or lung cancer, severe psychosis, etc) all within a period between 3 to 36 months. But plaintiff, as an experienced electronics technician, knows that the harmful effects can be much sooner if the attacker(s) modifies the power and frequency output of the DEWs software and hardware functions.

158.   In **March 2009,** at about 9:30am, an all black unmarked heavily tinted completely blacked-out windowed four-door vehicle in between (escorted by) two Cathedral City Police Department marked police vehicles pass-by plaintiff twice near the corners of Date Palm/ Ramon Road. The unseen agents attempted to murder plaintiff by assaulting plaintiff with a highly advanced deadly electromagnetic microwave ray gun near the corner of Date Palm Drive & Ramon Road in the City of Cathedral City, CA. A short while later plaintiff began having problems breathing with an irregular heartbeat

159.   On **August 26, 2009**, persons yet to be identified and unknown co-conspirator government officials did retaliate, intimidate, and tamper with a witness by attempting to murder plaintiff by attacking plaintiff using electromagnetic microwave weapons at or near the corner of East Ramon Road & San Luis Rey Road.

160.   On **October 16, 2009**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff by attacking plaintiff using electromagnetic microwave weapons near the Desert Regional Medical Center. Plaintiff with his back turned away from Palm Springs police vehicles with deep dark tinted windows parked less than 40 feet from plaintiff.

161.   On **October 17, 2009**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff by attacking plaintiff using electromagnetic microwave weapons at or near the Palm Desert Public Library on Fred Waring Drive.

162.   On **November 4, 2009,** persons yet to be identified and unknown co-conspirator government officials retaliated intimidated, and tampered with a witness by attempting to murder plaintiff trying to run plaintiff over as he entered the crosswalk at or near Fred Waring & Towncenter Way Street after visiting the Palm Desert Sheriff Department in Palm

Desert, CA. Plaintiff's TRO hearing against Defendant Sheriff Deputy Christopher Gelinas was supposed to be heard on November 5, 2009.

163.    On **November 13, 2009,** Defendants Tenet Healthcare Corporation, Desert Regional Medical Center, and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by extorting plaintiff in <u>authorizing</u> Defendant Ronald B. Himelman to fraudulently perform an unnecessary coronary angiogram surgery on plaintiff as a pre-textual cover-up with the intent to implant an experimental illegal radio frequency identification electronic device (RFID) chip inside of plaintiff's body as a favor for local law enforcement officials whom plaintiff filed numerous civil rights complaints. The defendants compromised and extorted a certain percentage of plaintiff's property (his body) by implanting the RFID chip which occupies and controls that area of plaintiff's body.

164.    On **December 5, 2009,** as plaintiff left the Palm Desert Public Library, multiple Riverside County sheriffs' vehicles parked outside area parking lot. While plaintiff walked along the sidewalk towards the bus stop, a mini-motor home came up from behind in the right-lane on Fred Waring Drive, and as it passed, plaintiff felt the symptoms of microwave exposure leaving plaintiff's chest feeling sore for two days.

165.    **On December 7, 2009,** today as plaintiff waited in the Martha's Kitchen Homeless shelter feeding line plaintiff noticed a gray heavily tinted windowed black-top convertible Cadillac, license plate #5TAL840, parked in the food distribution dock area which is located directed behind plaintiff at about 40 yards or so. After, a minute or so, with my back facing towards the vehicle, plaintiff's heart beat became irregular and felt a burning tingling sensation (similar to pointing a magnifying glass to one's skin) in his upper right back area.

166.    On **December 26, 2009,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using an electromagnetic microwave radiation weapon leaving plaintiff with blurred vision, headache, slight chest pain, numbness in right-hand, fatigue, drowsiness, and a tingling sensation throughout his body 15 minutes or so after exposure on Ramon Road in Palm Springs, CA. A brown van with deep tinted windows had driven past plaintiff.

167.    On **December 31, 2009, at 3:05pm,** while waiting at the bus stop on Ramon Road near the Wal-Mart in Palm Springs, plaintiff noticed a Caucasian male parked in the parking lo facing Office Depot. Plaintiff began to feel the onset of microwave radiation exposure so he walked up to the vehicle with the male still inside, peep inside to discover a light blue

electronic gadget plugged into the cigarette lighter port. The device looked similar to a miniature police portable RADAR gun having a bank of LED battery indicator lights glowing from yellow to green. This was plaintiff's first physical sighting of a direct energy weapon. The SUV vehicle displayed British of Columbia license plates.

168.   On **March 04, 2010**, for a second time, person yet to be identified and unknown co-conspirator government official, driving a gray convertible Cadillac vehicle (license plate # 5TAL840), retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using an electromagnetic microwave ray gun outside the homeless shelter at Martha's Kitchen in Indio, CA. Plaintiff felt the onset of radiation exposure symptoms.

169.   **On March 5, 2010**, on the corner of East Palm Canyon and Racquet Club Drive, suspiciously with no other traffic, at about 7pm, plaintiff witnessed a very unusual, never seen before, all jet black mini-motor home van (similar to a crime scene van) having black curtains covering the left-side window and with a black circular fanned-out dome antenna on top with smaller antennae located elsewhere. As plaintiff walked in the crosswalk, plaintiff began to feel the onset of symptoms of microwave radiation exposure. However, this time plaintiff felt the pain mostly on the left side of his chest. This pain felt like plaintiff had just had open heart surgery. The residual pain lasted for approximately two days after.

170.   **On April 17, 2010**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near Westfield Shopping Center in Palm Desert, CA.

171.   **On May 15, 2010**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near Calhoun Street & Dr. Carreon Street in Indio, CA. Plaintiff's thyroid became overactive with irregular blood pressure.

172.   **On January 09, 2011**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near plaintiff's church in Indio, CA. Plaintiff suffered thyroid hyperactivity.

173.   **On January 10, 2011,** at about 9:34am, while waiting at a bus stop in La Quinta, near the Walmart Superstore, a law enforcement blue and white helicopter flew directly in a

straight flight path towards my direction. Since plaintiff experienced this type of activity before by other government and civilian agents, plaintiff immediately knew to expect that the undercover agents were about to fire direct energy weapons at plaintiff. The prior incidents all share similar flight path attack positions by flying at about 500 feet to 700 feet in altitude, flying straight towards plaintiff without deviation form about 2 miles in distance, the pilot activating the engine propeller in quiet mode to not give away their position until in firing range with the direct energy weapons striking plaintiff before he learns of the helicopter's position. This incident caused plaintiff's upper left and center chest area sore for approximately five days.

174.   On **January 12, 2011**, at about 5pm, after leaving the Larson Justice Center Courthouse in Indio, CA, plaintiff suffered an electromagnetic gun attack on the left side of his head which left plaintiff with a severe headache with plaintiff's body feeling a warming sensation as if plaintiff had been injected with CT scan contrast fluid.

175.   **On January 14, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons near the law library in Riverside, CA.

176.   **On February 11, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons. Plaintiff had just completed his Deposition and was walking on a sidewalk in Indian Wells, CA.

177.   On **February 14, 2011**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked to the Larson Justice Center located in Indio, CA. Plaintiff identified the vehicle as a white crown Victoria 4-door vehicle which is the preferred vehicle capable of being out-fitted with Defendant Eureka Aerospace electromagnetic microwave weapons.

178.   On **March 20, 2011**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked to church the Kyraikos Christian Center located in Indio, CA. Plaintiff experienced thyroid hyperactivity.

179.   On **March 21, 2011**, persons yet to be identified driving, a Indio Police Department deep dark tinted windowed police vehicle retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked to

the Larson Justice Center in Indio, CA. Plaintiff suffered nausea and severe thyroid hyperactivity with plaintiff barely able to speak.

**Illegal Surveillance**:

180.   On November 13, 2009, the defendants FBI, other federal agents, **Desert Regional Medical Center** Cardiologist **Ronald B. Himelman, and others** planted an electronic radioactive Radio Frequency Identification (RFID) tracer in plaintiff's body for surveillance and to track plaintiff 24 hours for the reason to torture plaintiff with highly advanced electronic guns as part of a government human radiation research experiment in retaliation against plaintiff for filing police misconduct complaints to deter and chase plaintiff out of California.

181.   Unknown current or former federal agent defendants used a FBI connected civilian institution **InfraGard Los Angeles Members Alliance (InfraGard)**, hired a private security military contractor **International Counterintelligence Services (ICS)**, and a local private security corporation **Bower Security & Bower Investigations** along with citizen police patrol groups to form a community of gang-stalkers whose job was to severely harass and follow plaintiff wherever he goes to create a negative induced environment to have plaintiff stop focusing on his legal matters.

182.   The InfraGard Members participated in a conspiratorial scheme with the assistance of the FBI in harassment and intimidation by way of dangerous weapons, racial epithets, provocation, and other informant tactics. For example, some tactics involved members using their children to stand near plaintiff at bus stops, in shopping centers, and food stores so that security cameras can record a "photo op" of plaintiff near the kids to build a criminal terrorist child sexual exploitation case against plaintiff.  The members used their cell phones cameras (mostly Motorola brand) as real-time monitoring devices recording plaintiff out in public view sending the information to federal local and/or foreign intelligence agents and InfraGard leadership. InfraGard members followed directions from the InfraGard FBI Coordinator in an attempt to chase plaintiff out of California to prevent plaintiff from filing his federal civil rights suit against numerous law enforcement officers in a court of law. InfraGard is a formed in 50 states, and in some stalking instances members were non-residents of California (Arizona, Utah, Oregon, Washington, and Nevada license plates) took part in the harassment and retaliation scheme having crossed state lines to intimidate and stalk plaintiff. Plaintiff, while visiting family,

encountered the defendants who all introduced themselves in a "by the book" fashion, in the State of Florida (cities of Pensacola, Saint Petersburg, and Miami).

The retaliative government anti-terrorism tactics includes around the clock surveillance, attempted infiltration using nationwide FBI InfraGard government informants, operational electronic harassment, disruption in communications, opening of mail, sending suspected terrorist text-message ALERTS to businesses and potential employers and potential female companions via cell phone, fabrication of official intelligence reports (Suspicious Activity Reports SARs) containing terrorist information, electric shock and torture using DEWS, attempted vehicle/ pedestrian collision, and other evil means of psychological torture in some cases informants using dogs to intimidate plaintiff.

**Presidential (Acts) Exploited By a Well-Organized Secret Society of Prejudicially-Biased Group of Federal Agents "Big Brother" in Protection of Corrupted State, Local, and Tribal Law Enforcement Peace Officers "Little Brother" That Opened the Door to Plaintiff Being Labeled as a High-Valued "Domestic Terrorist" "Terrorist Sleeper Cell" "Lone-Wolf Terrorist" Then Tortured and Used as a Human Guinea Pig for Human Radiation Experiments By Government Officials**

183.   BIG BROTHER and "little brother" purposely conjectured to classify plaintiff as a high-valued "domestic terrorist" "terrorist sleeper cell" or "lone-wolf terrorist" based on fictitious intelligence reports and then with the aide of civilian medical doctors illegally implanted an experimental Radio Frequency Identification (RFID) chip inside of plaintiff's body during an unnecessary surgery to physically track plaintiff 24 hours. As a cover-up and keep everything "cloak-and-dagger", the defendants supplied plaintiff's name to the Department of Defense (DOD) and other federal research agencies for human radiation experimenting (targeting) with an objective to have plaintiff covertly tortured and murdered from the damaging effects of more powerful experimental radiation poisoning DEWs. It is well possible, that the CIA, NSA, ODNI, and DHS, may be involved by way of logistical support and cognizant of the illegal use of the DEWs.

184.   The Patriot Act, Project BioShield Act, and the Intelligence Reform and Terrorism Prevention Act (the "Acts") were specifically designed to implement policies and guidelines to protect American citizens from a terrorist attack; however, the Acts were not intended as a means of retaliation to be used by racially-biased corrupted law enforcement agents as "scheming vigilante tools" to circumvent constitutional law.  Inattentively, Congress quickly passed the Acts without a comprehensive careful analysis of the major constitutional loopholes

1   that quietly exist which basically "opened the floodgates" for corrupted government law

2   enforcement and intelligence officials with personal grievances and prejudicial racial biases

3   against innocent homeless African-American military veterans and others who challenge

4   governmental authority in the assertion of their guaranteed First Amendment Freedom of

    Speech rights to file law enforcement civil rights misconduct complaints.

5       185.    The **Patriot Act,** loophole has given corrupted government law enforcement

6   officials, with personal prejudicially biased criticisms, *the power* (to) apply the emotion-laden

7   designations "domestic terrorist" "terrorist sleeper cell" and "lone-wolf terrorist"  to plaintiff who

8   filed legitimate civil rights complaints against up to 20 Caucasian and Hispanic police officers,

9   sheriff deputies, and tribal officers.

10      186.    The **Project BioShield Act,** loophole has given corrupted government law

11  enforcement counterintelligence and other federal and civilian intelligence officials, either by

12  direct participation (use of its own doctors) or by use of medical doctors acting as independent

13  contractors employed at hospitals under government contract, acting surreptitiously, *the power*

    to perform unnecessary angiogram surgeries or any unneeded surgery, to implant inside a

14  person's body, <u>without a patient's consent</u>, in plaintiff's case a "suspected terrorist' consent,

15  highly-secretive sophisticated radioactive experimental medical telemetry wireless Radio

16  Frequency Identification (RFID) GPS  tracking chips or any similar operating devices that

17  provides the government with the technical capability not only (to) track a person's geographic

18  location 24 hours a day but also the capability (to) monitor heart rate, and other vital bodily

19  functions, **see similar "Exhibit F"**. Moreover, the **Project BioShield Act**, basically re-

20  jumpstarted the Human Radiation Experiments (**see Department of Defense of June 1997:**

21  **Report on Search for Human Radiation Experiment Records 1944-1994**) that has given

22  government and civilian scientific researchers authorization to continue the human experiments

23  (and now using the homeless, African-Americans, military veterans, and other un-consented

    citizens who challenge governmental authority as guinea pigs) to develop medical

24  countermeasures to create a way to tell, with a few drops of blood, who has absorbed

25  dangerous radiation levels, part of the government's preparations against a terrorist "dirty bomb"

26  attack or "nuclear fallout" on the U.S. population.

27      187.    The benefactors of this research being the Department of Defense (DOD),

28  Department of Health and Human Services (HHS), and the National Aeronautics and Space

    Administration (NASA) who now have real-time wireless WiFi medical feedback (using the

biometric RFID implants for data collection) on the human effects of non-ionized and ionized radiation on the human body. Another reason being, the radiation dosimetries (dosages) plaintiff absorbed, in comparison to having taken thousands of X-rays, beginning sometime in January 2009 until present, is for data compilation of the effects of radiation on psychomotor capabilities and behavior stability  which clearly explains why federal agents secretly employed hundreds of hired private contractor defendant Bower Investigations, International Counterintelligence Services, FBI InfraGard member employees, and others as undercover informants ("people monitors") who were given the task to stalk, observe & report plaintiff's behavior by sending instant cell phone (mostly Motorola brand cell phones) text-messages to intelligence researchers whenever encountering plaintiff in public places

188.   People monitors accomplished their task with ease, for the reason. that plaintiff lived in a homeless shelter which is susceptible to infiltration by intelligence informants whom plaintiff has encountered on a daily basis. Plaintiff is always out in public view since becoming homeless in 2007 as a result of economic hardship.  In order to keep plaintiff out in public view (or homeless) for torture, human radiation experimenting and also from ascertaining the truth about whether an RFID chip or similar radioactive device was implanted inside of plaintiff's body, two continuing actions were needed to be performed by two supportive defendant departmental federal agencies:

(a)   Defendant **Department of Housing and Urban Development (HUD)** needed to block plaintiff's attempt to obtain Section 8 low-income housing to keep plaintiff out in open public view (on the streets and homeless) for easy law enforcement bodily access. As a military veteran with a priority preference code, plaintiff has been on the Section 8 housing waiting list for approximately 4 years when other veterans whom plaintiff spoke obtained Section 8 housing within a period of only up to 9 months. On July 08, 2010, plaintiff contacted Riverside County Section 8 housing and was told plaintiff is still on a waiting list. Plaintiff has been calling every month for the past 4 years only to get the same answer "still on waiting list." Plaintiff attempted to contact Defendant Tom Neilson, Section 8 Supervisor of Riverside County, but to no avail.

(b)   Defendant **Department of Veteran Affairs (VA)** needed to prevent plaintiff from ascertaining the truth about whether unknown federal counter-intelligence agents working at Defendant Desert Regional Medical Center and other intelligence agents, did illegally implant within plaintiff's body an experimental RFID tracking medical data transponder storage chip

during an un-needed angiogram surgery. On July 08, 2010, plaintiff did speak with a local VA Doctor who informed plaintiff that a Jerry L. Pettis Memorial VA Medical Center radiologist DENIED plaintiff, on three separate medical requests, for Magnetic Resonance Imaging (MRI). Plaintiff believes that the reason for the denials is because the MRI's intense magnetism will not only clearly show the miniaturized RFID metallic object but will cause the RFID to shift or create a burning sensation in plaintiff's body. The VA radiologist refuses to conduct a MRI of plaintiff's left chest and nearby bodily organs where plaintiff believes the RFID implant resides which plaintiff can feel at times when sleeping on his left.

189. The **Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA)** loophole has given a small select group of prejudicially-biased agents of the United States Intelligence Community (IC), especially federal agents of the FBI Counterintelligence (FBI COINTELPRO) who has a notorious history of human torture abuses, particularly against African-Americans, the absolute power (without supervisory oversight) to knowingly support the use of fabricated and untruthful *terrorist information* to build fictitious terrorism cases against citizens expressing their First Amendment rights. The federal and local law enforcement illegal use of terrorist information sets a "very dangerous" precedent that lacks accountability, and governmental oversight which can lead to crimes of purposeful selective  cultural genocide at the hands of a secret society of racist governmental law enforcement intelligence agents and prejudicially-biased local peace officers.

190. In plaintiff's case, now labeled as an upgraded high-valued "terrorist", prejudicially-biased Federal, State, local, and tribal law enforcement entities knowingly disseminated and shared fictitiously written Nationwide *Suspicious Activity Reports (SARs)* or similar reports with fusion centers, Joint Terrorism Task Forces (JTTF),  other federal departmental agencies, and the entire international law enforcement intelligence community and the International Police Organization (INTERPOL); thereby, putting plaintiff's life in  grave danger of being assassinated. In the month of February 2010, the then Director of National Intelligence Dennis Blair in congressional testimony said, "Being a U.S. citizen will not spare an American from getting assassinated by military or intelligence operatives…" which explains why, in the week of August 23, 2009, plaintiff witnessed a Caucasian male—who stood about 6'2", dark-colored hair, weighing about 190lbs, clean-shaven, and square-jawed—wearing what appeared to be a U.S. Navy or Coast Guard officer dress uniform (khaki looking) spying on plaintiff inside of Westfield Shopping Center's Barnes & Nobles Bookstore located in Palm Desert, CA. Plaintiff recognized

the uniform from having had taken Navy ROTC as an elective in high school. It also explains the
daily encounters of military veterans working as undercover informants who attempt to befriend
plaintiff at homeless shelters (Coachella Valley Rescue Mission and Roy's
Resource Center) but are denied the opportunity to do so.

191.   In the aftermath of September 11, 2001, the government has blatantly and
systematically ignored the constitutional loopholes created by the enactment of the Patriot Act,
the Intelligence Reform and Terrorism Prevention Act, and the Project BioShield Act. The facts
of this case acutely illustrate the need to incorporate enhanced governmental accountability and
oversight protections for individuals' rights, privacy, and civil liberties especially for those groups
considered as disadvantaged subclass citizens.

**Federal, State, Local, and Tribal Peace Officers Use of Fictitious Terrorist Information Intelligence *Suspicious Activity Reports* in Upgrading Plaintiff as a High-Level "Domestic Terrorist" to Secure Funding for Top Secret Government Human Research Projects Using Electromagnetic Weapons Against Innocent Citizens Who File Civil Rights Peace Officer Misconduct Complaints.**

192.   Suspicious Activity Reports (SARs) are defined as "official documentation of
observed behavior that may be indicative of intelligence gathering or pre-operational planning
related to terrorism, criminal, or other illicit intention." The SAR, which relies heavily on the
individual character of each and every government law enforcement officer engaged in writing
intelligence reports, has played a pivotal role in the government's characterization of plaintiff as
a high-valued home-grown "domestic terrorist", under the USA PATRIOT Act, that granted high-
ranking government officials within the Department of Justice, Director of Intelligence,
Department of Homeland Security, and others, who all should have been aware of the  bogus
terrorist information, to  seek out appropriate action in the form of an intelligence 'hit squad" to
eliminate a non-existent "domestic terrorist" threat by causing irreversible serious bodily injury to
plaintiff using DEWs without due process of law.

193.   The SARs are fabricated with the intent, as if, plaintiff is involved in *terrorism.*
Defendant federal agents, and others, method of operation (MO) involves taking photos of
plaintiff near banks; near small children whose parents instruct the child to stand near plaintiff;
near electrical power transformers adjacent to bus stops; near armored trucks while plaintiff
walks harmlessly pass; near Palm Springs International Airport as plaintiff waits at pick-up
points for the homeless; near unseen suspicious loud small explosions upon plaintiff's arrival in
a particular area; near suspicious brush fires; near suspicious commercial building parking

structure fires; near large public gatherings at parks; and near unknown informants with extremist views.

194.   Law enforcement defendants created fictionalized suspicious activity reports of plaintiff in buildings where informants report stolen goods, at shopping malls where store managers report customer shoplifting crimes, and where police friendly casinos report bomb threats. In addition, the illegally RFID chip implanted in plaintiff's body has the ability to record audio conversations (plaintiff is a walking recordable microphone),  so federal agents can record then later use an "RFID Up Loader" , **see Exhibit G**,  to upload the stored audio into a RFID scanner and listen to any discernible audio within an unspecified radius of plaintiff's body which explains why informant women near plaintiff say things such as" Stop, leave me alone!" and women with small children loudly crying, strategically placed near plaintiff, saying "I am going to tell my mommy!" along with other Caucasian males purposely sitting next to plaintiff in café's, speaking about presidential assassinations in a loud tone of voice. This false information is later used to generate fake SARs to be entered on the Terrorist Screening Database (TSDB) at the Terrorist Screening Center (TSC) to give the appearance plaintiff is a bona-fide "sleeper cell lone-wolf terrorist."

195.   Federal and civilian intelligence agents' with local Riverside County police officers and sheriff deputies use of this underlined falsified terrorist information by way of Suspicious Activity Reports (SARs) were used to justify a continuance to receive funding for their super secretive "black-ops" racially-biased project in building bogus terrorism cases against plaintiff that may result in plaintiff's early demise with the use of cancer-causing DEWs.

196.   To be more explicit, in the use of fictitious SARs, racially-biased federal and civilian intelligence agents have been using hand-held camcorders and closed-circuit television (CCTV) public security cameras to take snap-shots of plaintiff  which gives first appearance of criminal terrorist behavior, in the **summer of 2010**, with 9 other male laborers from the Coachella Valley Rescue Mission (a homeless shelter) being paid $50 each, while working on a desert highway near Salton Sea, CA, cleaning up spilled cantaloupes from an overturned semi-truck, plaintiff who was wearing his striped blue shirt tightly-wrapped around his head to ward of the blaring sunrays and resting on a wooden stick and did notice a Caucasian male, while grinning, sitting in his car parked along side of the highway taking camcorder video of plaintiff.

**Brief Historical Introduction to Microwaves and  Direct Energy Weapons (DEWs) aka Electronic Guns Used for Torturing and Human Radiation Experimenting on Plaintiff by a**

**Secret Society of Racially-Biased Government Law Enforcement and Civilian Intelligence Operatives in Retaliation for Plaintiff's Filing of Civil Rights Complaints**

197.   This part of plaintiff's case is not about fantasizing of UFOs or seeing 'little green men", but real-life events which plaintiff intend to prove the existence and use of these weapons. Beginning in 1953 and continuing intermittently for about three decades, the Russian Soviets used microwaves to covertly attack the U.S. embassy staff in Moscow, Russia. The ongoing irradiation campaign affected about 1,800 employees and 3,000 dependents housed at the embassy during this period. Russians targeted the U.S. embassy with 2.4 to 4.1 gigahertz, a range within the same realm of frequencies blasting from America's wireless cell phones but using extremely higher output power wattages. In the mid 1970s, a Johns Hopkins medical team under direction of Dr. Abraham Lilienfield was commissioned by the U.S. State Department to study the health effects of the Moscow irradiation on our embassy staffers. The draft report documented numerous symptoms of radiation poisoning, including immune system disorders, high white blood cell counts, chronic fatigue, blurred vision, cataracts, muscle aches, and cancer incidence among embassy staff was four times normal.

198.   U.S. officials knew about the Soviet assault from the beginning but they did not warn embassy staff for 10 years because, like the Soviets, the CIA was interested in studying the effects of irradiation on the human body. While monitoring the Soviet project, the CIA launched Project Pandora and nefarious parallel projects like TUMS, MUTS and BAZAR, some of which involved the military. These projects documented the horrible effects of radio frequency/microwave radiation on both animal and human subjects.

199.   *Electronic guns* or Direct Energy Weapon (DEWs) have been in the media spotlight since January 2009. Some years ago, the United States Department of Justice (DOJ) developed its own portable versions of the *Microwave Ray Electromagnetic Gun*, and other similar portable *hand-carried* and *backpack* sized electromagnetic microwave weapons. These weapons fire bursts of energy, from long and short range distances, with pin-point surgical precision in the form of microwave electromagnetic radiation that is underectable and invisible to the human eye and only felt by the intended targeted victim. The amount of radiation power released from these electronic guns is equivalent to having taken thousands of x-rays, if not more.

**Defendant FBI and Other Unknown Federal Agents Along With Civilian Private Government Counter-Intelligence Contractors Use of 21st Century Direct Energy Weapons (DEWS) on Plaintiff in Attempt to Induce an Artificial Heart Attack**

200.   The average unwary citizens (homeless people, African-Americans, military veterans, and other subclass societal mis-fortunates) who are at odds with their law enforcement communities by filing police misconduct complaints are not aware of the existence of DEWs only to learn within a matter of a few months, after filing a civil rights complaint, that they have an immediate onset of heart problems or cancer which then mis-directs the citizen's attention away from a federal civil rights law suit to concerns about one's health. The intelligence agents' selective use of this particular DEWs weapon is because heart attacks and cancer are common societal ailments disguising the weapons undetectable damaging deadly harmful effects. For example, some years ago R.G. Biles of the U.S. State Department was quoted as saying he believed it was possible to "induce a heart attack via radar."

201.   This is pure genius by corrupted law enforcement intelligence officials. If these weapons have reached the rich and the powerful who at a moments notice after an encounter with someone whom legal disagreement exists can contact the "black-market" to gain access to individuals possessing DEWs to use on their unknowingly opponents to kill them off within a matter of months or days of heart failure or brain trauma with the unknown attacker pointing the very powerful weapons at a person's chest or head area while hidden behind blacked-out windowed vehicles. A good example, strong factual data that indicate government Direct Energy Weapon (DEWs) usage, in case, United States vs Padilla, the legal team, for convicted terrorist Padilla, saying one incidents of torture Padilla experienced was "he felt a burning sensation pulsing through his chest…experienced swelling and pressure in his chest and arms. He was given an electrocardiogram and given medication."

202.   In plaintiff's case, one of many visits to the emergency room, plaintiff experienced a burning stabbing pain on the left-side of his chest with his heartbeat speeding up then slowing down for no apparent reason, and at the same time, felt as if plaintiff's stomach was going to explode. While undergoing emergency care at the Desert Regional Medical Center, plaintiff was told by one female ultra-sound medical technician who was examining plaintiff's abdomen area said that plaintiff's gall bladder "looks huge" minutes before being replaced by an unknown Hispanic male who quickly ushered her out of the examining room. Plaintiff later was given an electrocardiogram and an un-needed angiogram both tests returned negative. It is a fact, that internal body organ swelling results from an increase in temperature of that particular body part

being hit by the DEWs. Also, on March 13, 2010, plaintiff entire upper chest and arms became tight and swollen to the point where plaintiff who in the past was a well-rounded multi-faceted athlete felt like he completed a strenuous 45-minute work-out in the gym with weights.

**Federal and Government Contracted Civilian Intelligence Operatives Make Huge Mis-Calculation Error Deploying and Using DEWs on Plaintiff and His Immediate Family Members**

203.    In disbelief, as a result of plaintiff's filing of civil rights complaints, it appears that racially biased government officials have not only targeted plaintiff but also his entire immediate family by having labeled all 10 brothers and a sister as suspected domestic terrorists and now committing an act of purposeful <u>cultural genocide</u> in using the Patriot Act as an elaborate cover-up tool as a "license to kill" with the deployment of 21st century cancer-causing electromagnetic weapons over a period of months.

204.    After federal and civilian counter-intelligence agents became aware that plaintiff was taking down license plate numbers of suspicious vehicles having windshield attached GPS devices being used to track plaintiff's RFID implant, the defendant agents began using personalized licenses plates to send plaintiff coded threatening messages. Such as noted, on a van that purposely slowly drove past plaintiff with the license plate displaying, "ALLTEN" making reference to plaintiff's ten brothers.

205.    Plaintiff's family members are being used as a cover-up to give the appearance that plaintiff and family members have a genetic mutative medical history of stomach and colon cancer as a means of skillful deception in having plaintiff and his family members believe that their "all of a sudden" severe medical problems are due to a naturally inherited medical history of cancer. This explains, why (1) in December 2009, plaintiff sought hospital emergency room care for severe stomach pain and vomiting that lasted two days. Emergency medical doctors could not find the cause of plaintiff's stomach pain (2) plaintiff's younger brother #1, in January 2010, a month after plaintiff hospitalization, living in the State of Florida, sought hospital emergency room care for severe stomach pain just below his sternum area that lasted for approximately two days (3) another younger brother #2, who was visiting the State of Florida, began vomiting without feeling ill and not due to food poisoning, and (4) in November 2010, an older brother who was living in San Bernardino, CA, mysteriously turned ill with severe stomach pain and diagnosed with colon cancer that was so isolated that his doctors were in disbelief with how localized the cancer tumor was with no metastasis.

# CIVIL RIGHTS VIOLATIONS

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983 – FIRST AMENDMENT FREEDOM OF SPEECH – RETALIATION)
### (Against ALL Defendants)

206.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 205 above with the same force and effect as if herein set forth.

207.   At all times relevant herein, the conduct of all Defendants were subject to 42 U.S.C. secs. 1983, 1985, 1986, and 1988.

208.   Plaintiff vs. ALL Defendants.

209.   ALL Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

210.   Plaintiff was engaged in the filing of official legitimate, justifiable police officer and sheriff deputy misconduct complaints which are matters of public concern and are protected by the First Amendment. The Defendants took action against plaintiff.

211.   The following incidents began to occur within a two week period immediately after plaintiff filed a negligence claim against the *law enforcement* friendly passenger city bus company SunLine Transit Agency (whose general manager is the Pro Tem Mayor of the City of Cathedral City) and two days after plaintiff filed a police officer misconduct complaint on August 07, 2008, against a Cathedral City police officer Defendant Jose Nunez.

a)   **On August 10, 2008**, at about 4:47am, just two days, after calling 911 on fellow police officer Defendant Nunez who plaintiff accused of racial profiling, quickly led to plaintiff being falsely arrested by up to ten Cathedral City police officers on trumped up charges of 'suspicion of burglary', 'being under the influence of an intoxicating substance', and 'making annoying 911. Eight months later, plaintiff received a "Detention Certificate" from Defendant Lieutenant Laura Hanlon which basically states no probable cause existed leading to plaintiff's seizure and arrest, **see attachment Exhibit H**.

b)   **On November 22, 2008**, at about 4:49am, as he left his girlfriend's house, plaintiff was briefly detained by three Cathedral City police officers Defendants Lemus, Carbajal, and Gaines. This act of retaliation was quite obvious since Defendant Lemus had participated in the incident on August 10, 2008. Internal investigators Defendant Connor and Hanlon refused to fully investigate incident and neither formally completed the internal investigation nor provided plaintiff with documentation indicating that the investigation was complete.

c) **On March 18, 2009**, at about 10:38am, the Palm Springs Police Department took advantage of an opportunity to retaliate and harass plaintiff who called 911 for help to report an unprovoked case of assault & battery against a Social Security Office security guard, Defendant Jan Jones, who, on information and belief, received a pre-arrival warning from local law enforcement to treat plaintiff disrespectfully and rudely because of plaintiff's filing of police misconduct complaints. The Palm Springs Police Department police officers, Defendants Studer and Vegas, both non-African Americans, failed to conduct a full investigation into plaintiff's accusations of assault and battery and treated plaintiff as the suspect instead of the victim.

d) **On July 22, 2009**, at about 8:42am, near Labor Ready, on the corners of Manufacturing and Varner Roads, in Thousand Palms, CA, a Palm Desert Riverside County sheriff deputy, Defendant Chaney, stopped, detained, intimidated, harassed, and assaulted plaintiff with a deadly weapon with the intent plaintiff would become fearful and leave Riverside County. As the incident took place, plaintiff called the FBI in Los Angeles, so FBI agents could hear in real-time what was taking place.

e) **On October 05, 2009**, a Palm Desert Riverside County sheriff deputy Defendant Christopher Gelinas purposefully drawn one of his deadly weapons (a metallic expandable baton) and threatened plaintiff with its use without any justification or provocation for doing so.

f) **On November 13, 2009**, plaintiff suspected that unknown defendant federal agents after earlier labeling plaintiff as a "high-value domestic terrorist" instructed defendant Desert Regional Medical Center and defendants Cardiologist Ronald B. Himelman M.D., DRMC defendant Cardiologist John Doe#1, Debbie Inencios and DOES, with malicious intent to fraudulently performed an unnecessary coronary angiogram surgery on plaintiff as a pre-textual cover-up with the intent to implant an experimental illegal radio frequency identification electronic device (RFID) chip inside of plaintiff's body without his informed consent as a favor for local law enforcement officials whom plaintiff filed numerous civil rights complaints.

g) On **August 28, 2010**, Riverside County sheriff deputy Defendant Adams, badge #4053, seized plaintiff's person, at a homeless shelter, moments after plaintiff played the role of a "Good Samaritan" in rendering emergency non-medical aid to an emotionally distraught woman who stated she consumed large doses of drugs.

212.   The Defendants' unrelentless retaliation against plaintiff with the hopes of chilling plaintiff's protected speech, was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, law enforcement apprehension, and loss of enjoyment of life.

213.   The Defendants' action of retaliation would not have occurred if it were not for plaintiff's protected speech of filing civil rights police misconduct complaints. As a result of the Defendants' actions chilling plaintiff's protected speech, plaintiff was deprived, and the due course of justice was impeded, in violation of the First and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE**, Plaintiff demands judgment for the chilling of his free speech against the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $25,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages, except defendants City of Cathedral City, City of Palm Springs, and County of Riverside, in the amount of $5,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983 – UNREASONABLE SEIZURE)

214.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 213 above with the same force and effect as if herein set forth.

215.   At all times relevant herein, the conduct of all Defendants were subject to 42 U.S.C. secs. 1983, 1985, 1986, and 1988.

216.   Plaintiff vs. Defendants City of Cathedral City, County of Riverside, Nunez, DeVeas, Bird, Lemus, Brothers, Gaines, Carbajal, Chaney, Covington, Robertson, Gelinas, Cleary, May, Adams, Debbie Inocencio, Bill Buckley, John Does No. 1- 4, JANE Doe No. 1, and John Doe No. 42. Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

217.   In seizing plaintiff's person, the Defendants acted intentionally and the seizure was unreasonable. Plaintiff did not consent and the Defendants conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

218.    As a result of the Defendants unreasonable seizure, plaintiff was deprived of his liberty, and the due course of justice was impeded, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE**, Plaintiff demands judgment for the unreasonable seizure against the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

### THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983 – UNREASONABLE SEARCH)

219.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 218 above with the same force and effect as if herein set forth.

220.    Plaintiff vs. Defendants City of Cathedral City, DeVeas, and Bird.

221.    Defendants were acting under color of law or purporting to act in the performance of his official duties. The defendants did not have a warrant.

222.    In conducting their search, Defendants DeVeas and Bird acted intentionally and the search was unreasonable. The Defendants conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

223.    As a result of Defendants DeVeas and Bird unreasonable search, Plaintiff was deprived of his liberty and the due course of justice was impeded, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE**, Plaintiff demands judgment for the unreasonable search against Defendant DeVeas and Bird, for actual, general, special, compensatory damages in the amount of $150,000 and further demands punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### FOURTH CAUSE OF ACTION

### (42 U.S.C. § 1983 – EXCESSIVE FORCE)

224.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 223 above with the same force and effect as if herein set forth.

225.   Plaintiff vs. Defendants City of Cathedral City, County of Riverside, DeVeas, Bird, Lemus, Brothers, Chaney, Gelinas, John Does No. 1- 4, and JANE Doe No. 1.

226.   Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

227.   On **August 10, 2008**, after <u>seizing</u> plaintiff, Defendants DeVeas, Bird, Lemus, Brothers, John Does No. 1- 4, and JANE Doe No. 1, surrounded by no less than eight police officers, used force in <u>arresting</u> plaintiff who was touched, handcuffed, and shoved into the back seat of a police car. While at the Cathedral City jail, Bird, with the use of his hands, physically touched and forced wide-opened plaintiff's eyelids on more than three occasions while conducting drug tests which failed to produce Bird's expected results.

228.   On **July 22, 2009**, after Chaney <u>seized</u> plaintiff, and later arrival of defendants Covington and Robertson, Chaney used excessive force with the use of a deadly weapon with Chaney grasping (not resting on top) the butt of his gun with his right-hand while slowly maneuvering directly behind plaintiff who felt threatened and feared for his life.

229.   On **October 05, 2009**, after Gelinas and Cleary <u>seized</u> plaintiff, without provocation, Gelinas had drawn-out of his holster a deadly weapon (a 21 inch metallic baton) and while grasping (not resting on top) the baton with his right-hand threatened plaintiff with its use. The force used by the Defendants was excessive.

230.   The Defendants conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life. As a result of the Defendants use of excessive force, plaintiff was deprived of his liberty, and the due course of justice was impeded, in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE**, Plaintiff demands judgment for the excessive force against the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

### FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – UNLAWFUL ARREST)

231.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 230 above with the same force and effect as if herein set forth.

232.   Plaintiff vs. Defendants City of Cathedral City, DeVeas, Bird, Lemus, Brothers, John Does No. 1- 4 and JANE Doe No. 1. Defendants were acting under color of law or purporting to act in the performance of his or her official duties. The Defendant police officers, on **August 10, 2008**, arrested plaintiff without a warrant.

233.   No complaint, information, or indictment was ever sworn against plaintiff alleging offenses occurring prior to the moment Defendant Bird handcuffed plaintiff and told him he was under arrest. It was the defendants' intention to entrap plaintiff into making a 911 call to justify an arrest on trumped up charges for calling 911 on a fellow officer who violated plaintiff's Civil Rights, two days prior.

234.   The Cathedral City Police Department (CCPD), itself, did not believe they had probable cause, as demonstrated by the fact that CCPD releasing plaintiff pursuant to P.C. § 849(b)(1) immediately after his arrest. Reluctantly, with CCPD still in denial, eights months later, Lieutenant Laura Hanlon gave plaintiff a "Detention Certificate," telling him that being taken into custody was recorded as a "detention only" and that "there are insufficient grounds for making a criminal complaint against the person arrested."

235.   The Defendants conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life. As a result of the Defendants concerted unlawful and malicious arrest, plaintiff was intentionally deprived of his liberty in violation of the Fourth Amendment of the Constitution of the United States and 42 U.S.C. sec.1983.

**WHEREFORE**, Plaintiff demands judgment for the unlawful arrest against the Defendants, jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

### SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983 – SUPERVISOR LIABILITY)**
**(Against Former Cathedral City Police Chief Defendant Stan Henry)**

236.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 235 above with the same force and effect as if herein set forth.

237.   Plaintiff vs. Defendant Stan Henry.

238.   The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Stan Henry's subordinates police officers Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, Jose Nunez, Jessica Carbajal, A. Lemus, Brothers, Larry Gaines, John Does No. 1- 4, and JANE Doe No. 1, deprived plaintiff of his particular rights under the United States Constitution.

239.   On **October 05, 2009**, Defendant Stan Henry <u>directed</u> a subordinate unknown Cathedral City Police Department (CCPD) police officer to harass and mock plaintiff hours after an un-provoked assault on plaintiff by a Riverside County sheriff deputy.

240.   On **February 04, 2009**, Defendant Stan Henry <u>directed</u> subordinate CCPD Records Supervisor Anita Singleterry to tamper with evidence and obstruct justice by falsifying official government documents. The official document, a CCPD police blotter dated 2/04/09, Event# 0808C-1402, dispatcher information had been intentionally left out or deleted.

241.   On **January 26, 2009**, from 9:15am to 11:15am, Defendant Stan Henry, who was not physically present during the unannounced interview, <u>directed</u> subordinate Captain Kevin Connor (Connor) to request an impromptu interview with plaintiff who originally had visited the Cathedral City Police Department to pick-up copies of documents related to his claims of illegal search & seizure, excessive force, and false arrest.  Connor implied that plaintiff was a sexual rapist. Plaintiff never received a copy of the internal investigative report results referencing nine of his subordinate officers civil rights violations.

242.   During an interview, on **November 27, 2008**, at precisely 11:24am, Defendant Stan Henry, who was not physically present during the interview, <u>directed</u> subordinate Lieutenant Laura Hanlon (Hanlon), a CCPD Internal Affairs Unit Investigator, to not fully investigate plaintiff's claims of police misconduct and to twist the facts surrounding plaintiff's claims of false arrest and other civil rights violations. Plaintiff never received a copy of the internal investigative report results.

243.   On **November 22, 2008**, at approximately **4:49am**, Defendant Stan Henry, who was not physically present at the scene, <u>directed</u> subordinate CCPD police officers Lemus, Jessica Carbajal, and Larry Gaines to use a home located within a half block of plaintiff's former

girlfriend's house to setup a stake-out with the intent to harass and intimidate plaintiff for having filed citizen police misconduct complaints against 9 CCPD officers.

244.   On **August 10, 2008**, at approximately **4:40am**, Defendant Stan Henry, who was not physically present at the scene, <u>directed</u> subordinate CCPD police officers Corwin DeVeas, Jeffrey Bird, Lemus, Brothers, John Does No. 1- 4, and JANE Doe No. 1, to seize, search, use excessive force, to falsify a police report, and arrest plaintiff without probable cause for calling 911 on CCPD police officer Jose Nunez who plaintiff accused of illegal seizure and racial profiling just two days before plaintiff's arrest on August 10, 2008.

245.   On **August 07, 2008**, at approximately **4:45am**, Defendant Stan Henry, who was not physically present at the scene, <u>directed</u> subordinate CCPD police officer Jose Nunez to seize and racially profile plaintiff without probable cause.

246.   Defendant Stan Henry, with deliberate indifference to the consequences, established and maintained a custom which directly caused the subordinate police officer violations. In fact, this practice was clearly revealed when, in **September 2002**, in a case entitled **Glen Haas, et al. v. Cathedral City, et al.** ,the Cathedral City Police Officers Association ("CCPOA") filed a complaint against Defendant Stan Henry (Chief Henry), and two other administrators that brought into public light the corrupt practices of Stan Henry's administration including the "cover-up of the 'Goon Squad' incident <u>where a Cathedral City Police Lieutenant gave an illegal order to officers during a briefing to intentionally intimidate a citizen.</u>" Once the Haas Complaint was filed,  in retaliation, on **April 27th, 2004**, in the United States District Court, **FEDERAL COURT EDCV 02-965, CV 0402931**, a complaint for damages was filed on behalf of 27 Cathedral City Police Officers (27 CCPD officers) charging defendant former police chief Defendant Stan Henry and other police administrators in the department for unlawful retaliation. Stan Henry's administration acting under the *color of law* intimidated, threatened, harassed, and punished the 27 CCPD subordinate police officers as a result of their roles in the Haas case. The 27 CCPD officers claimed Stan Henry used several intimidation tactics designed to prevent or dissuade them from testifying freely, honestly and openly in the Haas case. <u>In one implausible malicious tactic</u>, Stan Henry disclosed to the public some of the 27 CCPD police officers' home addresses and other confidential information in violation of California law.

247.   Again, this practice was clearly revealed when, on **January 23, 2008**, Sharon Stephens (Miss Stephens), a 65-year old woman, filed a police misconduct complaint against

the Cathedral City Police Department (CCPD). Defendant Stan Henry and other administrators soon began thereafter a "conspiratorial, covert and clandestine investigation" which led to Miss Stephens' false arrests.  To further retaliate and harass Miss Stephens, Defendant Stan Henry and other CCPD administrators conducted unannounced interviews and slandered (lies upon lies) Miss Stephens to the point that high-ranking government officials placed her name on the Department of Homeland Security (DHS) Terrorist Screening Database (TSDB) in Sacramento, CA.

248.    Defendant Stan Henry set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive plaintiff of his rights. Defendant Stan Henry failed to act to prevent his subordinates from engaging in such conduct. The Defendant Stan Henry's and his subordinates conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

### SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
### (Against Cathedral City Police Sergeant Defendant Corwin DeVeas)

249.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 248 above with the same force and effect as if herein set forth.

250.    Plaintiff vs. Defendant Corwin DeVeas.

251.    The Defendant was acting under color of law or purporting to act in the performance of his official duties.

252.    The acts of Defendant Corwin DeVeas' subordinates' police officers Jeffrey Bird, A. Lemus, Brothers, John Does No. 1- 4, and JANE Doe No. 1, deprived plaintiff of his civil rights under the United States Constitution.

253.    Defendant Corwin DeVeas knew, or in the exercise of reasonable diligence should have known, of subordinates CCPD police officers Jeffrey Bird, Lemus, Brothers, John Does No. 1- 4, and JANE Doe No. 1 wrongful conduct in plaintiff's seizure, search, excessive force,

and arrest. Defendant Corwin DeVeas' response was so inadequate that it showed deliberate indifference to, or tacit authorization of, his subordinates conduct.

254. Defendant Corwin DeVeas set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive plaintiff of his rights. Defendant DeVeas knew that the substance of his subordinate officer Bird's police report was untrue but approved of Bird's crime report anyway.

255. Defendant Corwin DeVeas failed to act to prevent his subordinates from engaging in such conduct. Defendant Corwin DeVeas' and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### EIGHTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY Act of Final PolicyMaker)
### (Against Defendant City of Cathedral City)

256. Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 255 above with the same force and effect as if herein set forth.

257. Plaintiff vs. Defendant City of Cathedral City.

258. Stan Henry, the former Cathedral City police chief, was acting under color of law or purporting to act in the performance of his official duties.

259. The acts of Stan Henry, with deliberate indifference, are based on his unwritten informal policies communicated to his subordinate administrators and police officers who deprived plaintiff of his First, Fourth, Fifth and Fourteenth Amendment Rights under the United States Constitution. Stan Henry's informal unwritten communicated policies involve a pattern of constitutional abuse against any citizen or subordinate officer who challenged his authority:

(1)     Intimidation of citizens, in **September 2002**, in a case entitled <u>Glen Haas, et al. v. Cathedral City, et al</u>, the Cathedral City Police Officers Association ("CCPOA") filed a complaint against Stan Henry and two other administrators that brought into public light the

corrupt practices of Stan Henry's administration including the "cover-up of the 'Goon Squad' incident <u>where a Cathedral City Police Lieutenant gave an illegal order to officers during a briefing to intentionally intimidate a citizen</u>."

(2)    Falsifying of official government documents, **in April 2004**, Jeff Miller (Officer Miller), an ex-Cathedral City Police Officer, took part in the Haas case, a Federal lawsuit against Stan Henry; Officer Miller's name was placed on Stan Henry's "<u>target hit list</u>." Stan Henry spent in excess of $50,000 initiating an internal investigation against Officer Miller.  Stan Henry then with assistance of a friendly Riverside County DA investigator obtained a search warrant against Officer Miller.  After having read the search warrant personally drafted up by Stan Henry, former CCPD Officer Miller later stated "…<u>it was filled with so many lies it was pathetic</u>." The City settled out of court to keep Officer Miller quiet.

(3)    Falsely arresting citizens who file citizen police misconduct complaints, on **January 23, 2008**, Sharon Stephens (Miss Stephens), a 65-year old woman, filed a police misconduct complaint against the Cathedral City Police Department (CCPD). Stan Henry and other administrators soon began thereafter a "<u>conspiratorial, covert and clandestine investigation</u>" which led to Miss Stephens' false arrests.

(4)    Retaliating against witnesses who speak out publicly about mismanagement and corrupt business practices of the Cathedral City Police Department, on **April 27th, 2004**, in the United States District Court, **FEDERAL COURT EDCV 02-965, CV 0402931**, a complaint for damages was filed on behalf of 27 witnesses who charged Stan Henry and other police administrators in the department for unlawful retaliation to prevent or dissuade them from testifying freely, honestly and openly in a civil rights case against the City of Cathedral City.

(5)    Providing the names of citizens who file legitimate citizen police misconduct complaints to the Department of Homeland Security that mistakenly labels the citizen as a "domestic terrorist", on **January 23, 2008**, Sharon Stephens (Miss Stephens), a 65-year old woman, after filing a police misconduct complaint against the Cathedral City Police Department (CCPD). Miss Stephens' stated that Stan Henry's administration told lies to <u>high-ranking</u> government officials who then placed Miss Stephens name on the <u>Terrorist Screening Database</u> (TSDB) in Sacramento, CA.

260.    Stan Henry had final policymaking authority from Defendant City of Cathedral City concerning these acts which led Stan Henry's subordinate police officers to seize, search, use

excessive force, falsify a criminal report, and falsely arrest plaintiff. When Stan Henry engaged in these acts, he was acting as a final policymaker for Defendant City of Cathedral City. Stan Henry's unwritten policies was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment against Defendant City of Cathedral City, for actual, general, special, compensatory damages in the amount of $1,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### NINTH CAUSE OF ACTION
**(42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Adopted Custom)**
**(Against Defendant City of Cathedral City)**

261.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 260 above with the same force and effect as if herein set forth.

262.    Plaintiff vs. Defendant City of Cathedral City.

263.    Stan Henry, the former Cathedral City police chief, was acting under color of law or purporting to act in the performance of his official duties.

264.    The acts of Stan Henry, with deliberate indifference, are based on Stan Henry's unwritten custom and practice communicated to his subordinate administrators and police officers who deprived plaintiff of his civil rights under the United States Constitution.

265.    Stan Henry's informal unwritten custom and practice demonstrate a pattern of constitutional abuses against citizens and subordinate officers who challenged his authority. Plaintiff having put on notice the City of Cathedral City by filing four police misconduct complaints against Stan Henry and his subordinate officers clearly demonstrate a wide-spread custom of retaliation against citizens who file civil rights police misconduct complaints. Stan Henry acted pursuant to an expressly adopted longstanding custom and practice of Defendant City of Cathedral City who failed to take action against its employees who commit constitutional abuses against citizens who file police misconduct complaints.

266.    Defendant City of Cathedral City adopted Stan Henry's informal custom and practices concerning these acts which led Stan Henry's subordinate police officers to seize, search, use excessive force, falsify a criminal report, and falsely arrest plaintiff.

267.    When Stan Henry engaged in these acts, he was acting as a final policymaker for Defendant City of Cathedral City. Stan Henry's informal unwritten policies was a substantial

factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Cathedral City, for actual, general, special, compensatory damages in the amount of $1,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## TENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Failure to Train)
### (Against Defendant City of Cathedral City)

268.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 267 above with the same force and effect as if herein set forth.

269.   Plaintiff vs. Defendant City of Cathedral City.

270.   The acts of Defendant City of Cathedral City's failure to train its employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, Jose Nunez, Jessica Carbajal, A. Lemus, Brothers, Larry Gaines, John Does No. 1- 4, and JANE Doe No. 1, deprived plaintiff of his civil rights under the United States Constitution.

271.   Defendant City of Cathedral City's employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, Jose Nunez, Jessica Carbajal, A. Lemus, Brothers, Larry Gaines, John Does No. 1- 4, and JANE Doe No. 1, were acting under color of law or purporting to act in the performance of his or her official duties. Defendant City of Cathedral City's had knowledge of or should have known of its police officer training deficiencies that were publicly manifested.

272.   The training policies of the Defendant City of Cathedral City were not adequate to train its police officers to handle the usual recurring situations with which they must deal. The Defendant City of Cathedral City was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately.

273.   Defendant City of Cathedral City knew its failure to train its employees would result in constitutional violations which led police officers to seize, search, use excessive force, falsify a criminal report, and falsely arrest plaintiff. The failure of the Defendant City of Cathedral City to provide adequate training caused the deprivation of plaintiff's rights as to be the moving force that caused police officers to seize, search, use excessive force, falsify a criminal report, and falsely arrest plaintiff. Defendant City of Cathedral City failure to train its employees was a

substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Cathedral City, for actual, general, special, compensatory damages in the amount of $1,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

**ELEVENTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Negligent Hiring)**
**(Against Defendant City of Cathedral City)**

274.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 273 above with the same force and effect as if herein set forth.

275.    Plaintiff vs. Defendant City of Cathedral City.

276.    The acts of Defendant City of Cathedral City's adopted policy of negligent hiring of its employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus deprived plaintiff of his civil rights under the United States Constitution.

277.    Defendant City of Cathedral City's employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus were acting under color of law or purporting to act in the performance of his or her official duties.

278.    Defendant City of Cathedral City's failed to check adequately employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus background when hiring him or her. Defendant City of Cathedral City's failure to check adequately employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus background amounted to deliberate indifference to the risk that a violation of plaintiff's civil rights would follow the hiring decision.

279.    The Defendant City of Cathedral City's failure to check adequately employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus background proximately caused the violation of plaintiff's civil rights. The failure of the Defendant City of Cathedral City to adequately check the backgrounds of its employee police officers caused the deprivation of plaintiff's rights as to be the moving force that

caused police officers to seize, search, use excessive force, falsify a criminal report, and falsely arrest plaintiff.

280.   Defendant City of Cathedral City's failure to check adequately employee police officers Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, and Lemus backgrounds was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Cathedral City, for actual, general, special, compensatory damages in the amount of $1,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## TWELVTH CAUSE OF ACTION

### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Ratification)
### (Against Defendant City of Cathedral City)

281.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 280 above with the same force and effect as if herein set forth.

282.   Plaintiff vs. Defendant City of Cathedral City.

283.   Stan Henry, the former Cathedral City police chief, was acting under color of law or purporting to act in the performance of his official duties.

284.   The acts of Stan Henry, with deliberate indifference, are based on Stan Henry's unwritten informal policies communicated to his subordinate administrators and police officers who deprived plaintiff of his First, Fourth, Fifth and Fourteenth Amendment Rights under the United States Constitution.

285.   Stan Henry's informal unwritten communicated policies involve a pattern of constitutional abuse against any citizen or subordinate officer who challenged his authority.

286.   On January 06, 2009 and August 26, 2009, referencing all police misconduct complaints, plaintiff received letters of "Rejection of Claim" from Defendant City of Cathedral City pertaining to plaintiff's claim for damages which is understood by plaintiff that Defendant City of Cathedral City approved of and cleared all subordinate police officers of any unconstitutional conduct.

287.   Stan Henry acted pursuant to an expressly adopted longstanding unwritten widespread custom and practice of defendant City of Cathedral City having denied plaintiff's

claim for damages all but approve and accept as constitutional (1) police officers can retaliate against citizens who file police misconduct complaints (2) police officers can illegally seize and intimidate citizens who have filed police officer misconduct complaints (3) police officers can label as "domestic terrorists" and fabricate intelligence reports to gain funding for bogus federal criminal terrorist investigations against citizens who file police officer misconduct complaints (4) police officers can refuse to give and to deny internal affairs police misconduct investigation reports to citizens seeking justice for civil rights violations (5) police officers can conjure fictitious criminal intelligence investigations (using the Patriot Act as a tool) to build a bogus terrorism case against citizens who appear to be anti-government by having filed police officer misconduct complaints, and (6) police officers  can use excessive force against citizens who file civil rights complaints against police officers, and (7) police officers can falsely arrest citizens who file citizen police misconduct complaints.

288.   Stan Henry had final policymaking authority from Defendant City of Cathedral City concerning the acts of Stan Henry's subordinate police officers Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, Jose Nunez, Jessica Carbajal, A. Lemus, Brothers, Larry Gaines, John Does No. 1- 4, and JANE Doe No. 1 who to seized, searched, used excessive force, falsified a criminal report, and falsely arrested plaintiff.

289.   Stan Henry ratified his subordinate police officers Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin DeVeas, Jeffrey Bird, Jose Nunez, Jessica Carbajal, A. Lemus, Brothers, Larry Gaines, John Does No. 1- 4, and JANE Doe No. 1 acts and the basis for it, that is, Stan Henry knew of and specifically approved of the employees' acts.

290.   Stan Henry's unwritten policies was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Cathedral City, for actual, general, special, compensatory damages in the amount of $5,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## THIRTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
### (Against Riverside County Sheriff Deputy Captain Defendant Dan Wilham)

291.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 290 above with the same force and effect as if herein set forth.

292.   Plaintiff vs. Defendant Dan Wilham.

293.   The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Dan Wilham's subordinates' sheriff deputies Covington, Chaney, Robertson, Elders, Gelinas, and Cleary deprived plaintiff of his particular rights under the United States Constitution.

294.   Defendant Dan Wilham, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the subordinates' sheriff deputies violations. In fact, this policy, practice, or custom was clearly revealed when, after plaintiff filed a Temporary Restraining Order (TRO) against Gelinas who unequivocally stated, in his November 03, 2009, Declaration "that it is common for law enforcement officers to rest our hands on our guns or any other weapon..." Gelinas' declared statement is an undeniable factual reflection of policy, custom, and practice of Riverside County and Riverside County Sheriff's Department.

295.   Defendant Dan Wilham set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive plaintiff of his rights. Defendant Dan Wilham failed to act to prevent his subordinates from engaging in such conduct. Defendant Dan Wilham's and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## FOURTEENTH CAUSE OF ACTION

### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)

### (Against Riverside County Sheriff Deputy Sergeant Defendant Covington)

296.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 295 above with the same force and effect as if herein set forth.

297.   Plaintiff vs. Defendant Covington.

298.   The Defendant was acting under color of law or purporting to act in the performance of her official duties. The acts of Defendant Covington's subordinates' sheriff deputies Chaney and Robertson deprived plaintiff of his particular rights under the United States Constitution.

299.   On **July 22, 2009**, Defendant Covington, who was physically present at the scene, failed to intervene as plaintiff's constitutional rights were being violated by subordinate Chaney who seized and used excessive force against plaintiff with Chaney intentionally grasping the butt of his gun with his right-hand while slowly maneuvering directly behind plaintiff.

300.   Defendant Covington knew, or in the exercise of reasonable diligence should have known, of subordinates' sheriff deputies Chaney and Robertson's wrongful conduct in seizing and using excessive force against plaintiff without probable cause. Defendant Covington's response was so inadequate that it showed deliberate indifference to, or tacit authorization of, sheriff deputies Chaney and Robertson's conduct.

301.   Defendant Covington failed to act to prevent her subordinates from engaging in such conduct. Defendant Covington's and her subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### FIFTEENTH CAUSE OF ACTION
#### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
#### (Against Riverside County Sheriff Deputy Sergeant Defendant Elders)

302.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 301 above with the same force and effect as if herein set forth.

303.   Plaintiff vs. Defendant Elders.

304.    The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Elders' subordinates' sheriff deputies Gelinas and Cleary deprived plaintiff of his particular rights under the United States Constitution. On **October 05, 2009**, Defendant Elders, who was not physically present at the scene, with Gelinas telephoning Defendant Elders immediately after the incident, failed to properly supervise subordinates' sheriff deputies Gelinas and Cleary who seized and used excessive force against plaintiff with Gelinas drawing his deadly metallic baton without provocation then threatening plaintiff for filing citizen sheriff and police misconduct complaints against co-worker deputy Chaney and Cathedral City police officers.

305.    Defendant Elders knew, or in the exercise of reasonable diligence should have known, of subordinates' sheriff deputies Gelinas and Cleary's wrongful conduct in seizing and using excessive force against plaintiff without probable cause.

306.    Defendant Elders response was so inadequate that it showed deliberate indifference to, or tacit authorization of, sheriff deputies Gelinas and Cleary's conduct. Defendant Elders failed to act to prevent his subordinates from engaging in such conduct.

307.    Defendant Elders' and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## SIXTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
### (Against Riverside County Sheriff Deputy Sergeant Defendant Horkel)

308.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 307 above with the same force and effect as if herein set forth.

309.    Plaintiff vs. Defendant Horkel.

310.    The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Horkel's subordinates' sheriff deputies

1    Garcia, Rivera, and Montes deprived plaintiff of his particular rights under the United States

2    Constitution.

3        311.    Defendant Horkel knew, or in the exercise of reasonable diligence should have

4    known, of subordinates' sheriff deputies Garcia, Rivera, and Montes' wrongful conduct by

5    tampering with evidence and obstruction of justice in denying the existence of incident reports.

     Defendant Horkel's response was so inadequate that it showed deliberate indifference to, or
6
     tacit authorization of, subordinate sheriff deputies Garcia, Rivera, and Montes' conduct.
7
     Defendant Horkel's and his subordinates' conduct was a substantial factor in causing plaintiff's
8
     pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of
9
     earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment
10
     of life.

11       **WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general,

12   special, compensatory damages in the amount of $500,000 and further demands judgment

13   against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this

14   action, including attorney's fees and such other relief deemed to be just and equitable.

15                              **SEVENTEENTH CAUSE OF ACTION**

16                        **(42 U.S.C. § 1983 – SUPERVISOR LIABILITY)**

17            **(Against Riverside County Sheriff Deputy Captain Raymond Gregory)**

18       312.    Plaintiff repeats, realleges, and incorporates by reference the allegations in

     paragraphs 1 through 311 above with the same force and effect as if herein set forth.
19
         313.    Plaintiff vs. Defendant Gregory.
20
         314.    The Defendant was acting under color of law or purporting to act in the
21
     performance of his official duties. The acts of Defendant Gregory's subordinate sheriff deputy
22
     Adams deprived plaintiff of his Fourth Amendment Rights under the United States Constitution.
23
         315.    Defendant Gregory knew, or in the exercise of reasonable diligence should have
24
     known, of subordinates' sheriff deputy Adams wrongful conduct by seizing plaintiff with threats
25
     and intimidation. Defendant Gregory's response was so inadequate that it showed deliberate
26
     indifference to, or tacit authorization of, subordinate sheriff deputy Adams' conduct. Defendant
27
     Gregory's and his subordinate's conduct was a substantial factor in causing plaintiff's pain and
28
     suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning

     capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### EIGHTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
### (Against Riverside County Sheriff Stanley Sniff)

316.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 315 above with the same force and effect as if herein set forth.

317.    Plaintiff vs. Defendant Stanley Sniff.

318.    The Defendant Stanley Sniff was acting under color of law or purporting to act in the performance of his official duties.

319.    The acts of Defendant Stanley Sniff's subordinates' sheriff deputies Wilham, Gregory, Covington, Chaney, Robertson, Elders, Gelinas, Cleary, and Adams deprived plaintiff of his civil rights under the United States Constitution.

320.    Defendant Stanley Sniff, with deliberate indifference to the consequences, established and maintained unwritten informal policy and custom directly caused the subordinates' sheriff deputies violations.

321.    Defendant Stanley Sniff set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive plaintiff of his rights. Defendant Stanley Sniff failed to act to prevent his subordinates from engaging in such conduct. Defendant Stanley Sniff's and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant Sniff, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### NINTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY Act of Final PolicyMaker)
### (Against Defendant County of Riverside)

322.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 321 above with the same force and effect as if herein set forth.

323.   Plaintiff vs. Defendant County of Riverside.

324.   Stanley Sniff, the Sheriff of Riverside County, was acting under color of law or purporting to act in the performance of his official duties.

325.   The acts of Stanley Sniff, with deliberate indifference, are based on Stanley Sniff's unwritten informal policies communicated to his subordinate administrators and sheriff deputies who deprived plaintiff of his First, Fourth, Fifth and Fourteenth Amendment Rights under the United States Constitution. Stanley Sniff had final policymaking authority from Defendant County of Riverside concerning these acts which led Stanley Sniff subordinate sheriff deputies to violate plaintiff's constitutional rights by seizing, using excessive force, racially profiling, and falsifying a criminal intelligence report.

326.   When Stanley Sniff engaged in these acts, he was acting as a final policymaker for Defendant County of Riverside. Stanley Sniff unwritten policies was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant County of Riverside, for actual, general, special, compensatory damages in the amount of $5,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

**TWENTIETH CAUSE OF ACTION**
**(42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Adopted Custom)**
**(Against Defendant County of Riverside)**

327.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 326 above with the same force and effect as if herein set forth.

328.   Plaintiff vs. Defendant County of Riverside.

329.   Stanley Sniff, the Sheriff of Riverside County, was acting under color of law or purporting to act in the performance of his official duties. The acts of Riverside County Sheriff Stanley Sniff, with deliberate indifference, are based on Stanley Sniff's longstanding unwritten custom and practice communicated to his subordinate administrators and sheriff deputies who deprived plaintiff of his civil rights under the United States Constitution.

330.   On January 05, 2010, plaintiff received letters of "Notice of Rejection of Claim by Operation of Law" from the Riverside County Board of Supervisors pertaining to plaintiff's claim for damages in Claim No. 557-09 and Claim No. 558-09 which is understood by plaintiff that a Riverside County Sheriff Department Internal Affairs Report cleared both of the subordinate deputies' of any unconstitutional conduct.

331.   Stanley Sniff acted pursuant to an expressly adopted longstanding unwritten widespread custom and practice of Defendant County of Riverside having denied plaintiff's claim for damages all but approve and accept as constitutional (1) sheriff deputies  can grasp the butts of their guns while slowly walking behind citizens in un-provoked non-confrontational situations to intimidate citizens who file police misconduct complaints (2)  sheriff deputies can draw their deadly weapons (metallic batons) without provocation and threaten with its use citizens who have file peace officer misconduct complaints  (3) sheriff deputies can illegally seize and intimidate citizens who have filed sheriff deputy misconduct complaints (4) sheriff deputies can label as "domestic terrorists" and fabricate intelligence reports to gain funding for bogus federal criminal terrorist investigations against citizens who file peace officer misconduct complaints (5) sheriff deputies can refuse to give and to deny incident reports to citizens seeking justice for civil rights violations committed against them by vindictive deputies seeking vengeance against citizens who file peace officer misconduct complaints (6) sheriff deputies can conjure fictitious criminal intelligence investigations (using the Patriot Act as a tool) to build a bogus terrorism case against citizens who appear to be anti-government by having filed sheriff deputy misconduct complaints, and (7) sheriff deputies can use excessive force against citizens as a means of retaliation for having filed civil rights complaints against their departments.

332.   Defendant County of Riverside City adopted Stanley Sniff's informal custom and practices concerning these acts which led Stanley Sniff's subordinate sheriff deputies to violate plaintiff's constitutional rights by seizing, using excessive force, racially profiling, denying government reports, and falsifying a criminal intelligence report. Defendant County of Riverside employee Stanley Sniff's unwritten custom was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant County of Riverside, for actual, general, special, compensatory damages in the amount of $5,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### TWENTY-FIRST CAUSE OF ACTION
#### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Failure to Train)
#### (Against Defendant County of Riverside)

333.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 332 above with the same force and effect as if herein set forth.

334.    Plaintiff vs. Defendant County of Riverside.

335.    The acts of Defendant County of Riverside's sheriff deputies Wilham, Gregory, Horkel, Covington, Chaney, Robertson, Elders, Gelinas, Cleary, and Adams deprived plaintiff of his First, Fourth, Fifth, Ninth, and, Fourteenth Amendment Rights under the United States Constitution. Defendant Wilham, Gregory, Covington, Horkel, Chaney, Robertson, Elders, Gelinas, Cleary, and Adams were acting under color of law or purporting to act in the performance of his or her official duties.

336.    The training policies of the Defendant County of Riverside were not adequate to train its sheriff deputies to handle the usual and recurring situations with which they must deal. The Defendant County of Riverside was deliberately indifferent to the obvious consequences of its failure to train its sheriff deputies adequately.

337.    The failure of the Defendant County of Riverside to provide adequate training caused the deprivation of the plaintiff's right's by the Defendant County of Riverside's sheriff deputies Wilham, Gregory, Covington, Chaney, Horkel, Robertson, Elders, Gelinas, Cleary, and Adams; that is the Defendant County of Riverside's failure to train is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury. Defendant County of Riverside failure to train adequately was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Defendant County of Riverside, for actual, general, special, compensatory damages in the amount of $5,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### TWENTY-SECOND CAUSE OF ACTION
#### (42 U.S.C. § 1983 – MUNICIPAL LIABILITY based on Ratification)
#### (Against Defendant County of Riverside)

338.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 337 above with the same force and effect as if herein set forth.

339.   Plaintiff vs. Defendant County of Riverside.

340.   Stanley Sniff, the Sheriff of County of Riverside, was acting under color of law or purporting to act in the performance of his official duties. The acts of Riverside County Sheriff Stanley Sniff, with deliberate indifference, are based on Stanley Sniff's longstanding unwritten custom and practice communicated to his subordinate administrators and sheriff deputies who deprived plaintiff of his First, Fourth, Fifth and Fourteenth Amendment Rights under the United States Constitution. On January 05, 2010, plaintiff received letters of "Notice of Rejection of Claim by Operation of Law" from the Riverside County Board of Supervisors pertaining to plaintiff's claim for damages in Claim No. 557-09 and Claim No. 558-09 which is understood by plaintiff that a Riverside County Sheriff Department Internal Affairs Report cleared both of the subordinate deputies' of any unconstitutional conduct.

341.   Defendant County of Riverside City adopted Stanley Sniff's informal custom and practices concerning these acts which led Stanley Sniff's subordinate sheriff deputies to violate plaintiff's constitutional rights by seizing, using excessive force, racially profiling, denying government incident reports, and falsifying criminal intelligence reports.

342.   Stanley Sniff had final policymaking authority from Defendant County of Riverside concerning the acts of Stanley Sniff's subordinate sheriff deputies Wilham, Gregory, Covington, Chaney, Horkel, Robertson, Elders, Gelinas, Cleary, and Adams who seized, searched, used excessive force, and falsified criminal reports. Stanley Sniff ratified his subordinate sheriff deputies Wilham, Gregory, Covington, Chaney, Horkel, Robertson, Elders, Gelinas, Cleary, and Adams acts and the basis for it, that is, Stanley Sniff knew of and specifically approved of the employees' acts. Stanley Sniff's unwritten policies was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against Defendant County of Riverside, for actual, general, special, compensatory damages in the amount of $5,000,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## TWENTY-THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)

**(Against Palm Springs former Police Chief Defendant David G. Dominguez)**

343. Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 342 above with the same force and effect as if herein set forth.

344. Plaintiff vs. Defendant David G. Dominguez.

345. The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Chief David G. Dominguez's subordinates Palm Springs Police Department (PSPD) police officers Donald Crager, Michael Studer, and Vega deprived plaintiff of his First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights under the United States Constitution. Defendant David G. Dominguez, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the subordinate police officer violations. In fact, this policy, practice, or custom was clearly revealed when, on two separate other occasions, that Palm Springs Police Department police officers treated plaintiff unequally and did not fully investigate plaintiff's alleged complaints of un-provoked assaults by Caucasian males for the reasons that Plaintiff is an African-American male citizen who filed citizen civil rights peace officer misconduct complaints against Riverside County sheriff deputies and Cathedral City police officers.

346. Defendant David G. Dominguez set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive plaintiff of his rights. Defendant David G. Dominguez failed to act to prevent his subordinates from engaging in such conduct. The Defendant David G. Dominguez's and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### TWENTY-FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – SUPERVISOR LIABILITY)
### (Against Palm Springs Police Sergeant Donald Crager)

347.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 346 above with the same force and effect as if herein set forth.

348.   Plaintiff vs. Defendant Donald Crager.

349.   The Defendant was acting under color of law or purporting to act in the performance of his official duties. The acts of Defendant Crager's subordinates' police officers Studer and Vegas deprived plaintiff of his First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights under the United States Constitution.

350.   Defendant Donald Crager knew, or in the exercise of reasonable diligence should have known, of subordinates' police officers Studer and Vegas' wrongful conduct in treating plaintiff unequally and unfairly. Defendant Donald Crager's response was so inadequate that it showed deliberate indifference to, or tacit authorization of, police officers Studer and Vegas' conduct. Defendant Donald Crager's failed to act to prevent his subordinates from engaging in such conduct. Defendant Donald Crager's and his subordinates' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, law enforcement apprehension, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the Defendant, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against said Defendant, for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

**TWENTY-FIFTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 – EQUAL PROTECTION OF THE LAWS; RACIAL PROFILING)**

351.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 350 above with the same force and effect as if herein set forth.

352.   Plaintiff vs. Defendants Nunez, DeVeas, Bird, Lemus, Brothers, Chaney, Covington, Robertson, Gelinas, Cleary, May, Studer, Vegas, John Does No. 1- 4 and JANE Doe No. 1.Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

353.   The Defendants (whose objective was to injure, oppress, and intimidate) maliciously and willfully discriminated against plaintiff that was based totally on his race as an African-American black male. The Defendants' discriminatory intent to seize plaintiff without

probable cause was a substantial factor in causing plaintiff's humiliation, mental and emotional injuries, loss of earning capacity, law enforcement apprehension, and loss of enjoyment of life. As a result of Defendants Nunez, DeVeas, Bird, Lemus, Brothers, Chaney, Covington, Robertson, Gelinas, Cleary, John Does No. 1- 4 and JANE Doe No. 1 (all of whom are non African-American) intentional acts of racial profiling, plaintiff was deprived of both his liberty without due process of law and equal protection of the laws, and the due course of justice was impeded, in violation of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

WHEREFORE, Plaintiff demands judgment for racial profiling against the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $500,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $500,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## TWENTY-SIXTH CAUSE OF ACTION

### (42 U.S.C. § 1983 – EQUAL PROTECTION OF THE LAWS; UNEQUAL TREATMENT)

354.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 353 above with the same force and effect as if herein set forth.

355.   Plaintiff vs. Defendants Studer and Vegas.

356.   Defendants were acting under color of law or purporting to act in the performance of his official duties.

357.   Defendant Studer failed to treat plaintiff (who is an African American black male) assault case as serious as other assaults involving Caucasians (Whites) by not conducting a full investigation into the matter. Defendant Studer because of his racial bias towards plaintiff (an African American male) gave Jan Jones (a Caucasian female) a free pass by failing to fully investigate a crime of assault against her reported by plaintiff.

358.   Plaintiff was harmed and that Defendant's racial bias was a substantial factor in causing plaintiff's humiliation, mental and emotional injuries, suffering, and loss of enjoyment of life. As a result of Defendant Studer racial bias and unequal treatment, plaintiff was deprived of equal protection of the laws, and the due course of justice was impeded, in violation of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

WHEREFORE, Plaintiff demands judgment for unequal protection against the Defendant for actual, general, special, compensatory damages in the amount of $500,000 and further

demands judgment against each of said Defendants for punitive damages in the amount of $100,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

## TWENTY-SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – DUE PROCESS EQUAL PROTECTION; RACIAL DISCRIMINATION)
### (Against ALL Defendants)

359.  Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 358 above with the same force and effect as if herein set forth.

360.  Plaintiff vs. ALL Defendants.

361.  Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

362.  Each Defendant beginning August 07, 2008 thru February 2011conspired to deprive Plaintiff of the equal protection of the laws based on prejudicial motivated racial-bias against plaintiff for filing legitimate civil rights police misconduct complaints against over 20 law enforcement peace officers all of whom are non-African American.

363.  Plaintiff was harmed and that ALL Defendants' discriminatory intent was a substantial factor in causing plaintiff's humiliation, mental and emotional injuries, suffering, and loss of enjoyment of life. As a result of their concerted racial discriminatory acts, Plaintiff was deprived of both his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE**, Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $5,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages, except defendant cities and counties, in the amount of $5,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## TWENTY-EIGHTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – VIRTUAL STRIP SEARCH)

364.  Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 363 above with the same force and effect as if herein set forth.

365.  Plaintiff vs. Defendants City of Cathedral City, Stan Henry, JANE Doe No. 1.

366.   Defendant was acting under color of law or purporting to act in the performance of her official duties. As a result of their concerted unlawful malicious arrest, detention, and confinement of plaintiff, caused plaintiff to be subjected, in the Cathedral City Police Department jail, to a virtual strip search of his body by Defendant JANE Doe No 1.

367.   Defendant JANE Doe No. 1 deprived plaintiff of his rights under the Fourth Amendment to the Constitution when operating a highly advanced x-ray full body scanning imaging machine in conducting a virtual strip search of plaintiff's naked body without plaintiff's prior consent and not telling plaintiff of the dangerous radiation risks that this machine presents to the human body, and thus deprived plaintiff of both his right to liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fourth, Fifth, Ninth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983.

368.   The Defendants conduct was a substantial factor in causing plaintiff's physical injuries, humiliation, mental and emotional injuries, loss of earning capacity, law enforcement apprehension, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment for the bodily strip search against Defendant Stan Henry and JANE Doe No. 1 for actual, general, special, compensatory damages in the amount of $1,000,000 and further demands judgment against the Defendant for punitive damages, except defendant City of Cathedral City, in the amount of $200,000, plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### TWENTY-NINTH CAUSE OF ACTION
**(42 U.S.C. § 1985 (3) & 1986 – CONSPIRACY)**

369.   Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 368 above with the same force and effect as if herein set forth.

370.   Plaintiff vs. ALL Defendants.

371.   The Defendants were acting under color of law or purporting to act in the performance of his or her official duties.

372.   All defendants violated their responsibilities by refusing to prevent or aid in the prevention of the civil rights violations perpetrated against plaintiff, which they had the ability to do, and which they knew existed.

373.   Plaintiff charges that the violations and injuries complained of herein were brought about by a retaliative conspiracy among some or all of the defendants and others, whereby,

1    beginning on or about August 07, 2008 and at various times thereafter, a "meeting of the minds"

2    occurred that consisted of all of the Defendants who all formed a "joint action" civil conspiracy to

3    *up the ante* in applying severe psychological and physical pressure with the intent and objective

4    to deter plaintiff from testifying freely, fully, and truthfully in court by attempting (to) chase

5    plaintiff out of Riverside County and the State of California,  (to) slowly murder plaintiff under the

6    veneer of an accidental death using torturous cancer-causing electromagnetic microwave guns,

7    (to) cause massive delays until the period of statute of limitations expires,  (to) protect the

8    corporate assets of local public entities and private businesses who plaintiff had ongoing

9    legitimate civil litigation, and (to) protect the law enforcement careers and their department

10   reputations that lauds allegiance to the "good ol boy" network of local police officers and sheriff

11   deputies who consider themselves "above the law" .

     374.   Plaintiff was harmed.

12   375.   On **July 26, 2008**, plaintiff suffered a fractured ankle while stepping off a city bus

13   and files a formal complaint against Sunline Transit Agency for negligence in preparation for a

14   civil lawsuit. Within a week or so, of the filing of plaintiff's negligent civil suit against Sunline

15   Transit Agency, quite coincidentally after disembarking off a any Sunline Transit Agency bus,

16   plaintiff began to observe marked defendant Bower Security (whose sister company is

17   defendant Bower Investigations) vehicles and unmarked personal heavily tinted windowed

18   vehicles following plaintiff around whichever city he happen to be visiting at the time in

19   Coachella Valley which includes the cities of Palm Desert, Palm Springs, Indio, Rancho Mirage,

     La Quinta, and Cathedral City.

20   376.   For many years, plaintiff has used Sunline Transit Agency's public bus

21   transportation and at one point witnessed a defendant Bower Investigations advertisement

22   displayed on a Sunline Transit Agency bus sometime after plaintiff was injured in 2008. This

23   suggested that a contract existed between the two companies. On information and belief,

24   Sunline Transit Agency hired Bower Investigations and its sister company Bower Security to

25   investigate plaintiff related to the filed negligence complaint for damages against one of its bus

26   drivers given that plaintiff was being followed by Bower Security vehicles. Defendant William

27   Bower Associates Incorporated, subsidiary companies Bower Investigations and Bower Security

28   are so intertwined that some Bower Security officers, who may work as police officers, became

     involved in the investigation of plaintiff.

377.   Driving white colored blue-striped mustangs, the Bower Security officers' presence suspiciously followed just minutes after plaintiff spotted a local city police vehicle in the nearby area. Plaintiff believes local police officers who worked as part-time security officers for Bower Security communicated plaintiff's exact geographical location to off-duty police officers working as investigators for Bower Investigations who were hired to investigate the legitimacy of plaintiff's negligent claim.  After only just 12 days of the filing of plaintiff's negligence complaint against the Sunline Transit Agency, on **August 07, 2008**, Cathedral City Police Department (CCPD) officer gets caught stalking and following plaintiff. As a result of the police officers behavior, plaintiff calls 911 and later files a civil rights racial profiling complaint against the CCPD officer. The police officer may be a part-time security officer for Bower Security/ Bower Investigations.

378.   On **August 10, 2008**, two days after plaintiff called 911 on their fellow police officer for racial profiling, up to 10 Cathedral City police officers (non of whom were African-American) did surround, stop, detain, harass, and ridicule plaintiff. The lead officer arrested plaintiff for suspicion of burglary, being under the influence of an illegal substance, and making annoying 911 calls. Plaintiff was physically manhandled, handcuffed, shoved into the back of a police vehicle, and transported to jail.

379.   Over 8 months later, plaintiff demanded and later given a **Detention Certificate** that basically states that the arresting officer lacked probable cause to stop, detain, and arrest plaintiff. Plaintiff accused CCPD of retaliation with the intent to intimidate and harass plaintiff for filing a negligence complaint against the Sunline Transit Agency and for calling 911 emergency on one of its police officers who racially profiled plaintiff.

380.   Just past the 100-day mark, which is the cutoff time a citizen has to file a formal complaint against a police officer, plaintiff anticipated that CCPD would attempt to harass plaintiff again. On **November 22, 2008**, three Cathedral City police officers did briefly stop and harass plaintiff. Plaintiff filed his third police misconduct complaint against the Cathedral City Police Department for retaliation.

381.   In **December 2008**, local law enforcement used a female teenager who rides the Sunline Transit Agency bus as a hired informant to purposely position herself close to plaintiff on a very crowded, standing room only, bus with the informant female later made a false complaint with local police in hopes of entrapping plaintiff in some sort of a sexual assault investigation. This ill-conceived entrapment scheme fizzled upon police review of security bus surveillance

video which would have easily exonerated plaintiff. This inaction left local law enforcement frustrated and bewildered but later changed their strategy.

382.    Beginning on or about **January 2009**, and continuing to the present time, and in furtherance of the conspiracy again with a new strategy, a "meeting of the minds" occurred that consisted of Cathedral City Police Chief Stan Henry, Bower Security & Bower Investigations CEO William Richard Bower, Chief Investigator of Bower Investigations and Private Investigator for International Counterintelligence Services Ron Ayala, Arizona's International Counterintelligence Services CEO Michael Rabern and former CEO David Rabern, Palm Springs Police Chief David G. Dominguez, Palm Desert Riverside County Sheriff Department Captain Dan Wilham, and Sunline Transit Agency Board Director Manager Bud England and others to apply severe pressure to chase plaintiff out of Riverside County. However, this law enforcement and private enterprise joint action conspiracy scheme could not go into effect until plaintiff's 6-month State Tort Claim statute of limitations expired—in June 2009—against the Cathedral City Police Department in order for the defendants to avoid the possibility of plaintiff's filing another legitimate civil rights complaint against more Cathedral City police officers and other possible defendants.

383.    While law enforcement intelligence officials waited behind the scenes for plaintiff's statute of limitations to expire in June 2009, local police officials remained alert for any opportunity to come into contact with and harass plaintiff by closely monitoring and following him. On **March 18, 2009**, the Palm Springs Police Department took advantage of an opportunity to harass when plaintiff called 911 for help to report an unprovoked case of assault & battery by a Social Security Office security guard who received communication from local law enforcement to treat plaintiff disrespectfully and rudely upon conducting a bag check. Upon their arrival, the Palm Springs police officers treated plaintiff who called for help as the suspect instead of the victim.

384.    Around end of **April 2009** or beginning of **May 2009**, two escorting Cathedral City marked police vehicles with an all black unmarked heavily tinted windowed vehicle between the two police vehicles pass plaintiff twice near on the corner of Date Palm/ Ramon Road. A short while later, plaintiff began having problems breathing with an irregular heartbeat. The police officers and possibly FBI agents used a modified police RADAR gun or a 21st century electronic gun to fire bursts of electromagnetic microwave energy with the intent to induce heart failure in plaintiff or to administer remote electrical shock to torture.

385.   In **June 2009**, the 6-month statute of limitations period expired for plaintiff to file his civil rights case in state court. As expected, about two weeks later, the conspirators, in thinking plaintiff defaulted on his chance to file a civil suit, put their conspiracy scheme into action to drive plaintiff out of Riverside County or commit his murder.

386.   The defendants' continue their conspiracy, on **June 11, 2009**, plaintiff files 4th police misconduct complaint against the Cathedral City Police Department for a continual onslaught of harassment and retaliation. Two weeks later, near a Wal-Mart on Ramon Road, plaintiff was followed and harassed over a half of a mile by a Cathedral City police officer driving a heavily tinted windowed police vehicle.

387.   On **July 11, 2009**, at the corners of Fred Waring and Highway 111, plaintiff caught red-handed a Bower Security officer—who was driving a white colored blue striped mustang—closely following plaintiff over a quarter of a mile, so plaintiff called 911 to report criminal stalking because plaintiff could not be sure if whether or not the a part-time security officer was one of the Cathedral City police officers whom plaintiff filed misconduct complaints. Plaintiff files complaint against William Bower Associates Incorporated (subsidiaries Bower Security and Bower Investigations) with the California Bureau of Investigative Services and Better Business Bureau.

388.   Around **mid-July 2009**, after numerous unsuccessful attempts "to chase" plaintiff out of Coachella Valley, federal and Coachella Valley law enforcement *covertly* hired private security contractor Bower Investigations who were already under contract with Sunline Transit Agency. Not being able to fulfill the private security contractual agreement, Chief Investigator Ron Ayala, of Bower Investigations, who is also a private investigator for International Counterintelligence Services (ICS), enlisted the help of Michael Rabern, CEO of ICS and David Rabern, former CEO and now top consultant, of ICS based in Scottsdale, Arizona.

389.   As a <u>former CIA operations officer and freelance mercenary</u>, David Rabern has the inside counterintelligence law enforcement connections, if needed, to obtain any type of "top of the line" advanced weaponry to injure plaintiff. However, in order for this criminal conspiracy of murder to take place, ICS needed full government approval from defendants BIG BROTHER (California Department of Homeland Security, FBI, DNI, DOJ, CIA, and others) who devised an elaborate fictitious scenario to characterize plaintiff as a suspected fanatical "domestic terrorist" to justify the funding for plaintiff's covert assassination to keep plaintiff's constitutional abuses quiet. With Ron Ayala's <u>Special Undercover/ Covert Investigations and Anti-Terrorist Counter-</u>

<u>Assault Hand-to-Hand Tactical Training</u> background, and ICS Michael Rabern/David Rabern's world-wide counterterrorism connections/ skills and thousands of undercover agents, with access to unimaginable 21st century electromagnetic cancer-causing guns, Defendants figured it will be easy to "get rid of" plaintiff without anyone ever knowing what happened to a poor homeless un-educated African-American military veteran.

390.   On **July 22, 2009**, in Thousand Palms, CA, a Palm Desert Riverside County sheriff deputy stopped, detained, intimidated, harassed, and assaulted plaintiff with a deadly weapon with the intent plaintiff would become fearful and leave Riverside County. Plaintiff filed a civil rights complaint for racial discrimination and assault against the deputy.

391.   After contacting the Federal Bureau of investigations (FBI) in regards to the sheriff deputy, in August 2009, local law enforcement, Bower Investigations, and private military contractor International Counterintelligence Services began a massive covert military style operations investigation with possible FBI and/ or CIA intervention with the intent to harass and/ or "neutralize" plaintiff to protect the vital interests of the Coachella Valley Law Enforcement Community using Direct Energy Weapons (DEWs) or electromagnetic microwave guns.

392.   On **August 09, 2009**, the defendants first attacked plaintiff's transportation. While plaintiff was visiting inside the Palm Desert Public Library some unknown person did purposely flattened the front tire of plaintiff's mountain bike.

393.   On **August 12, 2009**, early morning, the defendants' second attack focused on a psychological assault. As plaintiff left his storage area location walking the same path he has done so for over 2 years, a very big freshly killed partially decapitated dead rat was discovered. Plaintiff viewed this act as a threat that if plaintiff remained in Riverside County he may end up dead.

394.   The evening of **August 12, 2009**, the defendants' third attack was directed at plaintiff's communications. While using the computers in the word processing room in the Palm Desert Public Library, plaintiff's cell phone received a bombardment of multiple incoming calls at very short intervals (760-408-2423) which is the same number that plaintiff used to contact the FBI on the sheriff deputy and call 911 on a Bower Security officer for stalking; plaintiff cell phone mysteriously short-circuited. The cell phone was damaged beyond repair.

395.   Also, in the month of **August 2009**, plaintiff's email account was threatened with deactivation and on a daily basis constant confrontational stalking by third-party Bower Investigations & International counterintelligence Services under cover agents mostly of South

American descent. One Caucasian male attempted to run plaintiff over near Ramon/ Crossley Roads. A second male driver attempted to run plaintiff over with driver running a red light on purpose driving a black Mercedes, LIC# ?FVN, on Ramon Road near Palm Springs Airport.

396.    On **August 25, 2009**, between 5pm to 7pm, while browsing the Barnes & Nobles Bookstore in the Palm Desert Westfield Shopping Center, plaintiff observed a 20 something clean-cut Caucasian male wearing a U.S.  Navy khaki uniform, following and closely watching plaintiff.

397.    On **August 26, 2009**, at about 3:25pm, after shopping at Wal-Mart and now was headed for a bus stop on Ramon Road near the Palm Springs International Airport, with precise timing, plaintiff noticed flying directly towards him a light-grayish helicopter with no side windows with an under carriage having a small square looking design with a crissed-crossed pattern leading to a center point. The aircraft flew directly and very briefly hovered over (about a two seconds) plaintiff leaving plaintiff feeling a strange painful feeling penetrating downward from his upper left chest (about an inch below his left collar bone) directly into his heart. The slicing penetrating pain felt as if plaintiff had had radiation therapy which lasted for approximately 7 days.

398.    While visiting the Palm Desert Public Library, on **August 27, 2009**, at about 4:30pm, the library internet mysteriously shutdown in the midst of plaintiff using one of its computers to access the internet to research a former CIA operative named David Rabern who is the founder of International Counterintelligence Services ICS) headquartered in Arizona who, on information and belief, is one of the conspirators who was hired as a private contractor to attack plaintiff. At about 5:15pm, after the computer internet mysteriously shutdown at the Palm Desert Public Library, plaintiff left the library and approached the Palm Desert Westfield Shopping Center parking lot area, a brownish SUV vehicle with Arizona license plates (LIC#030SSR) slowly and purposely drives in very close proximity of plaintiff. Since plaintiff had been writing down license plates of all suspicious vehicles, the Hispanic male driver intentionally allowed plaintiff to visually inspect his Arizona license plates in order for the federal agents to confirm whether plaintiff had correctly identified ICS as one of his attackers. Very shortly, thereafter, plaintiff did not witness individuals driving vehicles with Arizona license plates anymore.

399.    **On October 05, 2009**, at about 2:00am, in the morning, in a retaliation scheme with Palm Desert Riverside County Sheriff Deputies, Defendants Gelinas and Cleary, and Agua

Caliente Casino Resort & Spa security officers, Defendant May and John Doe, became part of a criminal conspiracy (by detaining and surrounding plaintiff) to cause severe physical harm to plaintiff upon Defendant Gelinas purposeful drawing of one of his deadly weapons (a metallic expandable baton) and threatened plaintiff with its use without any justification in doing so.

400.    **On November 13, 2009,** plaintiff suspected that Defendant Desert Regional Medical Center and its employee defendants Cardiologist Ronald B. Himelman M.D., DRMC defendant Cardiologist John Doe#1, and DOES, with malicious intent for <u>fraudulently performing</u> an unnecessary coronary angiogram surgery on plaintiff as a pre-textual cover-up with the intent to implant an experimental illegal radio frequency identification electronic device (RFID) chip inside of plaintiff's body <u>without his informed consent</u> as a favor for local law enforcement officials whom plaintiff filed numerous civil rights complaints.

401.    **On December 7, 2009,** today as plaintiff waited in the Martha's  Kitchen Homeless shelter feeding line plaintiff noticed a gray heavily tinted windowed Cadillac parked in the food distribution dock area which is located directed behind plaintiff at about 40 yards or so. After, a minute or so, with my back facing towards the vehicle, plaintiff felt a tingling sensation in his upper back. Plaintiff looked around and could not see anyone inside of the vehicle because of the black-out windows. However, after leaving the cafeteria, plaintiff decided to take a closer look at the vehicle which was still parked in the same place. As plaintiff got closer and attempted to view the vehicle from the front but before plaintiff could see the vehicle made a very quick 180 degree turn and left the premises.

402.    On **December 31, 2009, at 3:05pm,** while waiting at the bus stop on Ramon Road near the Wal-Mart in Palm Springs, plaintiff noticed a Caucasian male parked in the parking lo facing Office Depot. Plaintiff began to feel the onset of microwave radiation exposure so he walked up to the vehicle with the male still inside, peep inside to discover a light blue electronic gadget plugged into the cigarette lighter port. The device looked similar to a miniature police portable RADAR gun having a bank of LED battery indicator lights glowing from yellow to green. This was plaintiff's first physical sighting of a direct energy weapon. The SUV vehicle displayed British of Columbia license plates.

403.    **On January 01, 2010,** at about 10:08am, an Indio Police Department police officer, driving a deeply tinted windowed police vehicle (license# 1258697), Defendant Caucasian male (John Doe), followed and harassed plaintiff at the corners of  Date and Calhoun Streets in Indio, CA.

404.  **In February 2010**, plaintiff requested thru a local military veteran liaison for a copy of plaintiff's U.S. Army military medical records and to have the documents sent to plaintiff's mailing address at the Cathedral City Post Office. Plaintiff served in the military from March 1982 to March 1989. However, upon receiving the manila envelope in the mail from the Department of Defense, plaintiff first noticed that the mail had been tampered with (opened and resealed with thick mailing tape). After removing the contents of the envelope, all documents should have been military files dated between 1982 thru 1989; however, plaintiff shockingly noticed that the first two pages of plaintiff's U.S. military medical documents had been intentionally replaced with civilian hospital medical documents of a surgery plaintiff had in 1997. Apparently, an unknown federal agent illegally obtained plaintiff's civilian historical medical documents then opened plaintiff's government mail and inserted these two civilian medical document pages to send a strong message to plaintiff that he was up against a very powerful adversary BIG BROTHER watching over Coachella Valley local law enforcement "little brother" who plaintiff accused of numerous constitutional civil rights violations.

405.  **On March 04, 2010**, plaintiff visited the homeless shelter at Martha's Kitchen for a free meal and while standing in line, for the second time, a gray convertible Cadillac vehicle (license plate # 5TAL840) was parked in the same area. After, a minute or so, with my back facing towards the vehicle, plaintiff felt a tingling sensation in his upper back. Plaintiff looked around and could not see anyone inside of the vehicle because of the black-out windows. However, after leaving the cafeteria, plaintiff decided to take a closer look at the vehicle which was still parked in the same place. As plaintiff got closer and attempted to view the vehicle from the front but before plaintiff could see the vehicle made a very quick 180 degree turn and left the premises. Plaintiff realized he had been attacked with a direct energy weapon.

406.  **On March 5, 2010**, on the corner of East Palm Canyon and Racquet Club Drive, suspiciously with no other traffic, at about 7pm, plaintiff witnessed a very unusual, never seen before, all jet black mini-motor home van (similar to a crime scene van) having black curtains covering the left-side window and with a black circular fanned-out dome antenna on top with smaller antennae located elsewhere. As plaintiff walked in the crosswalk, plaintiff began to feel the onset of symptoms of microwave radiation exposure. However, this time plaintiff felt the pain mostly on the left side of his chest. This pain felt like plaintiff had just had open heart surgery. The residual pain lasted for approximately two days after. Plaintiff attacked with electromagnetic cancer causing gun.

407.  **On January 10, 2011,** at about 9:34am, while waiting at a bus stop in La Quinta, near the Walmart Superstore, a law enforcement blue and white helicopter flew directly in a straight flight path towards my direction. Since plaintiff experienced this type of activity before by other government and civilian agents, plaintiff immediately knew to expect that the undercover agents were about to fire direct energy weapons at plaintiff. The prior incidents all share similar flight path attack positions by flying at about 900 feet to 1,200 feet in altitude, flying straight towards plaintiff without deviation form about 2 miles in distance, the pilot activating the engine propeller in quiet mode to not give away their position until in firing range with the direct energy weapons striking plaintiff before he learns of the helicopter's position. This incident caused plaintiff's upper left and center chest area sore for approximately five days.

408.  On **January 12, 2011**, at about 5pm, after leaving the Larson Justice Center Courthouse in Indio, CA, plaintiff suffered a electromagnetic gun attack on the left side of his head which left plaintiff with a severe headache and feeling as if plaintiff had just been injected with CT scan contrast fluid.

409.  All the named Defendants agreed or understood that both their methods of achieving to neutralize plaintiff were unlawful and would result in injury or death to plaintiff, and agreed and understood that each would act in concert with the others to achieve this purpose. The Defendants' undertook the acts described above with malice, and intent to injure plaintiff and possibly cause harm to his immediate family members.

410.  . Unless prevented by appropriate injunctive measures, Defendants will continue to inflict injury upon plaintiff by continuing to fire the slow killing electromagnetic cancer-causing microwave guns at plaintiff's body that is undergone permanent DNA structural damage with memory loss and radiation bone poisoning.

411.  As a result of their concerted unlawful and malicious conspiracy, plaintiff is being deprived of both his civil rights, liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the of the Constitution of the United States and 42 U.S.C. sec. 1983.

**WHEREFORE,** Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $100,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $75,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## THIRTIETH CAUSE OF ACTION

### (18 U.S.C. § 241 – CONSPIRACY TO INTERFERE WITH CONSTITUTIONAL RIGHTS)

412.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 411 above with the same force and effect as if herein set forth.

413.    Plaintiff vs. ALL Defendants.

414.    The Defendants were acting under color of law or purporting to act in the performance of his official duties. Beginning August 2008 thru February 2011, Defendants knowingly agreed to conspire to label plaintiff as a "domestic terrorist" to severely torture plaintiff using electromagnetic guns as a means of retaliation against plaintiff for filing legitimate, justifiable civil rights law enforcement officer misconduct complaints with the overall intent to slowly kill plaintiff in knowing these highly advanced microwave weapons can kill a person within a period of months in some case in a single shot to the heart or lung.

415.    As a result of their concerted unlawful and malicious conspiracy of the Defendants, plaintiff was deprived of both his liberty without due process of law and his right to equal protection of the laws, equal protection of his privileges and equal protection of his immunities and the due course of justice was impeded, in violation of 18 USC 241.

416.    Plaintiff was harmed, was caused to incur considerable debt for legal services, and has been greatly suffering from the damaging electromagnetic radiation attacks, anxiety, feelings of hopelessness, loss of trust, loss of confidence in and feelings of betrayal by the justice system, shock, and emotional scarring, all compensable as emotional distress, and other damages.

WHEREFORE, Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $100,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $75,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## THIRTY- FIRST CAUSE OF ACTION

### (18 U.S.C. § 242 – DEPRIVATIOIN OF CONSTITUTIONAL RIGHT)

417.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 416 above with the same force and effect as if herein set forth.

418.    Plaintiff vs. ALL Defendants.

419.   The Defendants were acting under color of law or purporting to act in the performance of his official duties. The Defendants deprived plaintiff of his civil rights under the Constitution or laws of the United States. The Defendants acted willfully. The Defendants actions resulted in plaintiff's bodily injuries.

420.   As a result of their concerted unlawful and malicious acts of the Defendants, plaintiff was deprived of both his liberty without due process of law and his right to equal protection of the laws, equal protection of his privileges and equal protection of his immunities and the due course of justice was impeded, in violation of 18 USC 242.

421.   Plaintiff was harmed, was caused to incur considerable debt for legal services, and has been greatly suffering from the damaging electromagnetic radiation attacks, anxiety, feelings of hopelessness, loss of trust, loss of confidence in and feelings of betrayal by the justice system, shock, and emotional scarring, all compensable as emotional distress, and other damages.

WHEREFORE, Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $100,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $75,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## THIRTY- SECOND CAUSE OF ACTION

## (18 U.S.C. § 245 – INTERFERENCE WITH FEDERALLY PROTECTED ACTIVITIES)

422.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 421 above with the same force and effect as if herein set forth.

423.   Plaintiff vs. ALL Defendants.

424.   The Defendants were acting under color of law or purporting to act in the performance of his official duties. The Defendants used force or threats of force.

425.   The Defendants injured, intimidated or interfered with or attempted to injure, intimidate or interfere with plaintiff. The Defendants acted because of the plaintiff's race and because the plaintiff was enjoying one of the protected activities set forth in the statute.

426.   The Defendants acted willfully. The Defendants' actions resulted in severe bodily injury to plaintiff. As a result of their concerted unlawful and malicious acts of the Defendants, plaintiff was deprived of both his liberty without due process of law and his right to equal protection of the laws, equal protection of his privileges and equal protection of his immunities

and the due course of justice was impeded, in violation 42 USC 1983, 18 USC 245. Plaintiff was harmed, was caused to incur considerable debt for legal services, and has been greatly suffering from the damaging electromagnetic radiation attacks, anxiety, feelings of hopelessness, loss of trust, loss of confidence in and feelings of betrayal by the justice system, shock, and emotional scarring, all compensable as emotional distress, and other damages.

**WHEREFORE,** Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages in the amount of $100,000,000 and further demands judgment against each of said Defendants, jointly and severally, for punitive damages in the amount of $75,000,000, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## THIRTY- THIRD CAUSE OF ACTION
### (Violation of California Civil Code § 51.7)

427.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 426 above with the same force and effect as if herein set forth.

428.   Plaintiff vs. ALL Defendants.

429.   Each defendant was the agent, employee, or co-conspirator of every other defendant, and in doing the acts alleged in this complaint, was acting within the course, scope, and authority of that agency or employment, and in furtherance of the conspiracy and with the knowledge and consent of each of the other defendants.

430.   Those defendants intimidated, threatened, and committed violent acts against plaintiff. That a motivating reason for each of the defendants' conduct was his or her perception of plaintiff's race as an African-American male and being a homeless U.S. Army military veteran. Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, severe physical injuries, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, and loss of enjoyment of life. Unless defendants are restrained by a preliminary and permanent injunction, plaintiff will continue to suffer severe, irreparable harm in that the acts of retaliation have been non-stop and the violence of extreme torture with the electromagnetic weapons unrelentless. Plaintiff has no adequate remedy at law because monetary damages, which may compensate for past interference with plaintiff's civil rights, will not afford adequate relief for the fear, humiliation, and risk of injury that a continuation of defendants' conduct in denial of plaintiff's rights will cause.

**WHEREFORE,** Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages according to proof. Plaintiff further demands judgment against each of said Defendants, jointly and severally, for punitive damages. Plaintiff requests a statutory penalty of $25,000 pursuant to Civil Code section plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

<u>**THIRTY- FOURTH CAUSE OF ACTION**</u>

**(Violation of California Civil Code § 52.1 and 52.3)**

431.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 430 above with the same force and effect as if herein set forth.

432.    Plaintiff vs. ALL Defendants and Does 1-1000 inclusive.

433.    Each defendant was the agent, employee, or co-conspirator of every other defendant, and in doing the acts alleged in this complaint, was acting within the course, scope, and authority of that agency or employment, and in furtherance of the conspiracy and with the knowledge and consent of each of the other defendants. The defendants interfered with or attempted to interfere with by the use of threats, intimidation, and coercion, in that the defendants retaliated by committing violent acts against plaintiff for expression of his First Amendment Freedom of Speech right to file legitimate law enforcement peace officer misconduct complaints. Plaintiff reasonably believed that if he exercised his freedom of speech right to file future peace officer misconduct complaints the defendants' would commit violence against him.

434.    The defendants' injured plaintiff to prevent him from exercising his First Amendment Freedom of Speech right or retaliate against plaintiff for having exercised his right of freedom of speech. Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, severe physical injuries, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, and loss of enjoyment of life.

435.    Unless defendants are restrained by a preliminary and permanent injunction, plaintiff will continue to suffer severe, irreparable harm in that the acts of retaliation have been non-stop and the violence of extreme torture with the electromagnetic weapons unrelentless. Plaintiff has no adequate remedy at law because monetary damages, which may compensate for past interference with plaintiff's civil rights, will not afford adequate relief for the fear,

humiliation, and risk of injury that a continuation of defendants' conduct in denial of plaintiff's rights will cause.

**WHEREFORE,** Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages according to proof. Plaintiff further demands judgment against each of said Defendants, jointly and severally, for punitive damages. Plaintiff requests a statutory penalty of $25,000 pursuant to Civil Code section plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable.

### THIRTY- FIFTH CAUSE OF ACTION
### (DENIAL OF CALIFORNIA CONSTITUTIONAL RIGHTS)

436.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 435 above with the same force and effect as if herein set forth.

437.   Plaintiff vs. ALL Defendants.

438.   The afore-described actions of defendants denied plaintiff his rights of privacy and to freely speak, to petition the government for redress of grievances, to attend religious ceremonies without interference, to due process of law and equal protection of the laws, and to be free from unreasonable searches and seizures as provided by the California Constitution, Article I sections 1, 2, 3, 7 and 13.

`WHEREFORE, as a direct and proximate result of said denials of plaintiff's state constitutional rights, plaintiff suffered general and special damages in an amount to be proven at trial.

### THIRTY- SIXTH CAUSE OF ACTION
### (ASSAULT & BATTERY)

439.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 438 above with the same force and effect as if herein set forth.

440.   Plaintiff vs. Defendants City of Cathedral City, DeVeas, Bird, Lemus, Brothers, John Does No. 1- 4 and JANE Doe No. 1.

441.   The defendants intentionally touched plaintiff. The defendants used unreasonable force to arrest plaintiff. Plaintiff did not consent to the use of that force.

442.   Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, and loss of enjoyment of life.

443.   As a direct and proximate result of said assault and battery, plaintiff suffered general and special damages in an amount to be proven at trial.

## THIRTY- SEVENTH CAUSE OF ACTION
## (FALSE ARREST)

444.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 443 above with the same force and effect as if herein set forth.

445.   Plaintiff vs. Defendants City of Cathedral City, DeVeas, Bird, Lemus, Brothers, John Does No. 1- 4 and JANE Doe No. 1.

446.   The defendants arrested plaintiff without a warrant.

447.   Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, and loss of enjoyment of life.

448.   As a direct and proximate result of said false arrest, plaintiff suffered general and special damages in an amount to be proven at trial.

## THIRTY- EIGHTH CAUSE OF ACTION
## (FALSE IMPRISONMENT)

449.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 448 above with the same force and effect as if herein set forth.

450.   Plaintiff vs. Defendants City of Cathedral City, County of Riverside, Nunez, DeVeas, Bird, Lemus, Brothers, Gaines, Carbajal, Chaney, Covington, Robertson, Gelinas, Cleary, May, Adams, John Does No. 1- 4, JANE Doe No. 1, and John Doe No. 42.

451.   The defendants intentionally deprived plaintiff of his freedom of movement by use of physical barriers, force, and threats of force. Plaintiff did not consent. Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, humiliation, injury to reputation, loss of earning capacity, future loss of income, and loss of enjoyment of life.

452.   As a direct and proximate result of said false imprisonment, plaintiff suffered general and special damages in an amount to be proven at trial.

## THIRTY-NINTH CAUSE OF ACTION
## (Intentional Infliction of Emotional Distress)

453.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 452 above with the same force and effect as if herein set forth.

454.   Plaintiff vs. ALL Defendants.

455.   The Defendants' conduct was outrageous. The defendants intended to cause plaintiff emotional distress and acted with reckless disregard of the probability that plaintiff would suffer emotional distress, knowing that plaintiff was present when the conduct occurred. Plaintiff suffered severe emotional distress.

456.   That Defendants' conduct was a substantial factor in causing plaintiff's severe emotional distress. As a direct and proximate result of said intentional infliction of emotional distress, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTIETH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

457.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 456 above with the same force and effect as if herein set forth.

458.   Plaintiff vs. ALL Defendants.

459.   The defendants were negligent. Plaintiff suffered serious emotional distress.

460.   That Defendants' negligence was a substantial factor in causing plaintiff's severe emotional distress. As a direct and proximate result of said negligent infliction of emotional distress, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-FIRST CAUSE OF ACTION

### (Stalking; Civ. Code, § 1708.7)

461.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 460 above with the same force and effect as if herein set forth.

462.   Plaintiff vs. Defendants William Bower Associates, Inc., Bower Security, Bower Investigations, William Richard Bower, Ron Ayala, InfraGard Los Angeles Members Alliance, William Michael, Regina Canale-Miles, and unknown DOES 101-1000.

463.   The defendants engaged in a pattern of conduct with the intent to follow, alarm, and harass plaintiff. That as a result of the defendants' conduct plaintiff reasonably feared for his own safety. That plaintiff at least once demanded that defendants stop.

464.   The defendants persisted in his or her conduct. Plaintiff was harmed.

465.   That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, loss of income, and loss of enjoyment of life.

466.   As a direct and proximate result of said stalking, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-SECOND CAUSE OF ACTION
## (18 U.S.C. § 2261A [1] – INTERSTATE STALKING)

467.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 466 above with the same force and effect as if herein set forth.

468.   Plaintiff vs. Defendants County of Riverside, Gelinas, Cleary, International Counterintelligence Services, and unknown DOES 101-500.

469.   The defendants engaged in a pattern of conduct with the intent to follow, alarm, and harass plaintiff across state lines within the territorial jurisdiction of the United States or within tribal lines of Indian country with the intent to injure, harass, or place under surveillance with intent to injure, harass, or intimidate plaintiff. That as a result of the defendants' conduct plaintiff reasonably feared for his own safety of the death of, or serious bodily injury to, or cause of substantial emotional distress to plaintiff.

470.   That plaintiff at least once demanded that defendants stop. The defendants persisted in his or her conduct. Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, physical injuries, mental and emotional injuries, loss of income, and loss of enjoyment of life. As a direct and proximate result of said stalking, plaintiff suffered general and special damages in an amount to be proven at trial.

## ALTERNATE THEORIES OF LIABILITY
## FORTY-THIRD CAUSE OF ACTION
## (ASSAULT WITH INTENT TO COMMIT MURDER)
## (18 U.S.C. §§ 113(a) (1) and (2))

471.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 470 above with the same force and effect as if herein set forth.

472.   Plaintiff vs. Defendants Christopher Gelinas and Deputy Chaney.

473.   The defendants intentionally used a display of force that reasonably caused Plaintiff to fear immediate bodily harm. The defendants did so with the specific intent to commit an assault with intent to commit murder]. Plaintiff was harmed. That Defendants' conduct was a

substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, loss of income, and loss of enjoyment of life.

474.   As a direct and proximate result of said acts, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-FOURTH CAUSE OF ACTION
### (HOBBS ACT—EXTORTION)
### (18 U.S.C. § 1951)

475.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 474 above with the same force and effect as if herein set forth.

476.   Plaintiff vs. Defendants Tenet Healthcare Corporation, Desert Regional Medical Center, Ronald B. Himelman operating under the color of law.

477.   The defendants induced plaintiff to part with his property by fraudulent deception and trickery. The defendants, on November 13, 2009, acted with the intent to take partial control over plaintiff's bodily property by implantation of a Radiological tracking device (RFID chip) inside of plaintiff's person thereby taking control of a certain percentage of space within plaintiff's body that the defendants knew they were not entitled to receive.

478.   Commerce from one state to another was affected in some way and the defendants did something that was a substantial step toward committing the crime of extortion by forceful deception.

479.   Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, loss of income, and loss of enjoyment of life. As a direct and proximate result of said extortion, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-FIFTH CAUSE OF ACTION
### (HOBBS ACT—EXTORTION—UNDER COLOR OF OFFICIAL RIGHT)
### (18 U.S.C. § 1951)

480.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 479 above with the same force and effect as if herein set forth.

481.   Plaintiff vs. Defendant unknown government federal, state, local, and tribal law enforcement peace officers operating under the color of law.

482.   The defendants were persons acting under official right.  The defendants obtained partial control over plaintiff's bodily person which they knew they were not entitled to. The

defendants knew that plaintiff's bodily person was being used in return for defendants labeling plaintiff as a terrorist and then receiving federal terrorist funding monies. Commerce from one state to another was affected in some way and the defendants did something that was a substantial step toward committing the crime of extortion by force.

483.   Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, loss of income, and loss of enjoyment of life. As a direct and proximate result of said extortion, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-SIXTH CAUSE OF ACTION
### (California Law Penal Code § 182 – CONSPIRACY TO COMMIT MURDER)

484.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 483 above with the same force and effect as if herein set forth.

485.   Plaintiff vs. ALL Defendants.

486.   The defendants intended to agree and did agree with one or more of the other defendant[s] to commit murder. At the time of the agreement, the defendant and one or more of the other alleged member[s] of the conspiracy intended that one or more of them would commit murder.

487.   The defendant[s] acting as conspirators or coparticipant [s] committed [at least one of] the following alleged overt act[s] to accomplish a conspiracy to commit murder.  Overt acts include, **January 2008 thru March 2011**, the defendants' premeditated systematic and intentional use of Directed Energy Weapons (DEWs) or electromagnetic microwave guns that inflicted great bodily injury on plaintiff.

488.   On **November 04, 2009**, an unknown person driving an SUV attempted to run over plaintiff as he walked inside of a crosswalk minutes after leaving the Riverside County Palm Desert Sheriff Station and a day before a Temporary Restraining Order hearing against a Riverside County Palm Desert sheriff deputy.  When inflicting the injury, the defendants intended to cause cruel or extreme pain and suffering for the purpose of revenge and persuasion. Plaintiff was harmed.

489.   That Defendants' conduct was a substantial factor in causing plaintiff's pain

and suffering, physical injuries, mental and emotional injuries, loss of income, and loss of enjoyment of life. As a direct and proximate result of said torture, plaintiff suffered general and special damages in an amount to be proven at trial.

## FORTY-SEVENTH CAUSE OF ACTION

### (MAIL FRAUD—DEPRIVATION OF RIGHT TO HONEST SERVICES)
### (18 U.S.C. §§ 1341 and 1346)

490.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 489 above with the same force and effect as if herein set forth.

491.   Plaintiff vs. Defendant Federal Agents operating under the color of law.

492.   The defendants made up a scheme or plan to deprive plaintiff of his right to honest services and the defendants acted with the intent to deprive plaintiff of his right to honest services. The defendants used, or caused someone to use, the mails to carry out or to attempt to carry out the scheme or plan. Commerce from one state to another was affected in some way and the defendants did something that was a substantial step toward committing the crime of extortion by force. Plaintiff was harmed. That Defendants' conduct was a substantial factor in causing plaintiff's pain and suffering, mental and emotional injuries, loss of income, and loss of enjoyment of life. As a direct and proximate result of said mail fraud, plaintiff suffered general and special damages in an amount to be proven at trial.

## R.I.C.O. Violations

### (Title IX of the Organized Crime Control Act of 1970, *18 U.S.C. §§ 1961 et seq.*)

493.   Defendants' unlawful conduct violates subsections (a), (b), (c) and (d) of 18 U.S.C. § 1962. Plaintiff's civil rights violations <u>do not</u> serve as the basis for his RICO action.

### THE DEFENDANTS AND THE ALLEGED MISCONDUCT AND BASIS OF LIABILITY

494.   <u>Bud England, Mikel Oglesby.</u> Defendants England and Oglesby, acting through control over the Sunline Transit Agency and their subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, extorts, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

495.   <u>Daliah H., Craig T.</u> Defendants Daliah and Craig, aided and abetted by Defendants England and Oglesby, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

496.   <u>Bower Events (d/b/a Bower Investigations)</u> (Defendant "Bower Investigations") - Defendant Bower Investigations, acting through its employer and employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Defendant Bower Investigations acted through Defendants William Richard Bower and Ron Ayala. Further discovery and investigation is needed to establish which of these persons and other as yet to be identified persons participated in racketeering activity.

497.   <u>William Bower Associates, Incorporated (d/b/a Bower Security)</u> (Defendant "Bower Security") – Defendant Bower Security, acting through its employer and employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Defendant Bower Investigations acted through Defendants William Richard Bower. Further discovery and investigation is needed to establish which of these persons and other as yet to be identified persons participated in racketeering activity.

498.   <u>William Richard Bower and Ron Ayala.</u> Defendants Bower and Ayala, acting through control over Bower Investigations, Bower Security and their subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendants Bower and Ayala, aided and abetted by Defendant federal government officials, labeled plaintiff as a "domestic terrorist" or "targeted

individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

499.   David G. Dominguez. Defendant Dominguez, acting through control over the Palm Springs Police Department and subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendant Dominguez, aided and abetted by Defendant federal government officials, labeled plaintiff as a "domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

500.   Michael Studer, Vegas, Donald Crager. Defendants Studer, Vegas, and Crager, using their positions as Palm Springs police officers, aided and abetted by Defendant Dominguez, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

501.   Stan Henry, Kevin Connor. Defendants Henry and Connor, acting through control over the Cathedral City Police Department and their subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendants Stan Henry and Kevin Connor aided and abetted by Defendant federal government officials, labeled plaintiff as a "domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

502.   Laura Hanlon, Anita Singleterry, Corwin Deveas, Jose Nunez, Jeffrey Bird, A. Lemus, T. Brothers, Jessica Carbajal, Larry Gaines. Defendants Hanlon, Singleterry, Deveas, Nunez, Bird, Lemus, Brothers, Carbajal, and Gaines, using their positions as Cathedral City police officers, aided and abetted by Defendants Stan Henry and Kevin Connor, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses,

obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

503.   Stanley Sniff, Dan Wilham, Raymond Gregory. Defendants Sniff, Wilham, and Gregory, acting through control over the Riverside County Sheriff's Department and their subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendants Stanley Sniff, Dan Wilham, and Raymond Gregory, aided and abetted by Defendant federal government officials, labeled plaintiff as a "domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

504.   Christopher Gelinas, Chaney, Covington, Robertson, Elders, Cleary, Horkel, Adams. Defendants Gelinas, Chaney, Covington, Robertson, Elders, Cleary, Horkel, and Adams, using their positions as Riverside County sheriff deputies, aided and abetted by Defendants Stanley Sniff, Dan Wilham, and Raymond Gregory, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

505.   Brad Ramos. Defendant Brad Ramos, acting through control over the Indio Police Department and subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendant Brad Ramos, aided and abetted by Defendant federal government officials, labeled plaintiff as a "domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

506.   Richard Pickowitz, Mullen. Defendants Pickowitz and Mullen, using their positions

as Riverside County prosecutors, aided and abetted, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

507. <u>Bob Buster, John F. Tavaglione, Jeff Stone, John J. Benoit, Marion Ashley</u>. Defendants Buster, Tavaglione, Stone, Benoit, and Ashley, using their positions as County of Riverside Board of Supervisors, aided and abetted by Defendants Stanley Sniff, Dan Wilham, and Raymond Gregory, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

508. <u>Lawrence P. Best</u>. Defendant Best, using his position as Riverside County Superior Court judge located at Larson Justice Center, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

509. <u>Robert Pickowitz, Ponce</u>. Defendants Robert Pickowitz and Ponce, using their positions as Riverside County sheriff bailiffs at Larson Justice Center, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

510. <u>Warren Norried</u>. Defendant Norried, acting as a government informant, aided and abetted by Defendants Robert Pickowitz and Ponce, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

511.   <u>International Counterintelligence Services, Incorporated</u> ("Defendant ICS") - Defendant ICS, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Defendant ICS acted through Defendant Ron Ayala. Further discovery and investigation is needed to establish which of these persons and other as yet to be identified persons participated in racketeering activity.

512.   <u>David Rabern, Michael Rabern</u>. Defendants David Rabern and Michael Rabern, acting through control over Defendant ICS and their subordinate employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that discovery and further investigation will establish that Defendants David Rabern and Michael Rabern aided and abetted by Defendant federal government officials labeled plaintiff as a "domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret government research database project involving human radiation experiments.

513.   <u>Paragon Systems, Incorporated</u> ("Defendant Paragon Systems") - Defendant Paragon Systems, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

514.   <u>Jan Jones</u>. Defendant Jan Jones, using her position as a Paragon Systems private security officer, aided and abetted by Defendants Michael Studer and Vegas, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

515.   <u>Tenet Healthcare Corporation, Desert Regional Medical Center</u> ("Defendant Tenet

Desert Regional Medical Center") - Defendant Tenet Desert Regional Medical Center, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

516.   Ronald B. Himelman. Defendant Himelman, using his position as a medical doctor at Defendant Tenet Desert Regional Medical Center, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

517.   Debbie Inocencio. Defendant Inocencio, using her position as a mental service worker at Defendant Tenet Desert Regional Medical Center, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

518.   Bill Buckley.  Defendant Buckley, using his position as security manager at Defendant Tenet Desert Regional Medical Center, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

519.   Agua Caliente Tribal Corporation, Agua Caliente Casino Resort Spa ("Defendant Agua Caliente") - Defendant Agua Caliente, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

520.   May. Defendant May, using his position as tribal security officer at Defendant Agua Caliente, aided and abetted by Defendant Christopher Gelinas, Cleary, and Elders, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses,

obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

521.   David Justin Lynch & Associates ("Defendant Lynch & Associates") - Defendant Lynch & Associates, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Defendant Lynch & Associates acted through Defendants David Justin Lynch, Christopher N. Mandarano, and Gary Gemberling. Further discovery and investigation is needed to establish which of these persons and other as yet to be identified persons participated in racketeering activity.

522.   David Justin Lynch. Defendant Lynch, acting through control over Defendant David Justin Lynch & Associates and subordinate employees, aided and abetted by Defendant federal government officials, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

523.   Christopher N. Mandarano, Gary Gemberling. Defendants, using their positions as public officials, aided and abetted by Defendant David Justin Lynch, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California.

524.   Eureka Aerospace. Defendant Eureka Aerospace, acting through its employees, engaged in racketeering activity by participating in a conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests, attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside, California. Defendant Eureka Aerospace acted through Defendant James Tatoian. Plaintiff also believes that discovery and further investigation will establish that Defendant James Tatoian, aided and abetted by Defendants federal, state, and local government law enforcement officials along with private military security contractors, in

permitting the use of Defendant Eureka Aerospace electromagnetic microwave technology by
out-fitting government law enforcement and private civilian vehicles, mainly the Ford Crown
Victoria, with the compact weapon devices embedded in the rear and/ or front-bumpers of the
vehicles that can shoot bursts of electromagnetic microwave radiation energy. Further discovery
and investigation is needed to establish which of these persons and other as yet to be identified
persons participated in racketeering activity.

525.  Infragard Los Angeles Members Alliance ("Defendant Infragard") - Defendant
Infragard, acting through its employees, engaged in racketeering activity by participating in a
conspiracy that bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens,
assaults, arrests, attempts of murder, and torture in retaliation against citizens who file
legitimate, justifiable police & sheriff misconduct complaints in the County of Riverside,
California. Defendant Eureka Aerospace acted through Defendants William Michael and Regina
Canale-Miles. Further discovery and investigation is needed to establish which of these persons
and other as yet to be identified persons participated in racketeering activity.

526.  William Michael, Regina Canale-Miles. Defendants Michael and Canale-Miles,
acting through control over the Defendant Infragard Los Angeles Members Alliance and
subordinate employees, engaged in racketeering activity by participating in a conspiracy that
bribes, stalks, tamper with witnesses, obstructs justice, intimidates, threatens, assaults, arrests,
attempts of murder, and torture in retaliation against citizens who file legitimate, justifiable police
& sheriff misconduct complaints in the County of Riverside, California. Plaintiff also believes that
discovery and further investigation will establish that Defendants William Michael and Regina
Canale-Miles, aided and abetted by Defendant federal government officials, labeled plaintiff as a
"domestic terrorist" or "targeted individual" (TI) and having placed plaintiff's name in a secret
government research database project involving human radiation experiments.

527.  Basis for liability under RICO for Defendants: Defendants Bower Events, William
Bower Associates Incorporated, International Counterintelligence Services Incorporated,
Paragon Systems Incorporated, Tenet Healthcare Corporation, Desert Regional Medical Center,
Agua Caliente Tribal Corporation, Agua Caliente Casino Resort Spa, David Justin Lynch &
Associates, Eureka Aerospace, Infragard Los Angeles Members Alliance, Bud England, Mikel
Oglesby, Daliah H., Craig T., William Richard Bower, Stan Henry, Kevin Connor, Ron Ayala,
David G. Dominguez, Michael Studer, Vegas, Donald Crager, Stan Henry, Kevin Connor, Laura
Hanlon, Anita Singleterry, Corwin Deveas, Jose Nunez, Jeffrey Bird, A. Lemus, T. Brothers,

Jessica Carbajal, Larry Gaines, Stanley Sniff, Dan Wilham, Raymond Gregory, Christopher Gelinas, Chaney, Covington, Robertson, Elders, Cleary, Horkel, Adams, Brad Ramos, Richard Pickowitz, Mullen, Bob Buster, John F. Tavaglione, Jeff Stone, John J. Benoit, Marion Ashley, Lawrence P. Best, Robert Pickowitz, Ponce, Warren Norried, David Rabern, Michael Rabern, Jan Jones, Ronald B. Himelman, Debbie Inocencio, Bill Buckley, May, David Justin Lynch, Christopher N. Mandarano, Gary Gemberling, William Michael, and Regina Canale-Miles conspired with certain *friendly* federal government law enforcement intelligence officials to engage in a series of wrongful and illegal acts, including but not limited to bribes, stalking, tampering with a witness, obstruction of justice, assault with a deadly weapons, false imprisonment, attempted murder, torture and repeated acts of unlawful seizures.

528.   Defendants intentionally participated in this conspiracy and knowingly engaged in a pattern and practice of wrongful acts in order to suppress plaintiff's First Amendment Freedom of Speech rights and to inflate artificially by these acts the demand for surveillance and intelligence services.

529.   Defendants profited from this artificially-inflated "supply" of "surveillance and intelligence" because it caused the United States to increase the demand for such services and direct additional government contracts to Defendants William Bower Associates, Inc., Bower Security, Bower Investigations, International Counterintelligence Services, Inc., and Infragard Los Angeles Members Alliance.

530.   Each of the Defendants was the agent, employee and/or joint venturer, and/or working in concert with, other Defendants and was acting within the course and scope of such agency, employment and/or joint venture or concerted activity. To the extent that any particular act was perpetrated by a certain Defendant or Defendants, the remaining Defendant or Defendants confirmed and/or ratified the same.

## WRONGDOERS OTHER THAN THE DEFENDANTS LISTED ABOVE AND ALLEGED MISCONDUCT OF EACH  WRONGDOER

531.   Certain government officials ("government officials"), acting through their individual agency departmental positions and subordinate employees, aided and abetted by Defendants, engaged in racketeering activity by participating in a conspiracy that retaliates against citizens who petition the government for redress of grievances for First Amendment violations in the County of Riverside, California. The government officials adopted and/or implemented policies and practices that led to plaintiff being tortured with 21st century highly advanced cancer-causing

electromagnetic microwave weapons or direct energy weapons (DEWs) which plaintiff has suffered severe irreversible and permanent bodily injuries. Among other acts, government officials authorized the use of plaintiff's body to be used for human radiation experiment projects at the bequest of Defendants who plaintiff filed civil rights constitutional violations. Government officials are fully aware of the existence of DEWs and the damage these weapons can cause but as a momentary "friendly gesture" allowed distribution of these weapons to Defendants to attack plaintiff. Further discovery and investigation is needed to identify all of the conspiring government officials, but they include Eric Holder, Robert Mueller, Steven M. Martinez, James R. Clapper, Dennis Blair, Timothy J. Healy, Janet Ann Napolitano, Kathleen Sebelius, Leon Panetta, Keith B. Alexander, and Robert M. Gates.

532.   Further discovery and investigation is also needed to ascertain whether the following persons also participated in the conspiracy and illegal racketeering activity: Eric Ken Shinseki, Shaun L. S. Donovan, Tom Neilson, and Charles Bolden.

<u>PLAINTIFF'S INJURIES AS A VICTIM OF THIS CIVIL RICO ACTION</u>

533.   From August 2008 up until present, plaintiff was repeatedly seized, falsely arrested, intimidated, threatened, tortured and otherwise mistreated by the Defendants and their coconspirators. As a consequence, plaintiff lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that plaintiff was rendered unable to pursue gainful employment while unjustly incarcerated and while being continuously seized and assaulted.

534.   Plaintiff's has also suffered massive psychological and permanent bodily internal injuries from the 21st century electromagnetic microwave weapons used by Defendants and their coconspirators. The monetary losses between 25 million to 100 million dollars.

<u>PREDICATE ACTS AND THE SPECIFIC STATUTES</u>
<u>THAT WERE ALLEGEDLY VIOLATED</u>

535.   In furtherance of the conspiracy, and to affect the objects and purposes thereof, the defendants, and other co-conspiring government officials not named as defendants, engaged in a systematic and extensive series of illegal acts that formed a pattern and practice of racketeering activity. The predicate acts is a "regular way of doing business" for the defendants. The pattern and practice of racketeering activities "included, but was not limited to,

conspiracy of attempted murder, false imprisonment, mail fraud, extortion, destruction of evidence, bribery, interference with contract, illegal wiretapping, use of radiological devices, and obstruction of justice.

536. Statutes violated include, among others, California Code Cal. Penal Code §§ 21a, 189, 664(a) (attempted murder); § 182 (conspiracy to commit murder); §§ 240, 245(a) (1)–(3), (b) (assault with a deadly weapon); §§ 217.1-219.3 (attempts to kill); §§ 240, 244.5(b) (assault with less lethal weapon); §§ 68, 86, 93 (requesting or taking a bribe); , § 646.9(a), (e)–(h) (stalking); California Tort Law (intentional interference with contract and interference with prospective business relations); United States Code, Title 18, U.S.C.

§ 1512(a) (1) and (2) (relating to tampering with a witness), § 1952 (relating to racketeering), § 1512(a) (1) and (2) (relating to tampering with a witness), § 1512(c) (1) (relating to destruction of evidence), § 1513 (relating to retaliating against a witness), §1505 (relating to obstruction of justice), §1341 (relating to mail fraud), §1343 (relating to wire fraud), §1951 (relating to interference with commerce), § 2511 (interception and disclosure of wire, oral, or electronic communications), § 2332h (relating to radiological dispersal devices), § 1703 (relating to delay or destruction of mail or newspapers, §1345 (relating to injunctions against fraud), §1001 (relating to fraudulent statements), § 241 (relating to conspiracy against rights), § 242 (relating to deprivation of rights under color of law), § 371 (relating to conspiracy to commit offense or to defraud the United States), § 245 (relating to federally protected rights), § 2 (aiding and abetting), and § 1951 (Hobbs Act).

## DATE OF EACH PREDICATE ACT, THE PARTICIPANTS IN EACH PREDICATE ACT, AND A DESCRIPTION OF THE FACTS CONSTITUTING EACH PREDICATE ACT

537. In furtherance of the conspiracy, and to affect the objects and purposes thereof, the defendants, and other co-conspirators not named as defendants, committed various predicate acts. The date, the participants, and the description of the facts of each predicate act , including but not limited to the following:

a. On **August 10, 2008**, Defendant Stan Henry directed subordinate Defendants Corwin Deveas, Jeffrey Bird, A. Lemus, T. Brothers, John Does No. 1- 4, and JANE Doe No. 1 to retaliate, intimidate, and tamper with a witness by unlawful seizure, assault, and false arrest of plaintiff at or near the corner of McCallum Way & Date Palm Drive in the City of Cathedral City, CA. Defendant Bird also made false statements in his police report.

b. On **January 26, 2009**, Defendant Stan Henry directed subordinate Defendant Kevin

Connor, the chief Internal Affairs Investigator, who propositioned plaintiff for an impromptu interview in order to retaliate, intimidate, and tamper with a witness by attempting to influence and twist the facts surrounding plaintiff's claims of false arrest and other civil rights violations.

c. On **February 04, 2009**, Defendant Stan Henry <u>directed</u> subordinate Defendant Anita Singleterry, Records Supervisor, to tamper with evidence and obstruct justice by falsifying official government documents. The official document, a police blotter dated 2/04/09, Event# 0808C-1402, dispatcher information had been intentionally left out or deleted.

d. In **May 2009**, Defendant Stan Henry and unknown co-conspirator government officials <u>directed</u> persons yet to be identified, driving deep dark tinted windowed law enforcement vehicles, attempted to murder plaintiff by assaulting plaintiff with a highly advanced deadly electromagnetic microwave ray gun near the corner of Date Palm Drive & Ramon Road in the City of Cathedral City, CA.

e. On **June 11, 2009**, Defendant Stan Henry <u>directed</u> person yet to be identified, driving a deep dark tinted windowed Cathedral City police vehicle to retaliate, intimidate, and tamper with a witness by stalking plaintiff near a Wal-Mart on Ramon Road in the City of Cathedral City. Plaintiff was followed and harassed over a half of a mile.

f. On **July 11, 2009**, Defendants William Richard Bower and Ron Ayala <u>directed</u> person yet to be identified, who is Bower Security and drove a white colored blue-striped mustang, stalked plaintiff over a quarter of a mile, at or near the corners of Fred Waring & Highway 111 in the City of Palm Desert, CA. Plaintiff called 911 to report criminal stalking.

g. On **July 22, 2009**, Defendants Stanley Sniff and Dan Wilham <u>directed</u> Defendant Chaney to retaliate, intimidate, and tamper with a witness by unlawful seizure, false imprisonment, and assault with a deadly weapon at the corners of Varner Road & Manufacturing Road in Thousand Palms. CA. Defendant Chaney caused plaintiff to lose wages, employment opportunities, and prospective business contracts.

h. On **August 25, 2009**, persons yet to be identified, an older Caucasian male drive a gray 4-door Buick, with Arizona Lic # ARR3232, having crossed interstate lines, retaliated, intimidated, and tampered with a witness stalking plaintiff in Palm Springs, CA.

i. On **October 05, 2009**, Defendants Stanley Sniff, Dan Wilham, Agua Caliente Tribal Corporation, and Agua Caliente Casino Resort Spa <u>directed</u> subordinate Defendants Christopher Gelinas, Cleary, and May to retaliate, intimidate, and tamper with a witness by unlawful seizure, false imprisonment, and assault with a deadly weapon outside of the Agua

Caliente Casino Resort & Spa in Rancho Mirage, CA.

j. On **October 16, 2009**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff by attacking plaintiff using electromagnetic microwave weapons near the Desert Regional Medical Center. Plaintiff with his back turned away from Palm Springs police vehicles with deep dark tinted windows parked less than 40 feet from plaintiff.

k. On **October 16, 2009,** Defendants Richard Pickowitz and Mullen retaliated intimidated, and tampered with a witness by obstructing justice in telling plaintiff to "move to another county if someone was trying to kill you."

l. On **November 4, 2009,** persons yet to be identified and unknown co-conspirator government officials retaliated intimidated, and tampered with a witness by attempting to murder plaintiff trying to run plaintiff over as he entered the crosswalk at or near Fred Waring & Towncenter Way Street after visiting the Palm Desert Sheriff Department in Palm Desert, CA. Plaintiff's TRO hearing against Defendant Sheriff Deputy Christopher Gelinas was supposed to be heard on November 5, 2009.

m. On **November 13, 2009,** Defendants Tenet Healthcare Corporation, Desert Regional Medical Center, and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by extorting plaintiff in <u>authorizing</u> Defendant Ronald B. Himelman to fraudulently perform an unnecessary coronary angiogram surgery on plaintiff as a pre-textual cover-up with the intent to implant radiological device with an objective to slowly kill plaintiff.

n. On **November 19, 2009,** Defendants Robert Pickowitz and Ponce <u>directed</u> Defendant Warren Norried, government informant, to retaliate, intimidate, and tamper with a witness by assaulting plaintiff in the Larson Justice Center Court Library in Indio, CA.

o. On **December 12, 2009**, Defendants Sunline Transit Agency, Bud England, Mikel Oglesby and unknown co-conspirator government officials <u>directed</u> persons yet to be identified to retaliate, intimidate, and tamper with a witness by stalking plaintiff in a parking lot at a Walmart Store on Ramon Road in Palm Springs, CA. Plaintiff recognized the person as a Sunline Transit Agency supervisor having a licenses plate # 7L27697.

p. On **December 26, 2009,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using an electromagnetic microwave radiation weapon leaving plaintiff with blurred vision, headache, slight chest pain, numbness in right-hand, fatigue, drowsiness, and a

tingling sensation throughout his body 15 minutes or so after exposure on Ramon Road in Palm Springs, CA. A brown van with deep tinted windows had driven past plaintiff.

q.  On **December 31, 2009,** persons yet to be identified and unknown co-conspirator government officials authorized a person driving a gray metallic SUV to retaliate, intimidate, and tamper with a witness by attempting to murder plaintiff using an electromagnetic microwave radiation weapon near Office Depot in Palm Springs, CA. Plaintiff's first physical sighting of a direct energy weapon. This particular SUV vehicle displayed British of Columbia license plates.

r.  In **February 23, 2010,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by mail fraud in illegally obtaining plaintiff's civilian medical documents that came into existence after plaintiff was honorably discharged from the military then opened plaintiff's recent request for government military medical mail and inserted two civilian medical document pages to send a strong message to plaintiff that he was up against a very powerful adversary BIG BROTHER watching over Coachella Valley local law enforcement "little brother" who plaintiff accused of numerous constitutional civil rights violations.

s.  On **March 04, 2010**, person yet to be identified and unknown co-conspirator government official, driving a gray convertible Cadillac vehicle (license plate # 5TAL840), retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using an electromagnetic microwave ray gun outside the homeless shelter at Martha's Kitchen in Indio, CA. Plaintiff felt the onset of radiation exposure symptoms.

t.  **On March 5, 2010**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near the corner of East Palm Canyon and Racquet Club Drive, The vehicle driven by participants was a completely jet black mini-motor home van having all black curtains with a black circular fanned-out dome antenna on top with smaller antennae located elsewhere.

u.  On **May 15, 2010**, persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near Calhoun Street & Dr. Carreon Street in Indio, CA. Plaintiff's thyroid became overactive with irregular blood pressure.

v.  On **August 28, 2010,** Defendants Stanley Sniff, Raymond Gregory, and unknown co-

conspirator government officials <u>directed</u> Defendant Adams to retaliate, intimidate, and tamper with a witness by making fraudulent statements, unlawfully seizing, and threatening plaintiff.

w.  On **November 16, 2010,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by <u>mail fraud</u> in intercepting plaintiff's mail to the Social Security Appeals Division in Virginia.

x.  On **January 09, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near plaintiff's church in Indio, CA. Plaintiff suffered thyroid hyperactivity.

y.  On **January 10, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons at or near a bus stop in La Quinta, near the Walmart Superstore.  Plaintiff's suffered ringing ears and sore chest.

z.  On **January 12, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons after plaintiff walked-out of the Larson Justice Center Courthouse in Indio, CA. Plaintiff's suffered a severe headache with plaintiff's body feeling a warming sensation as if plaintiff had been injected with CT scan contrast fluid.

aa.  On **February 14, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked to the Larson Justice Center located in Indio, CA. Plaintiff identified the vehicle as a white crown Victoria 4-door vehicle which is the preferred vehicle capable of being out-fitted with Defendant Eureka Aerospace electromagnetic microwave weapons.

bb. On **March 20, 2011,** persons yet to be identified and unknown co-conspirator government officials retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked to church the Kyraikos Christian Center located in Indio, CA.

cc.  On **March 21, 2011,** persons yet to be identified driving, a Indio Police Department deep dark tinted windowed police vehicle retaliated, intimidated, and tampered with a witness by attempting to murder plaintiff using electromagnetic microwave weapons as plaintiff walked

to the Larson Justice Center in Indio, CA. Plaintiff suffered nausea and thyroid hyperactivity.

## THE ENTERPRISE

538.   Members City of Cathedral City, Joe McMillin, Dennis Molloy, Cathedral City Police Department, Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin Deveas, Jose Nunez, Jeffrey Bird, A. Lemus, T. Brothers, Jessica Carbajal, Larry Gaines, County of Riverside,  County of Riverside Board of Supervisors, Bob Buster, John F. Tavaglione, Jeff Stone, John J. Benoit, Marion Ashley, Riverside County Sheriff's Department,  Stanley Sniff, Dan Wilham, Christopher Gelinas, Chaney, Covington, Robertson, Elders, Cleary, Raymond Gregory, Horkel, Adams, Riverside County Superior Court Larson Justice Center, Lawrence P. Best, Robert Pickowitz, Ponce, Warren Norried, Riverside County District Attorney's Office, Richard Pickowitz, Mullen, Riverside County Workforce Development Center, Riverside County Mental Health Clinic, Office of California Attorney General, Kamala D. Harris, City of Palm Springs, Palm Springs Police Department, David G. Dominguez, M. Studer, Vegas, Donald Crager, City of Indio, Indio Police Department, Brad Ramos, William Bower Associates, Inc., Bower Security, Bower Investigations, William Richard Bower, Ron Ayala, International Counterintelligence Services, Inc., David Rabern, Michael Rabern, Social Security Administration, Mason D. Harrell Jr., Paragon Systems, Inc., Jan Jones, Tenet Healthcare Corporation, Desert Regional Medical Center, Ronald B. Himelman, Debbie Inocencio, Bill, Agua Caliente Tribal Corporation, Security Officer May, Sunline Transit Agency, Bud England, Mikel Oglesby, Daliah H., Craig T., David Justin Lynch & Associates, David Justin Lynch, Christopher N. Mandarano, Gary Gemberling, Eureka Aerospace, James Tatoian, City of Palm Desert, Palm Desert Library, Jeannie Kays, Office of the Attorney General of the United States, Eric Holder, Office of the Director of the Federal Bureau of Investigation, Robert Mueller, Office of the Director of National Intelligence, James R. Clapper, Dennis Blair, Office of the Director of the Terrorist Screening Center, Timothy J. Healy, Office of the Secretary of the Department of Homeland Security, Janet Ann Napolitano, Office of the Secretary of the Department of Veteran Affairs, Eric Ken Shinseki, Loma Linda Veterans Hospital, Office of the Secretary of Housing and Urban Development, Shaun L. S. Donovan, Tom Neilson, Office of the Secretary of the Department of Health and Human Services, Kathleen Sebelius, Office of the Director of the Central Intelligence Agency, Leon Panetta, Office of the Director of the National Security Agency, Keith B. Alexander, Office of the Secretary of the Department of Defense, Robert M. Gates, Office of the Administrator of the National Aeronautics and Space Administration,

Charles Bolden, Infragard Los Angeles Members Alliance, William Michael, Regina Canale-Miles, together with other unknown individuals and legal entities, constitute and "Enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals and legal entities *associated-in-fact* bound together by the common purpose to suppress and chill plaintiff's First Amendment Freedom of Speech rights to petition the government for redress of grievances through the Enterprise's conduct of diverse illegal retaliatory activities including, but not limited to, conspiracy of attempted murder, false imprisonment, extortion, assault, excessive force, mail fraud, witness tampering, false statements, destruction of evidence, bribery, interference with contract and prospective business relations, illegal wiretapping, illegal implantation of RFID identification device, and obstruction of justice. The Enterprise operated primarily in the County of Riverside, California, within the Central District of California. The Enterprise was engaged in, and its activities affected, interstate commerce.

## PURPOSES OF THE ENTERPRISE

539.   It is a purpose of the Enterprise that its members and associates through the Enterprise's conduct of diverse illegal retaliatory activities including, but not limited to, conspiracy of attempted murder, false imprisonment, assault with a deadly weapon, excessive force, mail fraud, witness tampering, false statements, destruction of evidence, bribery, interference with contract and prospective business relations, illegal wiretapping, illegal implantation of RFID identification device, obstruction of justice and torture of plaintiff with electromagnetic microwave radiation cancer-causing guns with the Enterprise's objective to discourage plaintiff from filing civil rights action against its members and to chase plaintiff out of Riverside County and the State of California; thereby, protecting the assets of its members whom plaintiff filed legitimate and justifiable civil rights litigation.

540.   It was a further purpose of the Enterprise that its members and associates would obtain money and property, enrich its members, and generate continual earned revenue for the Enterprise by having its members perform bogus 24/7 "suspected terrorist" surveillance work. The members would then later file fictitious government intelligence *suspicious activity reports (SARs)* which authorized its members who can "remain anonymous" to collect federal grant funding rewards for information leading to the prevention or frustration  of an act of terrorism or espionage against a United States person or property. This earned income of federal funds is distributed and re-invested in the Enterprise amongst its members as payments for the bogus

surveillance work and reimbursements for out-of-pocket expenses for fuel, food, transportation and shelter.

541.   It is a further purpose of the Enterprise that its members and associates to cause interference with plaintiff's employment contract and prospective business relations through the use of unlawful seizures, false imprisonments, and pre-contact with potential employers who then refuse to hire plaintiff. Members also played a role in the denial of plaintiff's social security benefits.

542.   It is a further purpose of the Enterprise that its members and associates maintain, preserve, and protects the profits of the enterprise through a conspiracy to commit murder in aid of racketeering activity by slowly torturing and painfully killing plaintiff. The members have in their possession 21st century electromagnetic microwave cancer-causing guns or Direct Energy Weapons (DEWs) which can kill a human-being within a matter of months. The perfect murder without a trace of evidence.

## MANNER AND MEANS OF THE ENTERPRISE

543.   Defendant federal, state, local, tribal law enforcement intelligence officials and their associates, are the perpetrators of the alleged racketeering activity, who conducted and participated in the conduct of the management, operation, and affairs of the Enterprise in the manner and by the means described below.

544.   The Enterprise identified plaintiff as a potential threat to their members' organizations. Plaintiff had previously filed legitimate civil rights complaints against some of the Enterprises members. The members, belonging to law enforcement agencies and private security contractors, idealized to "kill two birds with one stone" by not only chasing plaintiff out of California but also to capitalize on plaintiff's action as an excellent money-making opportunity by labeling plaintiff as a "suspected terrorist", "child predator", "serial rapist", "burglar", "serial killer", and amongst other things with the intention to cover-up their retaliation against plaintiff by callously opening-up a series of bogus criminal investigations.

545.   The Enterprise, being totally aware that this type of "suspected terrorist" case requires around the clock surveillance work, estimated employment of hundreds, if not thousands, of its members and associate corporations along with other individuals.

546.    Enterprise members, who possibly received kick-backs, gave to the other members who own private security contractor businesses million dollar government surveillance contracts to perform the fraudulent intelligence surveillance work.

547.    The Enterprise received significant financial benefits from the pattern of racketeering. The members of the Enterprise received millions of dollars over and above what they otherwise would have received in the absence of the racketeering activity. In addition, the members received government contracts providing future revenue streams that they would not have otherwise received in the absence of the racketeering activity.

548.    The Individual Defendant members of the Enterprise received thousands of dollars over and above what they otherwise would have received in the absence of the racketeering activity.

549.    The government official members of the Enterprise received financial incentives, institutional praise and recognition (including but not limited to promotions and pay raises), and power over and above what they would have received in the absence of the racketeering activity.

EFFECT OF THE ACTIVITIES OF THE ENTERPRISE ON INTERSTATE COMMERCE

550.    Plaintiff alleges that the activities of the Enterprise had a substantial effect on interstate commerce.

551.    The Enterprise impacted interstate commerce by permitting members of the Enterprise to receive more United States government contracts than they would otherwise have received. This impacted competitors and others in commerce.

552.    The Enterprise's ongoing pattern and practice of illegal acts was designed to, and did, inflate artificially the demand for "intelligence" "surveillance" and the resulting demand for independent private military and security contractors' intelligence gathering services such as Defendant member principals CIA connected International Counterintelligence Services based in Arizona, Bower Security, and Bower Investigations.

553.    The Enterprise distorted the United States' overall investment in intelligence-gathering exercises and caused the expenditure of United States funds that should not have been spent. This spending impacts interstate commerce. The Enterprise interfered with the United States' hiring patterns by causing the United States to forego adding personnel to government payroll. These failures to hire impacted interstate commerce.

**FORTY-EIGHTH CAUSE OF ACTION**

**[Civil RICO Violations, Title 18 U.S.C. § 1962 (a)]**

554.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 493 through 553 above with the same force and effect as if herein set forth.

555.   The Defendants, as persons within the meaning of 18 USC § 1961(3), received income derived, directly or indirectly, from that alleged pattern of racketeering activity, which was used to acquire an interest in or operate said enterprise in violation of 18 USC § 1962(a). The Enterprise was engaged in, and its activities affected, interstate commerce.

556.   The income received from the pattern of racketeering was used by Defendants Bower Events, William Bower Associates Incorporated, Bower Security, Bower Investigations, International Counterintelligence Services Incorporated, Paragon Systems Incorporated, Tenet Healthcare Corporation, Desert Regional Medical Center, Agua Caliente Tribal Corporation, Agua Caliente Casino Resort Spa, David Justin Lynch & Associates, Eureka Aerospace, and Infragard Los Angeles Members Alliance to invest in and operate the ongoing operations of the corporations, including but not limited to those portions of the corporate operations that were members of the Enterprise and the conspiracy.

557.   The 52 predicate acts itemized above, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

558.   Plaintiff was injured in his business or property by reason of this violation of 18 USC § 1962, in that as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that plaintiff was rendered unable to pursue gainful employment while unjustly incarcerated and while being continuously seized and assaulted.

559.   Plaintiff's injury by reason of the investment of racketeering income is distinct from an injury caused by the predicate acts themselves. By reason of Defendants' violation of 18 USC § 1962, plaintiff is entitled, pursuant to 18 USC § 1964(c), to threefold damages sustained with interests thereof.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows for threefold damages actually sustained and the costs of suit, in a sum not less than $25,000,000 including a reasonable attorney's fee, pursuant to 18 USC § 1964(c) with interest

thereon at the rate of 10 percent per annum. For such other and further relief as the Court may deem appropriate pursuant to 18 USC §1964 deem proper and just in the premises. A trial by jury on all issues so triable.

### FORTY-NINTH CAUSE OF ACTION

### [Civil RICO Violations, Title 18 U.S.C. § 1962 (b)]

560.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 493 through 559 above with the same force and effect as if herein set forth.

561.   The Defendants, as persons within the meaning of 18 USC § 1961(3), through a pattern of racketeering activity, acquired or maintained,  directly or indirectly, an interest in and control of said Enterprise in violation of 18 USC § 1962(b). The Enterprise was engaged in, and its activities affected, interstate commerce.

562.    The 52 predicate acts itemized above, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

563.   Plaintiff was injured in his business or property by reason of this violation of 18 USC § 1962, in that as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that plaintiff was rendered unable to pursue gainful employment while unjustly incarcerated and while being continuously seized and assaulted.

564.   Plaintiff's injury by reason of the defendants' acquisition or maintenance of an interest in or control over an enterprise through a pattern of racketeering activity is distinct from an injury caused by the predicate acts themselves. By reason of Defendants' violation of 18 USC § 1962, plaintiff is entitled, pursuant to 18 USC § 1964(c), to threefold damages sustained with interests thereof.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows for threefold damages actually sustained and the costs of suit, in a sum not less than $25,000,000 including a reasonable attorney's fee, pursuant to 18 USC § 1964(c) with interest thereon at the rate of 10 percent per annum. For such other and further relief as the Court may deem appropriate pursuant to 18 USC §1964 deem proper and just in the premises. A trial by jury on all issues so triable.

### FIFTHIETH CAUSE OF ACTION
### [Civil RICO Violations, Title 18 U.S.C. § 1962 (c)]

565.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 493 through 564 above with the same force and effect as if herein set forth.

566.   The Defendants Bower Events, Bower Security, Bower Investigations, William Bower Associates Incorporated, International Counterintelligence Services Incorporated, Paragon Systems Incorporated, Tenet Healthcare Corporation, Desert Regional Medical Center, Agua Caliente Tribal Corporation, Agua Caliente Casino Resort Spa, David Justin Lynch & Associates, Eureka Aerospace, Infragard Los Angeles Members Alliance, Bud England, Mikel Oglesby, Daliah H., Craig T., William Richard Bower, Stan Henry, Kevin Connor, Ron Ayala, David G. Dominguez, Michael Studer, Vegas, Donald Crager, Stan Henry, Kevin Connor, Laura Hanlon, Anita Singleterry, Corwin Deveas, Jose Nunez, Jeffrey Bird, A. Lemus, T. Brothers, Jessica Carbajal, Larry Gaines, Stanley Sniff, Dan Wilham, Raymond Gregory, Christopher Gelinas, Chaney, Covington, Robertson, Elders, Cleary, Horkel, Adams, Brad Ramos, Richard Pickowitz, Mullen, Bob Buster, John F. Tavaglione, Jeff Stone, John J. Benoit, Marion Ashley, Lawrence P. Best, Robert Pickowitz, Ponce, Warren Norried, David Rabern, Michael Rabern, Jan Jones, Ronald B. Himelman, Debbie Inocencio, Bill Buckley, May, David Justin Lynch, Christopher N. Mandarano, Gary Gemberling, William Michael, and Regina Canale-Miles, as persons within the meaning of 18 USC § 1961(3) and as persons employed by or associated with said Enterprise  conducted and participated, directly and indirectly, in the conduct of the affairs of said Enterprise through a pattern of racketeering activity in violation of 18 USC § 1962(c). The Enterprise was engaged in, and its activities affected, interstate commerce.

567.   The Defendants participated in the operation or management of the enterprise itself in such a way, directly or indirectly, as to have played some part in directing the affairs of the enterprise.

568.   The 52 predicate acts itemized above, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

569.   Plaintiff was injured in his business or property by reason of this violation of 18 USC § 1962, in that as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that plaintiff was rendered unable to pursue gainful employment while unjustly incarcerated and while being continuously seized and assaulted.

570.   By reason of Defendants' violation of 18 USC § 1962, plaintiff is entitled, pursuant to 18 USC § 1964(c), to threefold damages sustained with interests thereof.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows for threefold damages actually sustained and the costs of suit, in a sum not less than $25,000,000 including a reasonable attorney's fee, pursuant to 18 USC § 1964(c) with interest thereon at the rate of 10 percent per annum. For such other and further relief as the Court may deem appropriate pursuant to 18 USC §1964 deem proper and just in the premises. A trial by jury on all issues so triable.

### FIFTY-ONE CAUSE OF ACTION

### [Civil RICO Violations, Title 18 U.S.C. § 1962 (d)]

571.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 493 through 570 above with the same force and effect as if herein set forth.

572.   All Defendants did conspire to acquire an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(a) and (d). The Enterprise was engaged in, and its activities affected, interstate commerce.

573.   All Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) (d).

574.   All Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).See also 18 U.S.C. §§ 1961(4), (5) and (9).

575.   All Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

576.   The 52 predicate acts itemized above, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

577.   Plaintiff was injured in his business or property by reason of this violation of 18 USC § 1962, in that as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that plaintiff was rendered unable to pursue gainful employment while unjustly incarcerated and while being continuously seized and assaulted.

578.   By reason of Defendants' violation of 18 USC § 1962, plaintiff is entitled, pursuant to 18 USC § 1964(c), to threefold damages sustained with interests thereof.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows for threefold damages actually sustained and the costs of suit, in a sum not less than $25,000,000 including a reasonable attorney's fee, pursuant to 18 USC § 1964(c) with interest thereon at the rate of 10 percent per annum. For such other and further relief as the Court may deem appropriate pursuant to 18 USC §1964 deem proper and just in the premises. A trial by jury on all issues so triable.

## PRAYER

**WHEREFORE**, plaintiff prays for judgment as follows:

On All Causes of Action

a)   Unless defendants are restrained by a preliminary and permanent injunction, plaintiff will continue to suffer severe, irreparable harm in that defendants conduct in the use of electromagnetic or direct energy weapons against plaintiff will continue to suffer injury;

b)   Compensatory general and special damages in accordance with proof;
c)   Costs of suit necessarily incurred herein; and
d)   For such other and further relief as the Court deems just or proper.
e)   Reasonable attorney's fees and expenses of litigation;
f)   Statutory damages;
g)   Exemplary damages against the individual defendants in an amount sufficient to make an example of the individual defendants and to deter future misconduct.

## PLAINTIFF'S VERIFICATION

I, TIMOTHY LEWIS WHITING, declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Dated this 07th day of April, 2011

Timothy Lewis Whiting

In Pro Se

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS



### Police To Get Microwave Ray Gun And Pain Beam Weapons

Thursday, January 01 2009 @ 05:17 PM MST
Contributed by: BMcDonald

**NewScientist**

The research arm of the US Department of Justice is working on two portable non-lethal weapons that inflict pain from a distance using beams of laser light or microwaves, with the intention of putting them into the hands of police to subdue suspects. Like the ADS, the new portable devices will also heat the skin, but will have beams only a few centimetres across. They are designed to elicit what the Pentagon calls a "repel response" - a strong urge to escape from the beam. Existing blunt trauma weapons can break ribs or even kill, making alternatives welcome. Yet ADS has recorded problems too - out of several thousand tests on human subjects there were two cases of second-degree burns.

**Dazzle and burn**

The National Institute of Justice (NIJ) laser weapon has been dubbed Personnel Halting and Stimulation Response - PHaSR - and resembles a bulky rifle. It was created in 2005 by a US air force agency. The NIJ is testing the PHaSR in various scenarios, which may include prison situations as well as law enforcement. The NIJ's portable microwave-based weapon is less developed. Currently a tabletop prototype with a range of less than a metre, a backpack-sized prototype with a range of 15 metres will be ready next year, a spokesperson says. The truly portable mini-ADS could prove the more useful, as microwaves penetrate clothing better than the infra-red beam, which is most effective on exposed skin. Although the spokesman says: "In LEC [Law Enforcement and Corrections] use there is always a little bit of skin to target."

**Torture concerns**

The effect of microwave beams on humans has been investigated for years, but there is little publicly available research on the effects of PHaSR-type lasers on humans. The attraction of using a laser is that it can be less bulky than a microwave device. Human rights groups say that equipping police with such weapons would add to the problems posed by existing "non-lethals" such as Tasers. Security expert Steve Wright at Leeds Metropolitan University describes the new weapons as "torture at the touch of a button". "We have grave concerns about the deployment and use of any such devices, which have the potential to be used for torture or other ill treatment," says Amnesty International's arms control researcher Helen Hughes, adding that all research into their effects should be made public.

"I would worry about what other health effects it is having," says Lin. "You might see neural damage."

Sierra Nevada says that a demonstration version could be built in a year, with a transportable system following within 18 months. They are currently seeking funding for the work from the US Department of Defense.

http://www.kickthemallout.com/article.php/Story-Microwave_Beam_Pain_Beam_Weapons

**Exhibit A**




**May 12, 2010 Indio, CA**          **May 10, 2010   Indio, CA**




**May 31, 2010   Indio, CA**          **July 22, 2010   Indio, CA**

**Exhibit B**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






**Exhibit C**



**Zapping the bad guys:** Attached to the roof of this police car, is a 200-pound electromagnetic system, which can quickly bring an opposing vehicle to a stop. The system is six to eight feet long (antennae included) and almost three feet wide. It works by sending out pulses of microwave radiation that disable the microprocessors that control the central engine functions of a car.
Credit: Eureka Aerospace

Tuesday, November 13, 2007

# Stopping Cars with Radiation

## A beam of microwave energy could stop vehicles in their tracks.

By Brittany Sauser

Researchers at Eureka Aerospace are turning a fictional concept from the movie *2 Fast 2 Furious* into reality: they're creating an electromagnetic system that can quickly bring a vehicle to a stop. The system, which can be attached to an automobile or aircraft carrier, sends out pulses of microwave radiation to disable the microprocessors that control the central engine functions in a car. Such a device could be used by law enforcement to stop fleeing and noncooperative vehicles at security checkpoints, or as perimeter protection for military bases, communication centers, and oil platforms in the open seas.

The system has been tested on a variety of stationary vehicles and could be ready for deployment in automobiles within 18 months, says James Tatoian, the chief executive officer of Eureka Aerospace and the project's leader.

To bring an opposing vehicle to a halt, the 200-pound device is attached to the roof of a car. The car's alternator serves as the system's power source, whose direct-current (DC) power feeds into a power supply. This generates a stream of 50-nanosecond-duration pulses of energy. These pulses are amplified to 640 kilovolts using a 16-stage Marx generator.

The 640 kilovolts of DC power are then converted into microwaves using an oscillator that consists of a pair of coupled transmission lines and several spark-gap switches. Finally, a specially designed antenna beams the microwave energy toward an opposing vehicle through a part of the car, such as the windshield, window, grill, or spacing between the hood and main body, that is not made of metal. (Metal acts as a shield against microwave energy.)

The concept of disabling vehicles' electronic system with microwaves was first tested in 1997 by the U.S. Army using bulky and heavy military equipment. But the Eureka Aerospace system is only six to eight feet long (antennae included) and not quite three feet wide. "It is much more efficient and compact than anything previously used in military vehicles," says Tatoian.

The device's peak power output is two gigawatts, although the average power emitted in a single shot is about 100 watts. Each radiated pulse lasts about 50 nanoseconds. All the test cars' engines were shut off using a single pulse at a distance of approximately 15 meters, making the total energy output 10 joules, says Tatoian. His company is currently developing a more compact high-power microwave pulse system with the goal of disabling engines at ranges from as far away as 200 meters.

Furthermore, Fisher cautions that, while the system may seem like an easier and more efficient solution than spike strips, it could still cause a huge accident if a car is disabled and a driver loses steering control. The system could pose a safety concern as well: radiation can burn human skin, and microwaves have long been suspected of being a cancer-causing agent.

Copyright Technology Review 2011.

**Exhibit D**



DEPARTMENT OF VETERANS AFFAIRS
RECORDS MANAGEMENT CENTER
PO BOX 5020
ST. LOUIS, MO  63115-0020

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE
$300

$ 01.90°

F R O N T S I D E

TIMOTHY WHITING
GENERAL DELIVERY
CATHEDRAL CITY CA 92234

B A C K S I D E

Exhibit E

### *Digital Angel chip now FDA approved for medical use*

By Mike Hanlon



The VeriChip is the size of a grain of rice

As reported way back in the first issue of Gizmo, US-based Digital Angel has produced the VeriChip, an implantable computer chip which monitors human biometric functions and transmits the data with GPS technology. The VeriChip has now been approved for human medical use by the Food and Drug Administration (FDA) of America, opening up the age of implantable technology.

The VeriChip system is already being used in a variety of innovative solutions, including monitoring the vital stats of at-risk patients, farm animal management systems, locating stolen property, managing commodity supply chains, monitoring the location of parolees and providing a tamper-proof means of identification for enhanced e-commerce security.

The FDA's green light of the VeriChip will help doctors access stored medical information about their patients and speed delivery during medical emergencies. The chip itself does not contain medical records but an access code that that can be scanned and revealed by a hand held scanner. VeriChip is not an FDA-regulated device with regard to its security, financial, personal identification or safety applications.

The VeriChip Health Information Microtransponder System consists of an implantable RFID microtransponder, an inserter, a proprietary hand-held scanner, and secure database containing the patient approved healthcare information. About the size of a grain of rice, VeriChip is a subdermal radio frequency microchip. Once inserted under the skin in a brief outpatient procedure, the VeriChip cannot be seen by the human eye. Each VeriChip contains a unique 16-digit verification number that is captured by briefly passing a proprietary scanner over the insertion site. The captured 16 digit number links to the database via encrypted Internet access. The previously stored information is then conveyed via the internet to the registered requesting healthcare provider.

If popular, the success of the medical applications of the VeriChip may herald further uses for security, identification and e-commerce.

**Exhibit F**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Stop unwanted RFID scanning with Secure Sleeves & Badgeholders..**

**Exhibit G**

| FILE NUMBER | **DETENTION CERTIFICATE** |
| --- | --- |
| _C8085 - 2160_ | |

As required by the provisions of Penal Code Section 851.6, I hereby certify that the taking

into custody of _____Timothy L. Whiting_____ on _8/10/2005_
  (Subject's Name)                                                (Date)

by the Cathedral City Police Department was a detention only, not an arrest.

_____Timothy L. Whiting_____ was released on _8/14/2005_
  (Subject's Name)                                          (Date)

by the Cathedral City Police Department. Pertinent portions of Penal Code Sections 849, 849.5 and 851.6 are included as part of this certificate.

Signed: _Laura G. Hardy_

Title and/or ID No.: _Lieutenant / 8468_

Penal Code Section 849 provides, in part:

(a) When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person shall be laid before such magistrate.

(b) Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever:

(1) He is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested.

(3) The person was arrested only for being under the influence of a narcotic, drug, or restricted dangerous drug and such person is delivered to a facility or hospital for treatment and no further proceedings are desirable.

(c) Any record of arrest of a person released pursuant to paragraphs (1) and (3) of subdivision (b) shall include a record of release. Thereafter, such arrest shall not be deemed an arrest, but a detention.

Penal Code Section 849.5 provides:

In any case in which a person is arrested and released and no accusatory pleading is filed charging him with an offense, any record of arrest of the person shall include a record of release. Thereafter, the arrest shall not be deemed an arrest, but a detention only.

Penal Code Section 851.6 provides, in part:

(a) In any case in which a person is arrested and released pursuant to paragraph (1) or (3) of subdivision (b) of Section 849, the person shall be issued a certificate, signed by the releasing officer or his superior officer, describing the action as a detention.

(b) In any case in which a person is arrested and released and no accusatory pleading is filed charging him with an offense, the person shall be issued a certificate by the law enforcement agency which arrested him describing the action as a detention.

**Exhibit H**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☑) | DEFENDANTS |
|---|---|
| TIMOTHY LEWIS WHITING | STAN HENRY (see attachment for additional parties) |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| TIMOTHY LEWIS WHITING<br>44489 TOWNCENTER WAY, SUITE D #179<br>PALM DESERT, CA 92260 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff      ☐ 3 Federal Question (U.S. Government Not a Party)

☑ 2 U.S. Government Defendant      ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding      ☐ 2 Removed from State Court      ☐ 3 Remanded from Appellate Court      ☐ 4 Reinstated or Reopened      ☐ 5 Transferred from another district (specify):      ☐ 6 Multi-District Litigation      ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No     ☑ **MONEY DEMANDED IN COMPLAINT:** $ 75,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. 1983     FIRST AMENDMENT FREEDOM OF SPEECH - RETALIATION

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☑ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

# EDCV11-552

**FOR OFFICE USE ONLY:**   Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| (see attachment)  Riverside County | (see attachment) |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☑   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| (see attachment)  Riverside County | (see attachment) |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| (see attachment)  Riverside County | (see attachment) |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Timothy L Whiting_    Date _April 07, 2011_

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# **Attachment**

**Defendant: City of Cathedral City and Employees**

1.     Defendant CITY OF CATHEDRAL CITY, STAN HENRY, KEVIN CONNOR, LAURA HANLON , ANITA SINGLETERRY, CORWIN DEVEAS, JOSE NUNEZ , JEFFREY BIRD, A. LEMUS, T. BROTHERS, JESSICA CARBAJAL , LARRY GAINES, JANE Doe No. 1, and John Does No. 1-5,  can be served with process in Riverside County located at 68-700 Avenida Lalo Guerro,  Cathedral City, CA 92234.

**Defendant: California Attorney General**

2.     Defendant KAMALA D. HARRIS is the Attorney General of the State of California served with process located at 1300 "I" Street, Sacramento, CA 95814.

**Defendants: County of Riverside and Employees**

3.     Defendant, COUNTY OF RIVERSIDE, STANLEY SNIFF, DAN WILHAM, RAYMOND GREGORY, Deputy HORKEL, Deputy ELDERS, CHRISTOPHER GELINAS, Deputy CLEARY, Deputy CHANEY, Deputy COVINGTON, Deputy ROBERTSON, RAYMOND GREGORY, Deputy ADAMS, BOB BUSTER, JOHN F. TAVAGLIONE, JEFF STONE, JOHN J. BENOIT, MARION ASHLEY, RICHARD PICKOWITZ, Senior Investigator Prosecutor MULLEN, ROBERT PICKOWITZ, Deputy PONCE, DEBBIE INOCENCIO, and TOM NEILSON served with process in Riverside County located at 3960 Orange Street, 5th Floor, Riverside County, CA 92501.

**Defendants: City of Palm Springs and Employees**

4.     Defendant CITY OF PALM SPRINGS, DAVID G. DOMINGUEZ, MICHAEL STUDER, Police Officer VEGAS, and DONALD CRAGER, served with process in Riverside County located at 3200 East Tahquitz Canyon Way, Palm Springs, CA 92262.

**Defendants:  City of Indio and Employees**

5.      Defendant CITY OF INDIO, BRAD RAMOS, and JOHN DOE#40 served with process in Riverside County located at 100 Civic Center Hall, Indio, CA 92201.

**Defendants: Bower Security and Bower Investigations**

6.      Defendant WILLIAM BOWER ASSOCIATES, INC., WILLIAM RICHARD BOWER, and JOHN DOE #41served with process in Riverside County located at 77622 Country Club Drive # P, Palm Desert, CA 92211.

7.      Defendant EVENT SUPPORT SERVICES, Inc. and RON AYALA served with process in Riverside County located at 77-622 Country Club Drive # P, Palm Desert, CA 92211.

**Defendant: International Counterintelligence Services and Employees**

8.      Defendant INTERNATIONAL COUNTERINTELLIGENCE SERVICES INCORPORATED, DAVID RABERN, and DAVID RABERN served with process in the State of Arizona located at 8283 North Hayden Road #128, Scottsdale, Arizona 85258.

**Defendant: Commissioner/ Judge Lawrence P. Best**

9.      Defendant LAWRENCE P. BEST served with process in Riverside County located at Department 240, 46-200 Oasis Street, Indio, CA 92201.

**Defendants: Sunline Transit Agency**

10.      Defendants BUD ENGLAND, JOE McMILLIN, MIKEL OGLESBY, SALVADOR SANDOVAL, CRAIG T., DALIAH H., and CAROLYN may be served at 32-505 Harry Oliver Trail, Thousand Palms, CA 92276.

**Defendant: Government Informant**

11.      Defendant WARREN NORRIED resides at 7777 Country Club Drive in Palm Desert, California in Riverside County.

**Defendants:  Private Security Paragon Systems**

12.     Defendant PARAGON SYSTEMS, INCORPORATED served with process in the State o Virginia located at 14160 Newbrook, Suite 150, Drive Chantilly, Virginia.

13.     Defendant JAN JONES (Jones) is a resident of Riverside County, California and whose whereabouts are unknown to plaintiff.  JONES works at the Social Security Administration in Palm Springs, California.

**Defendants: Agua Caliente Casino Indian Tribal Corporation**

14.     AGUA CALIENTE BAND OF CAHUILLA INDIANS, AGUA CALIENTE TRIBAL CORPORATION, CHRIS MAY, JOHN DOE#42, and JOHN DOE#43 served with process in Riverside County located at 5401 Dinah Shore Drive, Palm Springs, CA 92264.

**Defendants: Tenet HealthCare and Desert Regional Medical Center**

15.     Tenet HealthSystem Desert Incorporated (d/b/a Desert Regional Medical Center) may be served with process by serving its registered agent, C T Corporation System, 818 West 7th Street, Los Angeles, California 90017.

**Defendants: DAVID JUSTIN LYNCH & ASSOCIATES**

16.     Defendant David Justin Lynch & Associates, David Justin Lynch, Christopher N. Mandarano, and Gary Gemberling served with process in Riverside County located at 1111 East Tahquitz Canyon Way #115, Palm Springs, CA 92262.

**Defendant: EUREKA AEROSPACE**

17.     Defendant Eureka Aerospace and James Tatoian served with process located at 3452 East Foothill Blvd., Suite 340, Pasadena, California.

**Defendant Department of Justice U.S. Attorney General**

18.     Defendant ERIC HOLDER is the Attorney General of the United States of America served located at 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

**Defendant FBI and Terrorist Screening Center**

19.    Defendants ROBERT MUELLER and TIMOTHY J. HEALY served located at 935 Pennsylvania Avenue, NW, Washington, DC 20535-0001.

**Defendant:  InfraGard Los Angeles Members Alliance**

20.    Defendants STEVEN M. MARTINEZ, WILLIAM MICHAEL, REGINA CANALE-MILES, INFRAGARD LOS ANGELES MEMBERS ALLIANCE, LOS ANGELES FBI JOINT TERRORISM TASK FORCE, and unknown informants DOES 45-1000  may be served located at 11000 Wilshire Boulevard, Suite 1700, Los Angeles, CA 90024.

**Defendant: Director of National Intelligence**

21.    Defendant JAMES R. CLAPPER is the Director of National Intelligence may be served located at Office of the Director of National Intelligence, Washington, DC 20511.

22.    Defendant DENNIS BLAIR is the former Director of National Intelligence whereabouts unknown to plaintiff.

**Defendant:  Department of Homeland Security**

23.    JANET ANN NAPOLITANO is the Secretary of the Department of Homeland Security may be served located at Washington, DC 20528.

**Defendant: Department of Health and Human Services**

24.    Defendant Kathleen Sebelius Secretary of the Department of Health and Human Services may be served located at 200 Independence Avenue, S.W., Washington, DC 20201.

**Defendant:  Department of Veteran Affairs**

25.     Defendant Eric K. Shinseki is the Secretary of the United States Department of Veterans Affairs VA may be served located at 810 Vermont Avenue, NW, Washington, DC 20420.

**Defendant:  Department of Housing and Urban Development**

26.     Defendant SHAUN L. S. DONOVAN is the Secretary of the United States Department of Housing and Urban Development may be served located at 451 7th Street, S.W., Washington, DC 20410.

**Defendant: Central Intelligence Agency (CIA)**

27.     Defendant GENERAL MICHAEL V. HAYDEN, USAF, is the Director of the CIA, may be served located at Office of Public Affairs, Washington, DC 20505.

**Defendant: Department of Defense (DOD)**

28.     Defendant DR. ROBERT M. GATES is the Secretary of Defense, may be served located at 1400 Defense Pentagon, Washington, DC 20301-1400.

**Defendant: National Security Agency (NSA)**

29.     Defendant KEITH B. ALEXANDER is the Director of the National Security Agency may be served located at 4409 Llewellyn Avenue, Fort George Meade, MD 20755.